No. 25-2529

# United States Court of Appeals
# For the Eighth Circuit

EXPRESS SCRIPTS, INC., ET AL.,
Plaintiffs-Appellees,

v.

RODNEY RICHMOND, in his official capacity as board member of the
Arkansas State Board of Pharmacy, et al.,
Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Arkansas
Nos. 4:25-cv-520, 4:25-cv-524, 4:25-cv-561, 4:25-cv-598
(Hon. Brian S. Miller)

## Defendants-Appellants' Brief

TIM GRIFFIN
  Arkansas Attorney General

AUTUMN HAMIT PATTERSON
  Arkansas Solicitor General

ASHER STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, AR 72201
(501) 682-1051
Asher.Steinberg@arkansasag.gov

*Counsel for Defendants-Appellants*

## SUMMARY OF THE CASE AND STATEMENT
## REGARDING ORAL ARGUMENT

In today's pharmacy market, the entities that set pharmacies' reimbursement rates on behalf of health plans—pharmacy benefit managers or PBMs—all own their own pharmacies. As the district court said, this creates an "irresistible opportunity for PBMs to engage in predatory practices," whether steering the patients whose benefits they manage to their own pharmacies or reimbursing their competitors less than they reimburse themselves. Add. 2; App. 776; R. Doc. 73, at 2. To curb these practices in Arkansas, the Arkansas legislature prohibited PBMs from owning pharmacies in Arkansas. The district court held that prohibition impermissibly sought to protect local pharmacies from the PBM plaintiffs' competition. But protecting in-state business from *anti-competitive practices* by *some* out-of-state firms, rather than *competition* from *all* out-of-state firms, is permissible. So Arkansas's law must be upheld.

Defendants request 20 minutes for argument.

# TABLE OF CONTENTS

Summary of the Case and Statement Regarding
Oral Argument.................................................................. i

Table of Contents ............................................................ ii

Table of Authorities ....................................................... iii

Statement of Jurisdiction ................................................1

Statement of the Issues Presented.................................. 2

Statement of the Case .....................................................3

    A.  Vertically integrated PBMs engage in
         anticompetitive practices ..........................................3

    B.  Act 624 prohibits vertical PBM/pharmacy
         integration. .............................................................. 9

    C.  Factual and Procedural Background...........................10

Standard of Review ....................................................... 15

Summary of the Argument............................................. 16

Argument........................................................................ 18

    I.   PLAINTIFFS ARE NOT OUT-OF-STATE FIRMS
        FOR DORMANT COMMERCE CLAUSE PURPOSES. ......... 19

    II.  ACT 624 DOES NOT DISCRIMINATE AGAINST
        INTERSTATE COMMERCE...........................................26

        A.  Under *Exxon*, Laws That Ban Vertical
            Integration Are Non-Discriminatory. ................... 28

        B.  Act 624 Is Not Discriminatory in Purpose. ...........34

    III. Act 624 Satisfies *Pike*. ...........................................49

Conclusion......................................................................58

Certificate of Compliance ..............................................59

Certificate of Service......................................................60

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Allstate Ins. Co. v. Abbott*,
    495 F.3d 151 (5th Cir. 2007) ............................................12, 30-31, 33, 39, 54, 57

*Bacchus Imports, Ltd. v. Dias*,
    468 U.S. 263 (1984) ...................................................................................44

*Ben Oehrleins & Sons & Daughter, Inc. v.*
*Hennepin County*,
    115 F.3d 1372 (8th Cir. 1997) ......................................................2, 17, 20-23, 25

*Brandt ex rel. Brandt v. Griffin*,
    147 F.4th 867 (8th Cir. 2025) (en banc)...........................................................40

*C&A Carbone, Inc. v. Town of Clarkstown*,
    511 U.S. 383 (1994) ...................................................................................24

*Chambers Med. Techs. of S.C., Inc. v. Bryant*,
    52 F.3d 1252 (4th Cir. 1995) .........................................................................41

*Dep't of Revenue of Ky. v. Davis*,
    553 U.S. 328 (2008) ...................................................................................56

*Exxon Corp v. Governor of Md.*,
    437 U.S. 117 (1978)....................................... 2, 11-12, 16-18, 26-39, 42, 45-55, 57

*Fla. Transp. Servs., Inc. v. Miami-Dade County*,
    703 F.3d 1230 (11th Cir. 2012) ......................................................................24

*Flynt v. Bonta*,
    131 F.4th 918 (9th Cir. 2025)....................................................................30, 32

*Ford Motor Co. v. Ins. Comm'r of Pa.*,
    874 F.2d 926 (3d Cir. 1989).........................................................................31

*Ford Motor Co. v. Tex. Dep't of Transp.*,
    264 F.3d 493 (5th Cir. 2001) ...................................... 30-31, 37-38, 48, 53-54, 56

*Fresenius Med. Care Holdings, Inc. v. Tucker*,
704 F.3d 935 (11th Cir. 2013) ....................................... 31-33

*Gov. of Md. v. Exxon Corp.*,
370 A.2d 1102 (Md. 1977) ...............................28, 36-37, 48

*Hampton Feedlot, Inc. v. Nixon*,
249 F.3d 814 (8th Cir. 2001) ........................................... 45

*IESI AR Corp. v. Nw. Ark. Reg'l Solid
Waste Mgmt. Dist.*,
433 F.3d 600 (8th Cir. 2006)...................... 20, 22-23, 25

*LensCrafters, Inc. v. Robinson*,
403 F.3d 798 (6th Cir. 2005) .............................30, 39, 53

*LensCrafters, Inc. v. Wadley*,
248 F. Supp. 2d 705 (M.D. Tenn. 2003) ..................... 53

*LSP Transmission Holdings, LLC v. Sieben*,
954 F.3d 1018 (8th Cir. 2020) ..................................... 23

*Maine v. Taylor*,
477 U.S. 131 (1986) ....................................................44

*Minnesota v. Clover Leaf Creamery Co.*,
449 U.S. 456 (1981)...................................30, 41, 44-45

*Nat'l Ass'n of Optometrists & Opticians v.
Brown*,
567 F.3d 521 (9th Cir. 2009) ............................. 38-39, 48

*Nat'l Ass'n of Optometrists & Opticians v.
Harris*,
682 F.3d 1144 (9th Cir. 2012).................23, 30-31, 53, 55

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .................................... 19, 26, 50-51

*NextEra Energy Capital Holdings, Inc. v. Lake*,
48 F.4th 306 (5th Cir. 2022) ...................................23-25

iv

*Pharm. Care Mgmt. Ass'n v. Rowe*,
  429 F.3d 294 (1st Cir. 2005) .................................................. 55

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) .............................. 13, 16, 18-19, 49-51, 53, 55-57

*Planned Parenthood Minn., N.D., S.D.
v. Rounds*,
  530 F.3d 724 (8th Cir. 2008) (en banc) ........................................ 16

*Powell v. Noble*,
  798 F.3d 690 (8th Cir. 2015) .................................................. 15

*Rocky Mountain Farmers Union v. Corey*,
  730 F.3d 1070 (9th Cir. 2013) ................................................. 41

*Rutledge v. Pharm. Care Mgmt. Ass'n*,
  592 U.S. 80 (2020) ........................................................ 3-4, 55-56

*S.D. Farm Bureau, Inc. v. Hazeltine*,
  340 F.3d 583 (8th Cir. 2003) ............................................... 48, 49

*SDDS, Inc. v. South Dakota*,
  47 F.3d 263 (8th Cir. 1995) .................................................. 48

*Smithfield Foods, Inc. v. Miller*,
  367 F.3d 1061 (8th Cir. 2004) ................................................ 19

*Truesdell v. Friedlander*,
  80 F.4th 762 (6th Cir. 2023) ................................................. 51

*United Waste Sys. of Iowa, Inc. v. Wilson*,
  189 F.3d 762 (8th Cir. 1999) ................................................. 56

*Walgreen Co. v. Rullan*,
  405 F.3d 50 (1st Cir. 2005) .................................................. 43

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
  481 F.3d 1 (1st Cir. 2007) ................................................... 41

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ........................................................... 15

**Rules & Statutes**

28 U.S.C. § 1292 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

2025 Ark. Acts 624 § 1 ................................................................10, 40-41, 43

Ark. Code Ann. § 17-92-416 ...................................................3, 10, 25

**Other Authorities**

Fed. Trade Comm'n, *Pharmacy Benefit Managers:*
*The Powerful Middlemen Inflating Drug Costs and*
    *Squeezing Main Street Pharmacies* (2024) ...........................................4

Fed. Trade Comm'n, *Specialty Generic Drugs:*
*A Growing Profit Center for Vertically Integrated*
    *Pharmacy Benefit Managers* (2025) ..................................................4-5

Jose R. Guardado, Am. Med. Ass'n, *Competition in*
*Commercial PBM Markets and Vertical Integration of*
*Health Insurers with PBMs:*
    *2023 Update* (2023) ...........................................................................5

Rural Health Policy Analysis, *Rural and Urban*
*Pharmacy Presence – Pharmacy Deserts* (2022) ...........................................9

## Statement of Jurisdiction

The district court had original jurisdiction under 28 U.S.C. § 1331.  Under 28 U.S.C. § 1292(a)(1), this Court has appellate jurisdiction over Defendants' appeal from its preliminary-injunction order, entered July 28, 2025, Add. 1; App. 775; R. Doc. 73; Defendants timely appealed on July 31, 2025, App. 792, R. Doc. 77.

## Statement of the Issues Presented

Whether the district court erred in holding that Act 624 likely violated the

dormant Commerce Clause.

Apposite Authority: *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372 (8th Cir. 1997); *Exxon Corp v. Governor of Md.*, 437 U.S. 117 (1978).

**A.    Vertically integrated PBMs engage in anticompetitive practices.**

On April 16, 2025, the Arkansas General Assembly passed Act 624, the statute that is the subject of this case.  That statute's command is simple.  It provides that a pharmacy benefits manager (or PBM), regardless of where that PBM is headquartered or incorporated, may not hold or have an interest in a pharmacy permit "for the retail sale of drugs or medicines in this state."  Ark. Code Ann. § 17-92-416(b).  To understand why the state legislature adopted that prohibition, some background is helpful.

PBMs "are a little-known but important part of the process by which many Americans get their prescription drugs."  *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83 (2020) (*PCMA*) (upholding another Arkansas PBM regulation).  PBMs both manage prescription-drug plans and function as middlemen "between prescription-drug plans and the pharmacies that beneficiaries use."  *Id.* at 83–84.  On the one hand, they reimburse pharmacies on behalf of prescription drug plans at rates set by the PBM.  *See id.* at 84.  On the other hand, plans reimburse them at rates that "often differ[] from and exceed[] a PBM's reimbursement to a pharmacy"—rates that are also set by contracts written by the PBM.  *Id.*

When, as was traditionally the case, a PBM is not affiliated with the pharmacies it is reimbursing, these arrangements create an incentive for PBMs to reimburse pharmacies at low and often even below-cost rates, thereby increasing their profit margins from plan reimbursements. *PCMA*, 592 U.S. at 84. To combat these incentives Arkansas previously enacted a law—and successfully defended it before the Supreme Court—that required PBMs to reimburse pharmacies at least the amount that pharmacies paid to buy the drug. *See id.* But the incentives are quite different when a PBM, as is increasingly the case, owns the pharmacies with which it deals. In that circumstance, PBMs both have an incentive to reimburse their subsidiary pharmacies well *above* cost and, if possible, to steer beneficiaries of the prescription-drug plans they manage to their pharmacies. And there is mounting evidence that is just what PBMs have done.

In 2024 and 2025 the Federal Trade Commission issued a pair of reports on PBMs, which the Arkansas General Assembly cited in its legislative findings supporting Act 624, documenting the harms of PBM-pharmacy vertical integration. *See* Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (2024), App. 637, R. Doc. 54-2;[1]

---

[1] Unless otherwise noted, all citations to the record are to No. 4:25-cv-520.

Fed. Trade Comm'n, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers* (2025), App. 710, R. Doc. 54-3. Its findings were damning.

Beginning with the scope of integration, each of the top six PBMs, which collectively process 94 percent of the prescriptions dispensed in America,[2] is "vertically integrated downstream" with retail, mail order and specialty pharmacies. App. 640, 643; R. Doc. 54-2, at 4, 7. One PBM, CVS Caremark, "operates the largest chain of retail pharmacies in the country," CVS, which has 9,700 of the 61,000 pharmacies in the nation. App. 654; R. Doc. 54-2, at 18. The other top PBMs are all "vertically integrated with an affiliated mail order pharmacy," App. 655, R. Doc. 54-2, at 19, and the top three PBMs' mail-order pharmacies alone account for 72% of all mail-order pharmacies' dispensing revenue, and 67% of specialty drug dispensing revenue, App. 658, R. Doc. 54-2, at 22.

FTC found that PBMs' massive market power, and competition with the pharmacies whose reimbursement rates they control, lead to two phenomena: steering prescription-drug beneficiaries to PBMs' affiliated pharmacies, and differential

---

[2] In Arkansas, a study FTC cited found one Plaintiff in this case (CVS Caremark) has 54 percent market share alone, while another Plaintiff (OptumRx) has 31%. Jose R. Guardado, Am. Med. Ass'n, *Competition in Commercial PBM Markets and Vertical Integration of Health Insurers with PBMs: 2023 Update* 25 (2023).

rates of reimbursement between affiliated pharmacies and non-affiliated ones, along with massively inflated prices at affiliated pharmacies.

Starting with steering, PBMs can steer patients to their affiliated pharmacies in numerous ways. PBMs design prescription-drug plans' networks. App. 647; R. Doc. 46-2, at 11. Those networks can exclude certain competitors altogether, or "prefer" affiliated pharmacies over unaffiliated ones with lower cost-sharing, inducing patients to fill their prescriptions at the PBM's subsidiary. App. 647–48; R. Doc. 46-2, at 11–12. PBMs use the information they obtain on patients and providers wearing their hat as benefit managers to market themselves to patients and providers wearing their hat as pharmacies. App. 671; R. Doc. 46-2, at 35. PBMs can, at their discretion, reclassify a drug as a "specialty drug," which "triggers exclusivity provisions" in plans "that require use of the PBM's affiliated specialty pharmacy." App. 670; R. Doc. 46-2, at 34. And to police those exclusivity provisions PBMs go to such lengths as requiring "brown bagging," a practice where the patient must obtain the drug from a PBM-affiliated pharmacy "and then bring the drug to the provider's office for administration," "even when the provider could have otherwise obtained the drug for the patient from the pharmacy" the provider typically uses. *Id.*

FTC also found evidence that these methods of steering have worked. Although the amount of steering is difficult to measure, a comparison between PBM-

affiliated pharmacies' market share of prescriptions overall and their market share among their plans' patients is telling. The various PBM-affiliated pharmacies had, between 2017 and 2022, market shares of all specialty drug dispensing revenue between just 9 and 28 percent per pharmacy. App. 658; R. Doc. 54-2, at 22. Yet among their *own* plans' patients, two of the three big PBMs had an average 69 percent market share of specialty drug dispensing revenue. App. 673; R. Doc. 54-2, at 37. That gap suggests that PBMs are steering their own plans' patients to their affiliated pharmacies at rates far above what would obtain in an unintegrated market. *Id.* Another way of getting at steering is comparing PBMs' market share of the most profitable drugs to other drugs. Here, FTC found that between 2020 and 2022, the big three PBMs' affiliated pharmacies dispensed 45 percent of specialty generic prescriptions overall, "but 72 percent of prescriptions for drugs marked up more than $1,000." App. 729; R. Doc. 54-3, at 20. That suggests that the big three PBMs are steering the most profitable prescriptions to their own pharmacies. By contrast, internal documents produced to FTC reveal PBMs form "strategies to 'push[] to retail' prescriptions on 'low/no margin drugs' and 'effectively block[]'" patients from filling them at PBMs' own pharmacies. *Id.*

FTC also found sharply differential rates of reimbursement between PBM-affiliated pharmacies and unaffiliated ones, with the former often being massively

inflated above PBM-affiliated pharmacies' acquisition cost. This is not surprising given PBMs' market power and strong incentive to maximize their reimbursements at the pharmacies they control and minimize reimbursements at the ones they do not. As one internal document put it, "Retailers are our competitors. There is no win-win solution. We are seeking the same Rx. We need the best rates." App. 692; R. Doc. 54-2, at 56.

The effects of this approach are stark. In a case study of one generic leukemia drug, PBMs on average reimbursed their affiliated pharmacies over 40 times its average acquisition cost—$2,700 for a drug that costs on average $66. App. 679–80; R. Doc. 54-2, at 43–44. For a generic prostate cancer drug, PBMs reimbursed themselves 25 times its acquisition cost—$5,800 for a drug that costs $229. *Id.* PBMs reimbursed unaffiliated pharmacies much less. In 2022, they reimbursed nonaffiliated pharmacies a little over half what they reimbursed their own pharmacies. App. 681; R. Doc. 54-2, at 45. A later FTC study found that PBMs reimburse their affiliated pharmacies at markups above 1,000 percent for over a fifth of major generic specialty drugs, twice as many as they did for unaffiliated pharmacies. App. 722–23; R. Doc. 54-3, at 13–14. And for all generic specialty drugs in the study, "affiliated pharmacies [we]re almost always reimbursed at higher rates than unaffiliated

pharmacies," with many reimbursed at nearly double the rate at affiliated pharmacies compared with unaffiliated ones. App. 727; R. Doc. 54-3, at 18.

Finally, FTC found evidence that these practices have threatened the continued viability of independent pharmacies, and ultimately patient access. Whereas the number of pharmacies owned by CVS, the one major PBM-affiliated retail pharmacy, grew by 28 percent over the last decade, "other retail pharmacies declined by seven percent overall . . . and by ten percent within rural areas." App. 654; R. Doc. 54-2, at 18. And when independent rural pharmacies close, they are not replaced by chains; one study found that in over eight percent of U.S. counties, "a majority of residents lived more than ten miles from the nearest pharmacy." *Id.* Another found that 7.6% of rural counties have no retail pharmacies of any kind, and over 44 percent have no chain pharmacies. RUPRI Center for Rural Health Policy Analysis, *Rural and Urban Pharmacy Presence – Pharmacy Deserts* 2 (2022). And while residents of those counties can obtain their drugs from mail-order pharmacies, "mail-order services fail to replace the other fundamental functions provided by pharmacists beyond filling prescriptions, such as health screenings, patient education and counseling, and vaccinations." *Id.* at 4.

**B.     Act 624 prohibits vertical PBM/pharmacy integration.**

Responding to concerns that PBMs had "raised prescription drug prices and

9

stripp[ed] access from Arkansans," App. 430; R. Doc. 46-2, at 4 (opening committee hearing remarks of State Senate lead sponsor), the General Assembly enacted Act 624, banning PBM ownership of pharmacy permits to sell drugs at retail in the State. Ark. Code. Ann. § 17-92-416(b). The statute contained legislative findings and statements of intent explaining its purpose. First, the General Assembly found that "patient access to prescription drugs" and "fair prices" for them are "beneficial to the State of Arkansas." 2025 Ark. Acts 624 § 1(a)(1). Second, it noted that FTC, as well as the House Oversight Committee, had "found evidence of anticompetitive business tactics that ha[d] driven locally-operated pharmacies out of business," thereby "limiting patient choices and inflating drug prices" at PBM-affiliated pharmacies. *Id.* § 1(a)(2). Third, it explained that the statute sought to "minimize conflicts of interest by stopping" PBMs from "being both a price setter and price taker." *Id.* § 1(a)(3). Finally, it said that Act 624's purpose was to "improve healthcare delivery in the pharmacy market for patients by eliminating certain anticompetitive business tactics." *Id.* § 1(b).

### C. Factual and Procedural Background

Between May and June of 2025, the three largest PBMs, CVS/Caremark, Optum, and Express Scripts, and the PBMs' trade association, Pharmaceutical Care Management Association, sued the Arkansas State Board of Pharmacy's members

to enjoin them from enforcing Act 624. App. 148; R. Doc. 1, at 1; App. 794; R. Doc. 1, at 1, 4:25-cv-524; App. 868; R. Doc. 1, at 1, 4:25-cv-561; App. 1146; R. Doc. 1, at 1, 4:25-cv-598. The district court consolidated their cases. R. Doc. 31. Plaintiffs variously claimed that Act 624 violated the dormant Commerce Clause, the Privileges and Immunities Clause, the Bill of Attainder Clause, the Takings Clause, and the Equal Protection Clause, and was preempted by three different statutes: ERISA, Medicare Part D, and TRICARE, a federal insurance program for service members of the U.S. armed forces. Add. 2; App. 776; R. Doc. 73, at 2. Of these eight claims, the district court held Plaintiffs were likely to succeed on only two: dormant commerce and TRICARE preemption, as applied to Express Scripts' service of TRICARE patients. Add. 4; App. 778; R. Doc. 73, at 4.

Plaintiffs' dormant Commerce Clause claim primarily theorized that Act 624, though facially neutral, discriminated against interstate commerce. It discriminated against interstate commerce in effect, they claimed, because the only pharmacies it would prevent from operating in Arkansas were "out-of-state" companies doing business in Arkansas. R. Doc. 14, at 35, 4:25-cv-524. It discriminated against interstate commerce in purpose, they claimed, because it was enacted to protect local pharmacies from out-of-state competitors. *Id.* at 38. Defendants argued that under *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), which held that a Maryland

law that barred refiners—all of which were out-of-state companies—from owning gas stations merely had a disparate effect on interstate commerce, Act 624's similar ban on vertical integration in pharmacy was nondiscriminatory. R. Doc. 54, at 28–33.

After a preliminary-injunction hearing at which Plaintiffs presented no testimony, the district court enjoined the members of the State Pharmacy Board from enforcing Act 624. The district court began by briefly summarizing PBMs' role in the prescription drug market. Add. 1–2; App. 775–76; R. Doc. 73, at 1–2. Noting that some PBMs own their own pharmacies in addition to setting the reimbursement rates of their competitors, the district court said this "create[s] 'an inherent conflict of interest and an irresistible opportunity for PBMs to engage in predatory practices.'" Add. 2; App. 776; R. Doc. 73, at 2 (alteration omitted) (quoting *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 161 (5th Cir. 2007)). "For this reason," the district court said, Arkansas enacted Act 624. *Id.*

Yet after agreeing that PBMs' vertical integration creates an inherent conflict of interest and that Arkansas enacted Act 624 for that reason, the district court held Plaintiffs were likely to succeed on their dormant Commerce Clause claim because Act 624 had a discriminatory purpose. In a three-page discussion of Plaintiffs' dormant Commerce Clause claim that never cited *Exxon*, the district court seized on

the Act's legislative finding that FTC has found PBMs have engaged in "tactics that have driven locally-operated pharmacies out of business," which it characterized as a "state[d] . . . purpose . . . to eliminate" those tactics. Add. 5; App. 779; R. Doc. 73, at 5. The district court claimed "[t]his phrase 'artlessly discloses the state's avowed purpose to discriminate against interstate goods," *id.* (alteration omitted) (quoting *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951)), by "disclos[ing] that the state is also attempting to protect 'locally-operated pharmacies' as opposed to just consumers and non-PBM affiliated pharmacies" generally. *Id.*

Next, the district court said that in addition to that legislative finding, "the legislative history of Act 624 is brimming with protectionist rhetoric." Add. 6; App. 780; R. Doc. 73, at 6 (alteration omitted) (quoting *SDDS, Inc. v. South Dakota*, 47 F.3d 263, 268 (8th Cir. 1995)). It did not give any examples, claiming there were "too many . . . to list." *Id.*

In addition to finding discriminatory purpose, the district court alternatively held Act 624 failed the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), applicable to nondiscriminatory laws, because Arkansas already had PBM regulations that banned steering or differential reimbursement. Add. 6; App. 780; R. Doc. 73, at 6. It said that "[b]ased on the evidence in the record"—though it did not cite any evidence on this point and none was offered—the existing regulations

were "sufficient" to curtail the predatory practices it had noted above. *Id.* The district court then concluded that "Act 624's burden on interstate commerce" was therefore "excessive," without identifying any burden on interstate commerce Act 624 imposed. *Id.*

Of the balance of Plaintiffs' claims, the district court held Plaintiffs were unlikely to succeed on all but TRICARE preemption. Add. 7, 10–16; App. 781, 784–90; R. Doc. 73, at 7, 10–16. Of note, in addressing Plaintiffs' Takings Clause claim, the district court held it failed "because the Arkansas legislature enacted Act 624 to 'adjust the benefits and burdens of economic life to promote the common good.'" Add. 15; App. 789; R. Doc. 73, at 15 (alteration omitted) (quoting *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978)). Though noting the tension between this holding and its decision on dormant commerce, it said that "strik[ing] down Act 624" under the Takings Clause "would be an impermissible second-guess of the legislature's public policy goals." *Id.* With respect to TRICARE preemption, which was only pressed by Express Scripts, which owns a TRICARE-contracted mail-order pharmacy, the district court held Act 624 was preempted as applied to TRICARE by its express preemption of laws relating to "health care delivery" that are

"inconsistent with" TRICARE.  Add. 9; App. 783; R. Doc. 73, at 9 (quoting 10 U.S.C. § 1103(a)).[3]

On the equities, the district court summarily held that Plaintiffs would suffer irreparable harm absent an injunction because, given the State's sovereign immunity, they would suffer irrecoverable economic loss, Add. 16; App. 790; R. Doc. 73, at 16, and that the balance of the equities favored Plaintiffs because "[n]o harm is caused when defendants are enjoined from enforcing an unconstitutional law," Add. 16–17; App. 790–91; R. Doc. 73, at 16–17.

Defendants timely appealed the district court's order on July 31, 2025.  App. 792; R. Doc 77.

## STANDARD OF REVIEW

This Court generally reviews preliminary injunctions for abuse of discretion, but "[w]hen purely legal questions are presented," it gives "no special deference to the district court" and "review[s] its legal conclusions de novo." *Powell v. Noble*, 798 F.3d 690, 697 n.1 (8th Cir. 2015).

The underlying preliminary-injunction standard requires Plaintiffs to make a "clear showing" that each preliminary-injunction factor favors them. *Winter v. Nat.*

---

[3] Defendants did not dispute that Act 624 was expressly preempted by TRICARE below, claiming only that the TRICARE preemption claim was unripe.  They do not renew that contention here.

*Res. Def. Council*, 555 U.S. 7, 22 (2008). And on the likelihood-of-success factor, Plaintiffs were required to make a "more rigorous" showing than usual "that [it was] likely to prevail on the merits" in order to obtain an injunction blocking enforcement "of a duly enacted state statute." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc).

## SUMMARY OF THE ARGUMENT

The district court's injunction should be reversed for three main reasons. First, Plaintiffs, given their extensive presence in the Arkansas market, are not out-of-state firms that can claim to be discriminated against based on their out-of-state status. Second, even if Plaintiffs were properly viewed as out-of-state firms, Act 624's purpose was not to protect local pharmacies from competition by out-of-state firms, but to protect independent pharmacies from anticompetitive practices by vertically integrated ones. The latter purpose is permissible. Third, Act 624's burdens do not clearly exceed its benefits under *Pike* because *Exxon* holds that vertical-integration bans that merely burden some interstate firms do not burden interstate commerce as a whole.

With respect to Plaintiffs' status as in-state or out-of-state firms, this Court's cases hold that a company that is already doing business in a State is a resident of that State for dormant Commerce Clause purposes. Under this rule, a law that gives

a monopoly to a local firm is still subject to searching dormant Commerce Clause scrutiny even if that firm happens to be incorporated out of state, but a law that applies "equally to all businesses operating in the state" cannot be challenged as discriminatory even though some of those businesses may have out-of-state places of incorporation or headquarters. *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1386–87 (8th Cir. 1997). That rule is the right one for determining residency under the dormant Commerce Clause, because presence in a State and the political influence that comes with it, not place of incorporation, are what motivate protectionist legislation. Under that rule, Plaintiffs cannot claim to be discriminated against as out-of-state firms; indeed, the gravamen of their claim is that they have a substantial presence in Arkansas that Act 624 would end.

But even if Plaintiffs were out-of-state firms for dormant Commerce Clause purposes, Act 624 would not discriminate against them. *Exxon* held that bans on vertical integration do not discriminate against interstate commerce, even if all the vertically integrated firms in the relevant market happen to be out-of-state firms. Instead they discriminate only against a method of doing business. Plaintiffs say *Exxon* cannot settle whether Act 624 has a discriminatory purpose. But the purpose they claim Act 624 has is just what *Exxon* held was nondiscriminatory: protecting a State's independent firms from anticompetitive practices by vertically integrated ones. So

merely asserting that Act 624 was in part motivated to protect local pharmacies does not show Act 624 was discriminatory. To show discriminatory purpose in spite of *Exxon*, Plaintiffs would have to show that Act 624 was motivated by a desire to protect local pharmacies from out-of-state competition in general, not vertically integrated pharmacies in particular. Plaintiffs did not and could not make that showing.

Finally, Act 624's burdens on interstate commerce do not clearly exceed its putative benefits. First, under *Exxon* Act 624 does not burden interstate commerce at all. *Exxon* held that laws like Act 624 that restrict vertical integration merely burden the interstate firms that are vertically integrated, not the interstate market. 437 U.S. at 127. Accordingly, the Supreme Court did not even consider, eight years after *Pike* was decided, whether the burdens of the law there exceeded its benefits. Second, *Pike* instructs courts to look to "putative benefits," not the benefits a court in its judgment believes that a law will have. Here the legislature reasonably concluded that eliminating PBMs' incentives to steer business and inequitably reimburse pharmacies would better curb those practices than attempting to regulate them directly.

## ARGUMENT

Plaintiffs are unlikely to succeed on their dormant Commerce Clause claims. The "core" of "dormant Commerce Clause jurisprudence" is an "antidiscrimination principle": States may not seek to "build up" their own industries by burdening

those of other States. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). If a law discriminates against interstate commerce, "the strictest scrutiny" applies; if not, *Pike* balancing, which is more akin to a rational-basis test, does. *Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1065 (8th Cir. 2004). A law can discriminate against interstate commerce on its face, in effect, or in its purpose. *See id.* (citing *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003)). Act 624 does not discriminate against interstate commerce in any way.

## I. PLAINTIFFS ARE NOT OUT-OF-STATE FIRMS FOR DORMANT COMMERCE CLAUSE PURPOSES.

As a threshold matter, Plaintiffs cannot succeed on their dormant Commerce Clause claims because they are not out-of-state firms for dormant Commerce Clause purposes. The district court mistakenly assumed otherwise when it wrongly concluded that Act 624 has a discriminatory purpose.

As the district court put the theory, Act 624 ostensibly "attempt[ed] to protect 'locally-operated pharmacies'" from the "plaintiffs as out of state companies," though obviously not from all out-of-state companies. Add. 5; App. 779; R. Doc. 73, at 5. But this holding begs a question: in what sense are the Plaintiffs out-of-state companies? Below, CVS boasted that it "has provided Arkansans with affordable, convenient medicine" "[s]ince 2012," "employ[ing] more than 500 Arkansans to operate 23 retail pharmacies in the State." R. Doc. 14, at 19, 4:25-cv-524. Optum

touted its "eleven brick-and-mortar specialty pharmacies in Arkansas," R. Doc. 44, at 23, 4:25-cv-598, and mail-order services collectively expected to deliver 628,000 prescriptions in Arkansas in 2025, *id.* at 22. And Express Scripts claimed to have delivered or dispensed over 700,000 prescriptions to Arkansans in 2024, R. Doc. 17, at 13–14, including providing "over 3,000 hours of direct patient care to Arkansans in their homes" "to support the delivery of medications to patients," App. 255 ¶ 17; R. Doc. 19, at 5 ¶ 17.

The answer seems to be that the district court viewed Plaintiffs as out-of-state companies because they are incorporated or headquartered outside Arkansas. But under this Court's precedent, that does not make a company out of state for dormant Commerce Clause purposes. Instead, this Court has repeatedly held that "an out-of-state concern that permanently locates an operation within the state" is no longer "an 'out-of-state' entity" that can claim discrimination under the dormant Commerce Clause. *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 605 (8th Cir. 2006) (quoting *Ben Oehrleins*, 115 F.3d at 1386).

This Court first announced that limit on dormant commerce discrimination claims in *Ben Oehrleins*. *Ben Oehrleins* involved a county ordinance that required county waste to be delivered to certain local facilities—principally, a local facility that was "owned and operated by two out-of-state corporations." *Ben Oehrleins*, 115

F.3d at 1377. As applied to "export of waste across state lines," *id.* at 1384, this Court held that the ordinance "discriminate[d] against interstate commerce," *id.* at 1385. It did not matter that the facility the ordinance discriminated in favor of was owned by out-of-state corporations; as a facility located in the county enacting the ordinance, this Court viewed it as a "local interest." *Id.*

Yet for the same reason, this Court rejected the plaintiffs' claim that the ordinance was discriminatory as applied to waste disposed in the State. The plaintiffs argued, and the district court had held, that the ordinance "discriminate[d] against interstate commerce by prohibiting out-of-state entities full access to the local market." *Id.* at 1386. After all, as the district court reasoned, an "out-of-state concern which built a state-of-the-art processing facility in the middle of Hennepin County could not lawfully receive any waste from the County." *Id.* But by the same token that the designated facility, though owned by out-of-state corporations, was deemed local, this Court explained that any "out-of-state" competitor in the local market would be local too. Rejecting the "assum[ption] that an out-of-state concern that permanently locates an operation within the state is still an 'out-of-state' entity that can complain that a law that even-handedly restricts a local market is 'discriminatory,'" *id.* at 1386, this Court said categorically that "[a] Delaware corporation doing business in Minnesota could not argue that it is discriminated against by Minnesota

21

laws that apply equally to all businesses operating in the state," *id.* at 1386–87. Though such a law might "burden interstate commerce" under *Pike*'s balancing test, "[r]estrictions on the ability of companies . . . to process [Minnesota] waste *in Minnesota*" could "not [go] to a finding of 'discrimination.'" *Id.* at 1387.

This Court reaffirmed that holding in *IESI*. There, much as in *Ben Oehrleins*, a regional waste management district comprising several Arkansas counties issued a regulation that any waste from the district disposed in-state must be disposed within the district; disposal out of state was permitted. 433 F.3d at 602–03. The plaintiff, an Arkansas subsidiary of a Texas corporation, operated an Arkansas landfill outside the district and was thus ineligible to receive district waste. *See id.* The Court upheld the regulation, explaining that it did "not favor in-state economic interests over out-of-state interests," *id.* at 606, but instead only favored "in-District landfill operators as opposed to other *Arkansas* operators" by prohibiting disposal at non-district land-fills in Arkansas, *id.* at 605. That the plaintiff, or other Arkansas landfill operators, might be owned by corporations incorporated out-of-state did not make them out-of-state businesses; they were still Arkansas operators because they operated within Arkansas. This Court then reaffirmed *Ben Oehrleins*'s holding that a company doing business in a state, even though incorporated elsewhere, cannot claim to be

discriminated against by that state's laws on the basis of its supposedly out-of-state status. *Id.* (quoting *Ben Oehrleins*, 115 F.3d at 1386–87).[4]

That precedent controls whether Plaintiffs are "out-of-state" entities that can claim to be discriminated against on that basis by laws regulating their Arkansas operations. But it is also consistent with "the majority view of courts of appeals that where a company is 'based' is not controlling." *NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306, 323 (5th Cir. 2022); *see Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1150 n.6 (9th Cir. 2012) (*NAOO*) (noting that dormant Commerce Clause "cases generally use the term 'out-of-state' to refer to the origin of goods and materials," not "to corporations that are incorporated out-of-state, but own stores that are located in [state]"). Those courts of appeals have

---

[4] Over a decade after *IESI* reaffirmed *Ben Oehrleins*, this Court held that a law that favored in-state utility incumbents was nondiscriminatory, in part because it favored them "regardless of whether they are Minnesota-based entities or based elsewhere." *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1028 (8th Cir. 2020). The Court claimed in a footnote that, "[a]lthough briefly discussed in *Oehrleins*, we have not squarely addressed the issue of whether an entity that has an in-state presence but is headquartered elsewhere is considered an in-state entity for the purpose of dormant Commerce Clause review." *Id.* at 1029 n.7. But *Ben Oehrleins*'s holding that the ordinance there was not discriminatory as applied to waste disposed in state, and *IESI*'s holding that the regulation there was not discriminatory at all, rested squarely on the premise (which both opinions discussed extensively) that entities with in-state presences are in-state entities regardless of the location of their headquarters. Those earlier decisions control, and *LSP Transmission*, though mistakenly deeming the question open, expressly disclaims any contrary holding. *See id.* ("declin[ing] to [decide the issue] now").

explained that "local presence, rather than place of incorporation, should matter" for two reasons. *NextEra*, 48 F.4th at 323.

First, as the Fifth Circuit recently explained, the Supreme Court's many cases "finding dormant Commerce Clause violations" do "not even mention the place of incorporation" of the local interests that those laws favored. *Id.* at 322. It is entirely possible that, as in *Ben Oehrleins*, they were incorporated out of state. *See, e.g.*, *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 387 (1994) (holding invalid an ordinance granting a monopoly to what the Court simply described as a "local private contractor"). So not just this Court's binding precedent but the Supreme Court's teaches that local presence is what counts.

Second, if "place of incorporation . . . decide[d] whether" to view companies as "out-of-state" or "local," "then a state['s] . . . dormant Commerce Clause liability would turn on the empty formality of where a company's articles of incorporation were filed, rather than where the company's business takes place or where its political influence lies." *Fla. Transp. Servs., Inc. v. Miami-Dade County*, 703 F.3d 1230, 1259 (11th Cir. 2012). Such a rule would not respond to the "underlying concern about . . . protectionist legislation" that animates dormant Commerce Clause jurisprudence, *NextEra*, 48 F.4th at 324; a business with a substantial presence in a State "is more likely to have the clout to enact protectionist measures" than one "that

paid a nominal filing fee to be incorporated in state." *Id.* at 323. Thus, a place-of-incorporation rule would insulate many instances of protectionist legislation—as *Ben Oehrleins* illustrates. But it would also mistakenly deem protectionist, based on a formality unlikely to have influenced the legislature, laws that merely draw distinctions between established businesses in a state's market, like the laws in *IESI* or (as applied in-state) in *Ben Oehrleins*.

Because local presence, not place of incorporation or headquarters, is what determines whether a company is in-state for dormant Commerce Clause purposes, Plaintiffs, which all have a substantial presence in Arkansas, cannot claim to be discriminated against as out-of-state firms. Even if Act 624 was intended to discriminate against Plaintiffs and in favor of "local" pharmacies—which it was not—it would still only discriminate among in-state companies, just as the regulations in *Ben Oehrleins* and *IESI* only discriminated among in-state companies by only regulating in-state waste disposal. Like those regulations, Act 624 only regulates the in-state business of "businesses operating in the state," *Ben Oehrleins*, 115 F.3d at 1386–87, by regulating who may obtain "a permit . . . for the retail sale of drugs or medicines in th[e] state," Ark. Code Ann. § 17-92-416(b). And unlike those regulations, which this Court held were non-discriminatory even though they benefited a single local monopolist, the class of businesses Act 624 benefits comprises many pharmacies

incorporated in and out of state alike, as well as truly out-of-state pharmacies that have not yet entered Arkansas's market and could benefit from the space opened up by the ban on vertically integrated competitors. So whatever Act 624's purpose, by definition it could not have been a purpose to discriminate in favor of in-state businesses or against Plaintiffs as out-of-state businesses.

## II.   ACT 624 DOES NOT DISCRIMINATE AGAINST INTERSTATE COMMERCE.

For dormant Commerce Clause purposes, Plaintiffs are in-state businesses, so they cannot claim that Act 624 discriminates them as out-of-state businesses. But even if Plaintiffs were out-of-state businesses, Act 624 would not discriminate against interstate commerce in effect or purpose. In *Exxon*, which the district court ignored, the Supreme Court held that restrictions on vertical integration in a particular industry do not discriminate against interstate commerce, even if "*only* . . . out-of-state firms" are affected. *Nat'l Pork Producers*, 598 U.S. at 384 (plurality). The courts of appeals have applied that rule to uphold a plethora of vertical-integration laws, from laws banning car insurers from owning body shops or auto manufacturers from owning auto dealers, to ones prohibiting physicians from integrating with dialysis clinics and opticians from integrating with optometrists. Like those laws, Act 624 is in *Exxon*'s heartland: it bans a kind of vertical integration—specifically,

between pharmacies and PBMs—that, as in *Exxon*, the legislature found injured competition.

The district court did not attempt to distinguish *Exxon*, or even mention it. Plaintiffs, for their part, maintained that *Exxon* addressed only whether bans on vertical integration have discriminatory effects, and cannot save a law whose purpose was to protect local businesses from anticompetitive practices by vertically integrated ones.

But *Exxon* cannot be so easily distinguished. For the law's purpose in *Exxon* was also to protect the State's market from anticompetitive practices by vertically integrated firms, as was the purpose of all the vertical-integration restrictions lower courts have upheld in *Exxon*'s wake. Indeed, that is the whole point of regulating vertical integration. So if proving that a law's purpose was to protect non-vertically integrated businesses from vertically integrated ones sufficed to show it was unconstitutional, *Exxon* would have no meaning. For a vertical-integration restriction to have a discriminatory purpose in spite of *Exxon*, its true purpose must be to protect in-state firms from out-of-state competition in general, not just vertically integrated competition. And there is no evidence of that broader purpose here.

## A.   Under *Exxon*, Laws That Ban Vertical Integration Are Non-Discriminatory.

The law in *Exxon* was "an outgrowth of the 1973 shortage of petroleum."  437 U.S. at 121.  During that shortage, refiners gave gas stations they operated "preferential treatment" in allocating gasoline.  *Id.*  "Responding to evidence" of that treatment, and concerns that it "would eventually decrease the competitiveness of the retail market, the State enacted a law prohibiting producers and refiners from operating their own stations."  *Id.* at 124.

As the case came to the Court, it was undisputed that the law sought to protect "the continued existence of independent retail dealers" from "elimination" by "vertical integration"—as Maryland's high court, which upheld the law below, held.  *Gov. of Md. v. Exxon Corp.*, 370 A.2d 1102, 1112 (Md. 1977).  Indeed, Maryland admitted that the law "was intended to protect 'the retail dealer as an independent businessman by reducing the control and dominance of the vertically integrated petroleum producer and refiner in the retail market.'"  *Exxon*, 437 U.S. at 140 (Blackmun, J., dissenting) (alteration omitted).  Yet the Supreme Court upheld the law.

The Court was dismissive of the claim that Maryland's law discriminated against interstate commerce, dispatching it in only two paragraphs.  *See Exxon*, 437 U.S. at 125–26.  The Court first observed that Maryland's law did "not discriminate

against interstate goods" because all of Maryland's gas was imported from out of state. *Id.* at 125. It then turned to the plaintiffs' claim that the law "discriminat[ed] against interstate commerce at the retail level" by effectively "protect[ing] in-state independent dealers from out-of-state competition." *Id.* The Court agreed that the law's burdens "f[ell] solely on interstate companies," as the only refiners that owned gas stations in Maryland were interstate companies like Exxon. *Id.* But it said that "fact d[id] not lead . . . to a conclusion that the State is discriminating against interstate commerce." *Id.* The sole reason the Court gave is that the law did not burden *all* interstate companies, but only "some interstate companies," *id.* at 126, since the law "create[d] no barriers whatsoever against interstate independent dealers," *id.* And the fact that the law "burden[ed] . . . some interstate companies d[id] not, by itself, establish a claim of discrimination against interstate commerce." *Id.* at 126.

The Court made one reservation on that holding, allowing in a footnote that if "the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market . . . the regulation may have a discriminatory effect on interstate commerce." *Exxon*, 437 U.S. at 126 n.16. Maryland's law did not have that effect because *all* the goods Maryland gas stations sold were "part of the flow of interstate

commerce," since all of Maryland's gasoline came from out of state. *Id.*; *see also id.* at 146 n.13 (Blackmun, J., dissenting) ("Footnote 16 . . . suggests that unconstitutional discrimination does not exist unless there is an effect on the quantity of out-of-state goods entering a State." (citation omitted)).  The Court did not say that effects on retail market share could make a law discriminatory.  And just three years after *Exxon*, the Court explained *Exxon* held that "[a] nondiscriminatory regulation . . . is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 474 (1981).

Since *Exxon*, the courts of appeals have upheld a plethora of restrictions on various forms of vertical integration.  And like the *Exxon* Court, they have done so without regard for whether those restrictions would reduce the out-of-state market share of retail sales or services.  The Fifth Circuit has upheld bans on car manufacturers owning dealerships, *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493 (5th Cir. 2001), and a ban on auto insurers' owning auto body shops, *Allstate*, 495 F.3d at 164.  The Sixth and Ninth Circuits have both upheld bans on opticians' integration with optometrists, *LensCrafters, Inc. v. Robinson*, 403 F.3d 798 (6th Cir. 2005); *NAOO*, 682 F.3d 1144, while the Ninth Circuit has recently upheld a ban on casinos' owning cardrooms, *Flynt v. Bonta*, 131 F.4th 918 (9th Cir. 2025).  The Eleventh

Circuit has upheld a ban on integration between referring physicians and dialysis providers, *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935 (11th Cir. 2013), and the Third Circuit has upheld a ban on savings and loan institutions' owning insurance companies, *Ford Motor Co. v. Ins. Comm'r of Pa.*, 874 F.2d 926 (3d Cir. 1989).

As that list illustrates, the courts of appeals have reviewed a wide range of bans on vertical integration with a wide range of effects on the markets they regulated. Those bans ranged from laws that sought to halt emerging forms of anticompetitive integration (auto insurers' buying auto body shops in *Allstate*), to ones that banned the business model of the largest player in the market (LensCrafters in the optician/optometrist cases), and would likely "result in an overall shift in the market share" from "out-of-state corporations to entities that are entirely owned by [in-state residents]." *NAOO*, 682 F.3d at 1152 n.9. But none of those distinctions have mattered. Instead, courts of appeals have read *Exxon* to control at a high level of generality, wherever a state bans a form of vertical integration without respect to vertically integrated firms' residency and continues to allow competition from out-of-state non-integrated firms.

For example, in *Ford Motor*, the Fifth Circuit found "no significant factual or legal distinction between *Exxon*" and Texas's ban on car manufacturers' owning car dealers, and said *Exxon*'s "holding control[led] the outcome." 264 F.3d at 500–01.

Judge Jones, who viewed the law as part of "a genre of state laws favoring local automobile dealers over out-of-state manufacturers" that was "as negative toward interstate commerce as legislative action can get," conceded that *Exxon* "compels this result," *id.* at 512 (Jones, J., specially concurring). All that mattered is that the prohibition on manufacturer ownership applied equally on its face to in-state and out-of-state manufacturers—though that neutrality had little practical consequence, since "Texas ha[d] no motor vehicle manufacturers," *id.* at 502—and left Texas dealers open to competition from "out-of-state dealers" that were "non-manufacturers," *id.* Similarly in *Flynt*, which upheld a ban on casinos' owning cardrooms, the Ninth Circuit drew the broad lesson from *Exxon* that a State may always "decide[] that a single person or entity owning or controlling two kinds of businesses is problematic," 131 F.4th at 928, so long as out-of-state and in-state residents alike can participate on equal terms in either kind of business, *see id.* at 927. And in *Fresenius*, where the "law adversely affecte[d] only" "out-of-state entities" and solely benefited "the[ir] lone, in-state competitor," the Eleventh Circuit reasoned that the law passed muster because like the *Exxon* law, it "prohibit[ed] vertical integration . . . regardless of whether a business entity is in-state or out-of-state." 704 F.3d at 943.

Like those cases, this case falls within *Exxon*'s heartland. First, as in *Exxon*, Act 624 prohibits vertical integration between two distinct kinds of businesses: the

pharmacies that sell drugs at retail, and the PBMs who reimburse them for it. In particular, it prohibits a kind of vertical integration that other States' laws upheld under *Exxon* have targeted: tying arrangements between two entities that create opportunities and incentives for one tied entity to steer its customers to the other. *See Allstate*, 495 F.3d at 156 (noting that integration between auto insurance companies and body shops "raised the risk of illegal customer steering"); *Fresenius*, 704 F.3d at 938 (deferring to legislative findings that "physician self-referral practices [to dialysis providers they owned] 'may limit or eliminate competitive alternatives in the health care services market'"). Indeed, the district court even noted, quoting *Allstate*, that vertical integration in this space "create[s] 'an inherent conflict of interest and an irresistible opportunity for PBMs to engage in predatory practices.'" Add. 2; App. 776; R. Doc. 73, at 2 (alteration omitted) (quoting *Allstate*, 493 F.3d at 161).

Second, as in *Exxon*, Act 624 leaves the State's market open to competition from non-integrated interstate firms. So long as a pharmacy is not owned by a PBM, it can do business in Arkansas. And that does not just make Arkansas's law facially neutral, but practically so, as some of the largest pharmacy chains in America are independent from PBMs. Indeed, supporters of the bill repeatedly noted that the bill would "give patients choice in local access, not only at independent pharmacies, but Walgreens." App. 317:20-22; R. Doc. 46-1, at 20:20–22; *see* App. 438:13–15; R. Doc.

46-2, at 12:13–15 (testimony that the bill would allow not "just . . . independent pharmacies," but "Walgreens"). And other proponents of the bill noted it would allow competition from "Amazon, the second largest retailer in the world," App. 322:12–13; R. Doc. 46-1, at 25:12–13, as well as Kroger, App. 307:11, 364:21; R. Doc. 46-1, at 10:11, 67:21; App. 588:15; R. Doc. 46-3, at 7:15. In fact, bill supporters specifically worried about the effects of vertical integration on national chain pharmacies, warning that even though Walgreens was "the largest non PBM owned pharmacy in the entire world" it was "now selling to private equity" and was "under collapse." App. 328:16–20; R. Doc. 46-1, at 31:16–20.

## B. Act 624 Is Not Discriminatory in Purpose.

Though *Exxon* forecloses any claim that Act 624 is discriminatory in effect, Plaintiffs maintained below that *Exxon* is irrelevant to their claim that Act 624 is discriminatory in purpose. *Exxon*, they argued, did not consider a discriminatory-purpose claim, so it offers no guidance on when vertical-integration restrictions might be purposefully discriminatory. Yet in the nearly half-century since *Exxon* was decided, no court has distinguished it based on discriminatory purpose. Is that because challengers to vertical-integration restrictions have never claimed discriminatory purpose before, or because Act 624 has a uniquely discriminatory purpose that past vertical-integration restrictions lacked? No. It is because the usual purpose of

restrictions on vertical integration, which Act 624 shares—protecting the market from anticompetitive practices by vertically integrated firms that threaten to reduce competition from independent ones—is a permissible one. Indeed, discriminatory purpose has often been litigated in cases applying *Exxon*—and was in *Exxon* itself— and the line courts have drawn is between seeking to protect a State's market from competition by vertically integrated firms versus out-of-state competition. Only the latter is impermissible. For a contrary rule would be irreconcilable with *Exxon*'s logic. The whole point of *Exxon* is that laws that only restrict competition from vertically integrated firms do not discriminate in effect, so it cannot be that seeking to restrict competition from vertically integrated firms is a discriminatory purpose.

The *Exxon* plaintiffs alleged discriminatory purpose. The dormant commerce section of their brief began by claiming that "the protection of Maryland independent dealers was at least one, if not the main, object of the Maryland Legislature," and that "it was the clear and specific intent of the Maryland Legislature that the Maryland dealers were to be the principal beneficiaries of the Act." Brief of Appellants at 27–28, *Exxon*, 1977 WL 189920. They hardly wanted for evidence. Maryland admitted in its pleadings that the law "was intended to protect 'the retail dealer as an independent businessman by reducing the control and dominance of the vertically integrated . . . refiner in the retail market.'" *Exxon*, 437 U.S. at 140 (Blackmun, J.,

dissenting) (alteration omitted). Maryland's independent gas stations' chief lobbyist, testifying in support of the law, asked the legislature "to protect us from an economic giant who would take away our very livelihood and our children's future in its greed for greater profits," and not "to let this octopus loose and unrestricted in the state of Maryland, among our small businessmen to devour them." *Id.* at 142 n.8. And the Maryland Court of Appeals, in upholding the law, acknowledged the legislature enacted it to preserve "the continued existence of independent retail dealers" and prevent "control of the retail gasoline market by producers and refiners." *Exxon*, 370 A.2d at 1112. Indeed, Justice Blackmun marshaled much of this evidence in lone dissent to claim Maryland's law was purposefully discriminatory.

Yet the Supreme Court, of course, did not hold that Maryland's law purposefully discriminated against interstate commerce. Instead, it necessarily rejected the premise that protecting in-state businesses from vertically integrated competitors that happen to be out-of-state discriminates against interstate commerce. The Maryland Court of Appeals, whose decision the Supreme Court affirmed, made this distinction plain. Rejecting Exxon's discriminatory-purpose claim, it reasoned Maryland's law's "purpose was not to protect Maryland interests from out-of-state competition," but to protect "dealer operated stations" and "competition within the

retail gasoline marketing industry in Maryland" from "control of that market by a few major oil companies." *Exxon*, 370 A.2d at 1114.

At the Supreme Court, Exxon claimed that even that purpose was impermissibly discriminatory. The dissent agreed, faulting the law for "intentionally improv[ing]" the "local service station dealers['] . . . competitive position by insulating them from competition by out-of-state integrated producers." *Exxon*, 437 U.S. at 140 (Blackmun, J., dissenting). Yet the Court did not even respond to that theory. Presumably had the Court viewed that purpose as impermissible, it would have reached a different result, or explained why Maryland's law did not have that purpose. Instead, the Court said that "[t]he fact that the burden of a state regulation falls on some interstate companies," or even "solely on interstate companies," "does not, by itself, establish a claim of discrimination against interstate commerce." *Id.* at 125–26.

Since *Exxon* was decided, challengers to vertical-integration restrictions have often attempted to distinguish it on discriminatory-purpose grounds. Those attempts have uniformly failed, with courts making explicit what *Exxon* implies—intentionally protecting local commerce from vertically integrated competition, rather than out-of-state commerce per se, is not a discriminatory purpose. An early example is the Fifth Circuit's decision in *Ford Motor*, which upheld a ban on car

manufacturers' owning car dealerships. The Fifth Circuit agreed that "the legislature's intent [was] to prevent manufacturers from utilizing their superior market position to compete against dealers in the retail car market." *Ford Motor*, 264 F.3d at 500. Ford argued that was a discriminatory purpose, reasoning that intentionally "burden[ing] some out-of-state interest while benefitting some in-state interest" was discriminatory. *Id.* The Fifth Circuit disagreed, explaining that "discriminat[ing] against vertical organization" did not intentionally discriminate against out-of-state commerce. *Id.* at 502.

That distinction between protecting local commerce from vertical integration and protecting it from out-of-state commerce has been drawn again and again since *Exxon*. In *NAOO*, where the Ninth Circuit upheld a ban on integration between opticians and optometrists, the law's chief sponsor acknowledged it was introduced "on behalf of the California Optometric Association in an effort to protect California from some of the problems being experienced in eastern states, where large business interests have completely taken over the optometric profession." *Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009) (*NAOO*). LensCrafters argued that statement evinced a discriminatory purpose, but the Ninth Circuit disagreed. Drawing a sharp distinction between purposefully "protect[ing] California optometrists and ophthalmologists from competition from out-of-state

interests, as opposed to commercial interests generally," *id.*, the Ninth Circuit held the latter was permissible. Likewise, the Sixth Circuit, upholding a similar law, drew the same distinction between permissibly "protect[ing] optometry from commercialism" and "discriminat[ing] against *interstate* retail eyewear companies." *LensCrafters*, 403 F.3d at 803. And in *Allstate*, the Fifth Circuit found no intentional discrimination even though legislators said their ban on integration between auto insurers and body shops sought "to remedy a situation" where insurance companies could unfairly "compete with [body shops] run by our local independent folks back home," 495 F.3d at 156 n.4, and lobbyists for those body shops testified that integration "would lead to the demise of the independent repair industry, along with billions of dollars in local economic impact," *id.* at 156. It reasoned that Allstate failed to show evidence of "hostility . . . towards out-of-state companies in general," and viewed its evidence of discrimination as "simply evidence of a legislative desire to treat differently two business forms"—integrated body shops and non-integrated ones. *Id.* at 161.

This distinction between protecting in-state commerce from vertically integrated competition and protecting it from out-of-state competition is not only strongly implied by *Exxon*, but also compelled by what *Exxon* expressly held. *Exxon* held that burdening vertically integrated firms, even if they are all out-of-state, to the

advantage of in-state firms is not a discriminatory effect. So to have a discriminatory purpose, a State must do more than merely intend that effect. Instead, the State must draw the lines it does between integrated and non-integrated firms "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" interstate commerce. *Cf. Brandt ex rel. Brandt v. Griffin*, 147 F.4th 867, 880 (8th Cir. 2025) (en banc) (quoting *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (explaining the standard for judging whether a law with merely disparate impact is intentionally discriminatory generally). Otherwise, to prove discriminatory purpose a vertically integrated firm would only need to prove that the State intended to cause a non-discriminatory result.

Under the correct understanding of purposeful discrimination against interstate commerce, none of Plaintiffs' supposed evidence of purposeful discrimination supports their claim. Instead, at most it merely shows that the legislature intended to protect local pharmacies from predatory practices by particular vertically integrated firms, not from out-of-state competition generally. And that is a permissible purpose.

Starting with Act 624's text, Act 624 contains legislative findings stating the Act's "intent." 2025 Ark. Acts 624 § 1. And when considering a claim of discriminatory purpose, federal courts "assume that the objectives articulated by the

legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they 'could not have been a goal of the legislation.'" *Clover Leaf Creamery*, 449 U.S. at 463 n.7 (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975)).[5]  Act 624 states wholly non-discriminatory purposes. It explains that "[i]t is beneficial to the State of Arkansas to support patient access to prescription drugs . . . at fair prices." 2025 Ark. Acts 624 § 1(a)(1). It then notes that FTC has "found evidence of anticompetitive business tactics" on the part of PBMs "that have driven locally-operated pharmacies out of business," which in turn has "limit[ed] patient choices and inflat[ed] drug prices at pharmacies owned" by PBMs. *Id.* § 1(a)(2). It then explains that the legislature sought "to minimize conflicts of interest by stopping" PBMs from "being both a price setter and price taker." *Id.* § 1(a)(3). Finally, it states a purpose to "improv[e] healthcare delivery in the pharmacy market for patients by eliminating certain anticompetitive business tactics." *Id.* § 1(b).

---

[5] *Clover Leaf Creamery*, though principally a dormant Commerce Clause case, made that statement in the context of a related equal protection claim that a law drew irrational distinctions for the purpose of "isolat[ing]" local industry "from interstate competition," *id.*, but courts agree that the rule applies to dormant Commerce Clause claims as well. *See, e.g.*, *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1097–98 (9th Cir. 2013); *Wine & Spirts Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 13 (1st Cir. 2007); *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1259 (4th Cir. 1995).

Nothing in that statement of purpose suggests an intent to reduce out-of-state competition or increase local pharmacies' market share. Instead, the Act states the same purposes that the law in *Exxon* had: to reduce market consolidation, improve consumer access, and reduce prices by eliminating incentives that vertically integrated firms had to engage in anticompetitive tactics with their independent competitors. *See Exxon*, 437 U.S. at 124 (describing Maryland's law as "[r]esponding to evidence that producers and refiners were favoring company-operated stations in the allocation of gasoline and that this would eventually decrease the competitiveness of the retail market"); *id.* at 140 (Blackmun, J., dissenting) (quoting Maryland's admission that it "intended to protect 'the retail dealer as an independent businessman by reducing the control and dominance of the vertically integrated petroleum producer and refiner'" (alteration omitted)).

Despite this statement of nondiscriminatory purpose, the district court found Act 624 purposefully discriminatory, seizing on its reference to "tactics that have driven locally-operated pharmacies out of business." Add. 5; App. 779; R. Doc. 73, at 5 (quoting 2025 Ark. Acts. 624 § 1(a)(2)). That lone "phrase," the district court opined, "'artlessly discloses the state's avowed purpose to discriminate against interstate goods.'" *Id.* (quoting *Dean Milk*, 340 U.S. at 354) (alteration omitted). It does not.

First, setting aside that the Act merely notes that a federal agency has found evidence of tactics that have driven local pharmacies out of business, which would be an odd way to avow a purpose to discriminate against interstate commerce, the Act does not simply note that PBMs have driven locally operated pharmacies out of business. Rather, it says that driving those pharmacies out of business has "limit[ed] patient choices and inflat[ed] drug prices at pharmacies owned by [PBMs]." 2025 Ark. Acts 624 § 1(a)(2). Seeking to reduce local pharmacy closure in order to protect access to drugs and reduce prices is an indisputably legitimate purpose. *See, e.g.*, *Walgreen Co. v. Rullan*, 405 F.3d 50, 60 (1st Cir. 2005) (holding in a dormant commerce case that there could be "no dispute that the Commonwealth has a legitimate interest in encouraging pharmacies to locate in all parts of Puerto Rico"). And it is an empirically well-grounded one. When independent pharmacies close, often no one replaces them, particularly in rural America; chain pharmacies do not operate in 44 percent of rural counties, and over 7 percent of rural counties no longer have any retail pharmacy at all. *Supra* at __. And local pharmacy closure's effects on prices are also a valid concern. As FTC has documented, PBMs reimburse their own pharmacies 80 to 90 percent more for some common generics than they reimburse their competitors, and often reimburse themselves at prices marked up over 1,000 percent

above average acquisition cost. *Supra* at _. If PBMs succeed in driving out their competition, they can charge those prices, or even greater ones, from all consumers.

But more fundamentally, even if Act 624 stated a purpose of protecting local pharmacies from anticompetitive practices purely for its own sake, wanting to protect local businesses from anticompetitive practices is not a discriminatory purpose. Otherwise, a State could only regulate anticompetitive practices if its legislators studiously avoided expressing any concern about their effects on the local economy in particular rather than the marketplace in the abstract. That is not a realistic standard. *Cf. Clover Leaf Creamery*, 449 U.S. at 463 n.7 ("We will not invalidate a state statute . . . merely because some legislators sought to obtain votes for the measure on the basis of its beneficial side effects on state industry.").

But it is also not a standard that the dormant Commerce Clause requires. As the Supreme Court said in one of its landmark discriminatory-purpose cases, "[n]o one disputes that a State may enact laws pursuant to its police powers that have the purpose and effect of encouraging domestic industry. However, the Commerce Clause stands as a limitation on the means by which a State can constitutionally seek to achieve that goal." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 271 (1984). That limitation is that States may not seek to "[s]hield[] in-state industries from out-of-state competition." *Maine v. Taylor*, 477 U.S. 131, 148 (1986). By contrast, seeking

to shield them from *unfair* competition, regardless of where it comes from, is not discriminatory, as *Exxon* and its progeny show, and as this Court has said. *See Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 820 (8th Cir. 2001) (upholding a price discrimination statute because it served the "legitimate" interest of "preserv[ing] the family farm and Missouri's rural economy by preventing [small farms'] discriminatory treatment").

Because Act 624's stated purposes are valid, this Court must reject Plaintiffs' discriminatory-purpose claim unless "the circumstances force[]" the Court "to conclude that" its stated purposes "could not have been a goal of the legislation." *Clover Leaf Creamery*, 449 U.S. at 463 n.7. Yet below, Plaintiffs did not claim that Act 624's actual purposes differed from its stated ones. Instead, maintaining those stated purposes were impermissible, they cited a series of remarks by legislators and supporters of the Act that merely confirmed its purpose was in part to protect independent pharmacies—and thereby patient access and price competition—from anticompetitive PBM practices that threatened their existence. The district court, apparently accepting Plaintiffs' mistaken view that such a purpose was impermissible, claimed "the legislative history [of Act 624] is brimming with protectionist rhetoric" without citing any examples in particular. Add. 6; App. 780; R. Doc. 73, at 6. But representative examples of the statements on which Plaintiffs relied below, which

are indistinguishable from statements in *Exxon* and its progeny, illustrate how benign that rhetoric was:

- At a committee hearing, the CEO of the Arkansas Pharmacists Association noted that billions of dollars of prescriptions were "being forced through out-of-state mail order pharmacies at higher prices according to the FTC reports, that should be able to be filled locally if a patient chooses," and that eliminating PBMs' ability to steer prescriptions to integrated pharmacies would "give patients choice in local access, not only at independent pharmacies, but Walgreens." App. 317:15–22; R. Doc. 46-1, at 20:15–22.

- A state representative said a pharmacist friend of his told him that "he may have to shut down his pharmacy and sell his family business . . . because of predatory pricing and reimbursement rates" by PBMs. App. 304:2–5; R. Doc. 46-1, at 7:2–5.

- Another state representative said that "so many small pharmacies have [gone] out of business," and that in his industry, if "[his] competition had the ability to set [his] prices, pretty soon all of us small business would be out," and there would be "just one big one and we know

what's going to happen to the prices then." App. 327:2–7; R. Doc. 46-1, at 30:2–7.

- Another state representative said "it concerns me, the small-town pharmacist, if they can't survive . . . we're going to be losing competition," and said he was "afraid that if [PBMs are] steering patients" to their pharmacies, they might "eventually . . . close all [their] brick and mortars" and exclusively distribute drugs by mail. App. 341:11–20; R. Doc. 46-1, at 44:11–20.

- A state senator said that PBMs were "steering patients to out-of-state mail order pharmacies that they own," that "often have no relationship with the patient," and that "inflat[e] prices," and that banning PBM-affiliated pharmacies "could dramatically lower cost" and "give[] patients the option to fill prescriptions at their local community pharmacy" or another pharmacy "where their pharmacist actually knows them." App. 430:22–431:20; R. Doc. 46-2 at 4:22–5:20.

These statements undeniably show that members of the legislature and supporters of the Act were—as the Act's statement of purpose says—motivated to preserve independent pharmacies, which they believed furthered patient access and helped reduce drug prices. But that is not a discriminatory purpose. In *Exxon*, the

legislature had the same purpose as applied to the gasoline industry: it banned vertically integrated gas stations because it concluded that "the continued existence of independent retail dealers was necessary to preserve competition," *Exxon*, 370 A.2d at 1112, and sought "to protect 'the retail dealer as an independent businessman by reducing the control and dominance of the vertically integrated . . . refiner[s] in the retail market," 437 U.S. at 139 (alteration omitted). And legislatures had the same purposes in *NAOO*, 567 F.3d at 525, and *Ford*, 264 F.3d at 500. None of those were deemed discriminatory purposes; to the contrary, the courts considering them said they showed the legislature's purposes were *not* discriminatory.

By contrast, in the cases where this Court has said a law's legislative history was "brimming with protectionist rhetoric," *Hazeltine*, 340 F.3d at 594 (quoting *SDDS*, 47 F.3d at 268), proponents did not merely say they wanted to protect local business from consolidation. Instead, they specifically expressed antipathy to out-of-state business. In *SDDS*, the State published a pro-and-con statement on a referendum to permit a proposed waste disposal facility. The con portion described the facility as "an out-of-state dump" where "95% of the waste will come from out-of-state," and urged a no vote because "South Dakota is not the nation's dumping grounds" and rejecting the referendum would "keep . . . imported garbage out of South Dakota." *SDDS*, 47 F.3d at 266. In *Hazeltine*, where South Dakotan voters

passed a referendum prohibiting corporations from acquiring farmland, the state-sponsored "pro" statement in support of the referendum urged passage because without the ban, "[d]esperately needed profits will be skimmed out of local economies and into the pockets of distant corporations." 340 F.3d at 594.

That kind of hostility to out-of-state business is absent here. At most, a couple of remarks noted that PBMs steered patients to out-of-state mail-order pharmacies, but in the context of faulting that steering for frustrating patient access by preventing patients from filling their prescriptions at a retail pharmacy, independent or otherwise, where they had a relationship with their pharmacist. *See, e.g.*, App. 430:22–431:20; R. Doc. 46-2 at 4:22–5:20. Act 624 was not purposefully discriminatory.

## III. Act 624 Satisfies *Pike*.

The district court also held that even if Act 624 were non-discriminatory it failed the *Pike* balancing test because the burden it imposes on interstate commerce exceeds its benefits. But that holding too overlooks and is irreconcilable with *Exxon*. *Exxon* held that a law banning vertical integration did not substantially burden interstate commerce because it merely burdened "particular interstate firms," not "the interstate market" as a whole. *Exxon*, 437 U.S. at 127. The same is true here. In fact, even if Plaintiffs were deemed out-of-state firms in spite of their presence in Arkansas, Act 624 likely bans a smaller share of out-of-state firms than the law in

*Exxon* did. Because Act 624 does not substantially burden interstate commerce, its burdens could not outweigh its benefits.

The test known today as *Pike* balancing was first announced eight years before *Exxon*. *See Pike*, 397 U.S. at 142. *Pike* involved a law requiring fruit in Arizona to be packed before shipment. *Id.* at 138. Though the law did not require intrastate packing by name, it effectively required growers "to go into a local packing business" instead of using interstate packing facilities. *Id.* at 146. Reviewing that law, the Court held that where a law is nondiscriminatory "and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142. And though the Court did not say so in *Pike* itself, today it is well-settled that "*Pike* requires a plaintiff to . . . show[] that a challenged law imposes 'substantial burdens' on interstate commerce *before* a court may assess the law's competing benefits." *Nat'l Pork Producers*, 598 U.S. at 383 (plurality opinion); *id.* at 394 (Barrett, J., concurring in part) (requiring "a substantial burden"); *id.* at 395 (Roberts, C.J., concurring in part and dissenting in part) (requiring and finding "a substantial burden"). Between the requirement of a substantial burden and the requirement that burdens clearly outweigh even a law's "putative," not just actual, benefits, challengers under *Pike* face a "tall order"; indeed "the Supreme Court 'has not invalidated a law under *Pike*' in

more than 30 years." *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023) (quoting *Garber v. Menendez*, 888 F.3d 839, 845 (6th Cir. 2018)).

Eight years after *Pike*, having held Maryland's ban on refiner-owned gas stations did not discriminate against interstate commerce, the *Exxon* Court considered whether it "impermissibly burden[ed] interstate commerce." 437 U.S. at 127. Holding that it did not "impose a sufficient burden on interstate commerce to warrant further scrutiny," *Nat'l Pork Producers*, 598 U.S. at 384 (plurality opinion) (discussing *Exxon*), the Court never even reached the question of whether its burdens outweighed its benefits.

The Court considered two theories of burden in *Exxon*. The first was that Maryland's law would not only shutter refiner-owned stations but cause some refiners to "stop selling" gasoline to Maryland altogether. *Exxon*, 437 U.S. at 127. The Court held that was not a material burden because their share of Maryland's gasoline supply would presumably be "replaced by other interstate refiners," and "caus[ing] some business to shift from one interstate supplier to another" was not "an impermissible burden." *Id.*

The Court then turned to the refiners' claim that "regardless of whether the State ha[d] interfered with the movement of goods in interstate commerce," *id.*, it had burdened interstate commerce in the retail market by banning the refiner-owned

51

stores. The Court rejected that claim out of hand. Even if it were true, the Court said, that the public would be "injured by the loss" of the refiners' stations, that harm went only "to the wisdom of the statute, not its burden on commerce." *Id.* at 128. The Court explained that the Commerce Clause "protects the interstate market, not particular interstate firms," or particular "methods of operation in a retail market." *Id.* at 127.

Plaintiffs may suggest that *Exxon*'s no-burden holding depended on a prediction that the refiners' market share would be replaced by other out-of-state stations. But the Court never made any prediction of the sort. The only prediction it made about market share was in response to the refiners' argument that some refiners might "choose to withdraw entirely" from Maryland's *wholesale* market, to which the Court responded that "their share of the entire supply [would] be promptly replaced by other interstate *refiners*." 437 U.S. at 127 (emphasis added). The Court never predicted that the refiner-owned stations' retail market share would shift to other out-of-state-owned stations. Nor could it have. Of the 231 chain gas stations in Maryland, only 34 were not owned by refiners. *See id.* at 137–39 (Blackmun, J., dissenting); *see also id.* at 126 n.15 (majority opinion). The other 3,500-plus gas stations in the state were owned by "local retail dealers." *Id.* at 137. The Court could not have predicted that the large refiners' market share would shift to "out-of-state

firms such as Pantry Pride, Fisca, Hi-Way and Midway" rather than largely being absorbed by the already dominant local dealers. *Id.* at 147.

Accordingly, courts of appeals agree that under *Exxon*, bans on vertical integration in a retail market do not impose significant burdens on interstate commerce, even if they may cause a shift in market share from out-of-state to in-state retailers. In *NAOO*, where California banned LensCrafters' vertically integrated business model, the Ninth Circuit "assume[d] that there w[ould] be a shift in market share from . . . companies incorporated out-of-state to in-state optometrists." 682 F.3d at 1152. Nevertheless, it held that causing that shift did "not impose a significant burden on interstate commerce," *id.* at 1155, reasoning that *Exxon*'s no-burden holding "turned on the interstate *flow of goods*, not on . . . the out-of-state market shares of sales and profits," *id.* at 1153. Accordingly, even prohibiting the largest out-of-state retailer's business model did not burden interstate commerce because it did not "interfere with the flow of eyewear into California." *Id.* at 1155. The Sixth Circuit held that Tennessee's ban on optician-optometrist integration did not burden interstate commerce for the same reasons.[6] The Fifth Circuit's decisions are of a piece. *See*

---

[6] *See LensCrafters*, 403 F.3d at 806 (adopting district court's treatment of *Pike*); *LensCrafters, Inc. v. Wadley*, 248 F. Supp. 2d 705, 735 (M.D. Tenn. 2003) (reasoning LensCrafters failed to show that Tennessee's law "impedes the flow of optical wear into the state of Tennessee").

*Ford*, 264 F.3d at 503 (holding that banning manufacturer-owned car dealerships did not burden interstate commerce because it would not "inhibit[] the flow of interstate goods"); *Allstate*, 495 F.3d at 163–64 (holding that banning auto-insurer-owned body shops did not burden interstate commerce because it did not burden "interstate re-pair chains" generally).

Under *Exxon*, Act 624 does not burden interstate commerce. Just as in *Exxon*, Act 624's burdens fall on "particular interstate firms" and "methods of operation in a retail market," not "the interstate market" as a whole. *Exxon*, 437 U.S. at 127. In fact, Plaintiffs' burden claims are even weaker than those in *Exxon* in two key re-spects. First, unlike in *Exxon*, where the plaintiffs at least claimed that *they* would be deterred from selling gasoline to Maryland, if not that gasoline imports would be di-minished overall, Plaintiffs do not claim that any drug manufacturer will stop selling any drug to Arkansas pharmacies. They merely claim that "[t]he source of the con-sumers' supply" will switch from one pharmacy to another. *Id.* So it is even more true here than in *Exxon* that the law has "no demonstrable effect whatsoever on the interstate flow of goods." *Id.* at 125 n.16. Second, whereas the law in *Exxon* had the effect of shuttering over eighty percent of the local gas stations' competition, leaving untouched only a smattering of non-independent stations owned by forgotten com-panies like Pantry Pride, Act 624 has a smaller footprint. As legislators repeatedly

noted in the enactment process, it leaves untouched one of the two largest national pharmacy chains, Walgreens, as well as one of the largest mail-order pharmacies, Amazon. So it is even more true here than in *Exxon* that Act 624 only burdens "particular interstate firms," not "the interstate market." *Id.* at 127.

Yet even if Act 624 were thought, contrary to *Exxon*, to burden interstate commerce, those burdens would not clearly exceed its putative benefits. Act 624's putative benefits are considerable. The legislature predicted it would protect patient access—both by removing PBMs' incentive to steer patients away from local pharmacies and by protecting those local pharmacies from ultimately being driven out of business—and reduce prices, by removing PBMs' incentive to reimburse at inflated rates at pharmacies they control. Those benefits easily outweigh—and at a minimum are not clearly outweighed by—the burdens occasioned by merely ousting particular pharmacies from Arkansas's market. *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 312–13 (1st Cir. 2005) (*PCMA*) (holding that a PBM regulation's putative local benefits of "reduc[ing] the costs of, and increas[ing] the public's access to, prescription drugs" "clearly outweigh[ed]" the burden of some PBMs' "no longer do[ing] business in Maine").

Plaintiffs may dispute whether Act 624 will have those benefits. But *Pike* "does not mention actual benefits," *NAOO*, 682 F.3d at 1155; it instead asks

whether a law's burdens clearly exceed its "putative" ones. *Pike*, 397 U.S. at 142.

"Consistent with the use of the term 'putative'" in *Pike*, courts do "not 'second guess the empirical judgment of lawmakers concerning the utility of legislation'" in applying it. *Ford*, 264 F.3d at 503 (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987)). Instead, they assume a law's intended benefits will come to pass. For example, in *PCMA*, where Maine claimed that its PBM regulation would "reduce the costs of, and increase the public's access to, prescription drugs," the First Circuit refused to entertain PCMA's claim that "th[o]se benefits [we]re not likely to materialize," explaining that "under *Pike*, it is the *putative* local benefits that matter," "not whether those benefits actually come into being at the end of the day." 429 F.3d at 312–13.

The district court nevertheless concluded that Act 624's burdens clearly exceeded its putative benefits because Arkansas already has laws that prohibit PBM steering and price discrimination against non-affiliated pharmacies. Add. 6; App. 780; R. Doc. 73, at 6. But whether there are "less restrictive alternatives" to a law is only relevant where "heightened scrutiny" applies; it is not, this Court has said, a proper inquiry under *Pike*'s standard for reviewing non-discriminatory laws. *United Waste Sys. of Iowa, Inc. v. Wilson*, 189 F.3d 762, 768 (8th Cir. 1999); *see Dep't of*

*Revenue of Ky. v. Davis*, 553 U.S. 328, 338–39 (2008) (suggesting the availability of less restrictive alternatives is only relevant where a law is discriminatory).

In any event, the legislature could have reasonably believed that removing PBMs' incentive to steer and discriminate on price would be a substantially more effective means of preventing steering and price discrimination than tasking a small state agency with policing massive corporations' often opaque reimbursement practices. *Cf. Exxon*, 437 U.S. at 144 (Blackmun, J., dissenting) (noting that "predatory pricing and unfair allocation already ha[d] been prohibited by both [Maryland] and federal law" in *Exxon*); *Allstate*, 495 F.3d at 164 (upholding Texas's ban of auto insurer/body-shop integration under *Pike* as a "reasonable" means of targeting steering notwithstanding that Texas could have instead banned steering). For as the district court itself observed, PBMs' "vertical integration . . . create[s] 'an inherent conflict of interest and an irresistible opportunity for PBMs to engage in predatory practices.'" Add. 2; App. 776; R. Doc. 73, at 2 (alteration omitted) (quoting *Allstate*, 495 F.3d at 161). It is unlikely that policing those predatory practices after the fact would be as effective a method of curbing them as eliminating PBMs' "irresistible" incentive to engage in them.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's order granting a preliminary injunction.

Respectfully submitted,

TIM GRIFFIN
 Arkansas Attorney General

AUTUMN HAMIT PATTERSON
 Arkansas Solicitor General

ASHER L. STEINBERG
 Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
 ATTORNEY GENERAL
101 West Capitol Ave.
Little Rock, AR 72201
(501) 682-1051
Asher.Steinberg@arkansasag.gov

*Attorneys for Appellants*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,936 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Equity, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Asher Steinberg*
Asher Steinberg

## CERTIFICATE OF SERVICE

I certify that on October 24, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Asher Steinberg*
Asher Steinberg