# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

EXPRESS SCRIPTS, INC., et al.,

*Plaintiffs-Appellees*,

v.

RODNEY RICHMOND, et al., in their official capacities as board members of the Arkansas State Board of Pharmacy,

*Defendants-Appellants*.

On Appeal from the U.S. District Court
for the Eastern District of Arkansas
Nos. 4:25-cv-00520, 4:25-cv-00524, 4:25-cv-00561, 4:25-cv-00598
District Judge Brian S. Miller

## BRIEF OF COMMUNITY ONCOLOGY ALLIANCE, INC. AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS AND SUPPORTING REVERSAL

**FRIER & LEVITT, LLC**
Todd Mizeski, Esq.
Jonathan E. Levitt, Esq.
84 Bloomfield Avenue
Pine Brook, NJ 07058
(973) 618-1660
tmizeski@frierlevitt.com
jlevitt@frierlevitt.com

Dated: October 31, 2025

i

## **<u>F.R.A.P. 26.1 CORPORATE DISCLOSURE STATEMENT</u>**

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Community Oncology Alliance states as follows:

Community Oncology Alliance is a tax-exempt, nonprofit corporation. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

**Table of Contents**

I.   Interest of *Amicus Curiae*.................................................................1

II.  Introduction ...........................................................................................3

III. Factual Background...............................................................................4

   A.   PBM Market Structure and Vertical Integration .......................5

     1.   Role of PBMs in the health care system ...............................5

     2.   Industry consolidation ..........................................................6

     3.   Vertical integration with other health care sectors...............7

     4.   Conflicts of interest inherent in vertical integration ............8

        a)   Spread pricing ...............................................................8

        b)   Rebate manipulation ....................................................10

        c)   Steering and suppression of lower-cost options ............12

   B.   PBM-Affiliated Pharmacies Result in Lower Quality of Care
      and Increased Out-of-Pocket Costs. .......................................14

   C.   National Policy Context...........................................................18

     1.   Congressional Concern .......................................................18

     2.   Structure Separation in Healthcare......................................20

   D.   Arkansas Context....................................................................20

     1.   Documented Harms in Arkansas and the Legislative Record
        for Act 624.........................................................................21

     2.   Prior Legislative Efforts and Their Limits .........................23

     3.   Patient Harms in Arkansas .................................................25

IV.  Argument..............................................................................................27

   A.   An Accurate Account of Arkansas's Legislative and
      Regulatory Context. ................................................................27

     1.   Prior reforms did not resolve the PBM problem.................27

     2.   The law's purpose was patient-centered, not protectionist. ................29

   B.   TRICARE and Preemption ......................................................31

   C.   Patient Harms and the Public Interest.....................................33

V.   Conclusion............................................................................................35

# Table of Authorities

## Cases

*Conroy v. Aniskoff*, 507 U.S. 511 (1993)................................................................29

*Dataphase Systems, Inc. v. CL Systems, Inc*., 640 F.2d 109 (8th Cir. 1981) ... 33, 34

*Express Scripts, Inc. v. Richmond*,
No. 4:25-cv-00520-BSM (E.D. Ark. July 28, 2025).................................... passim

*Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80 (2020) ...............................5, 23

## Statutes

10 U.S.C. § 1071 ........................................................................................................3

10 U.S.C. § 1074g........................................................................................................32

2015 Ark. Laws Act 900 (S.B. 688) .........................................................................23

2018 Ark. Laws Act 1 (H.B. 1010, 2d Ex. Sess). .....................................................24

2018 Ark. Laws Act 3 (S.B. 2, 2d Ex. Sess.)............................................................24

2025 Ark. Laws Act 624 (H.B. 1150).................................................................. passim

42 U.S.C. § 1395nn.....................................................................................................20

Modernizing and Ensuring PBM Accountability Act, S. 2973, 118th Cong. (2023),
https://www.congress.gov/bill/118th-congress/senate-bill/2973/text.................19

Pharmacy Benefit Manager Transparency Act, S. 127, 118th Cong. (2023),
https://www.congress.gov/bill/118th-congress/senate-bill/127 ..........................19

## Other Authorities

American Society of Clinical Oncology, In-House Specialty Pharmacy at Cancer Center Improves Quality of Care, Reduces Medical Errors (Feb. 28, 2017), https://ascopost.com/News/48395 ........................................................................2

Ark. H. Ins. & Com. Comm. Hr'g on H.B. 1150, 94th Gen. Assemb., Reg. Sess. (Apr. 2, 2025) (statement of Rep. Moore), https://arkleg.state.ar.us/Bills/Detail?ddBienniumSession=2025%2F2025R&id= hb1150 ...............................................................................................................22

Ark. H. Ins. & Com. Comm. Hr'g on H.B. 1150, 94th Gen. Assemb., Reg. Sess. (Apr. 2, 2025) (testimony of J. Vinson, Ark. Pharmacists Ass'n), https://arkleg.state.ar.us/Bills/Detail?ddBienniumSession=2025%2F2025R&id= hb1150 ........................................................................................................ 21, 24

Arkansas Senate News, Legislature Prohibits Pharmacy Benefit Managers from Operating Retail Drug Stores (Apr. 2025), https://senate.arkansas.gov/senate-news/posts/2025/april/pharmacy-benefit-managers/...........................................21

Audit of the American Postal Workers Union Health Plan (FEHBP) Administered by Express Scripts, Inc., Rep. No. 2022-SAG-029 (Mar. 2024).........................10

Fed. Trade Comm'n, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies (July 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf ................................................................................................... passim

Fed. Trade Comm'n, Prescription Drug Middlemen and the Impact of Pharmacy Benefit Managers 3–4 (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf. ................................................................................................... passim

H. Comm. on Oversight & Accountability, Pharmacy Benefit Managers and Their Impact on Patients and Taxpayers (July 23, 2024), https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pdf.................................................................................. 5, 11, 13

José R. Guardado, *Policy Research Perspectives: Competition in Pharmacy Benefit Manager Markets and Vertical Integration of Insurers with Health Insurers* (Am. Med. Ass'n 2025), https://www.ama-assn.org/system/files/prp-pbm-shares-hhi-2025.pdf ........................................................................... 6, 7, 12, 13

Ohio Auditor of State, *Pharmacy Benefit Manager Services in Ohio's Medicaid Managed Care Program* (Aug. 2018), https://audits.ohioauditor.gov/Reports/AuditReports/2018/Medicaid_Pharmacy_Services_2018_Franklin.pdf.................................................................9

Rebecca Pifer, 'Stopping a 'Moral Obscenity': Senate Judiciary Committee Expresses Support for PBM Reform, Healthcare Dive (May 14, 2025), https://www.healthcaredive.com/news/senate-judiciary-backs-pbm-reform-hearing/747989 ..............................................................................18

T. Lambourne et al., Optimizing Patient Education of Oncology Medications: A Patient Perspective, J Canc Educ 34, 1024–1030 (2019), https://doi.org/10.1007/s13187-018-1406-9..........................................................2

Tess Vrbin, 'Arkansas Lawmakers Seek to Ban Prescription Drug Middlemen from Owning Pharmacies in the State,' Arkansas Advocate (Jan. 16, 2025), https://arkansasadvocate.com/2025/01/16/arkansas-lawmakers-seek-to-ban-prescription-drug-middlemen-from-owning ......................................................21

TRICARE, Defense Health Agency, *TRICARE Pharmacy Program Overview Fact Sheet* (Feb. 2025), https://tricare.mil/Publications/Fact-Sheets/pharmacy_overview..................................................................32

U.S. Gov't Accountability Off., Prescription Drugs: Selected States' Regulation of Pharmacy Benefit Managers, GAO-24-106898 (Mar. 2024), https://www.gao.gov/assets/gao-24-106898.pdf.............................. 12, 22, 24, 25

U.S. Off. of Pers. Mgmt., Off. of Inspector Gen., Audit of the Compass Rose Health Plan (FEHBP) Administered by Express Scripts, Inc., Rep. No. 2023-SAG-019 (Nov. 2024) .......................................................................10

**Constitutional Provisions**

U.S. Constitution, Art. I, § 8, cl. 3 .............................................................................3

## I. Interest of *Amicus Curiae*

Community Oncology Alliance ("COA"), *amicus curiae*, advocates for the survival of community oncology practices and the well-being of the patients they serve nationwide.[1] COA's mission is to ensure that patients with cancer receive quality, affordable, and accessible treatment in their own communities through community oncology practices, which increasingly provide oral therapies directly to patients via in-office pharmacies or dispensing facilities. Through this work, COA and its members have unique visibility into the effects of pharmacy benefit manager ("PBM") vertical integration on patient access, affordability, and continuity of treatment.

COA and its members have a direct interest in this matter because Arkansas Act 624 of 2025 ("Act 624") addresses the structural conflicts of interest created when PBMs own or control pharmacies. Those conflicts affect COA members and their patients, including many in Arkansas, by shaping the terms of competition and influencing where and how patients receive oncology care. Along with other independent pharmacies in Arkansas, COA members are hindered in their ability to provide quality cancer care due to patient steering, underwater reimbursement, and

[1] All parties have consented to the filing of this brief.

1

related PBM practices that are obstacles to providing cancer patients with the highest quality, most affordable cancer care close to home.

Specifically, chemotherapy and related cancer medications are complex and potentially life-threatening if mishandled. Oncologists and specialized nurses must closely supervise these therapies, educate patients on side effects, and adjust regimens in real time.[2] Patient compliance with oral cancer drug therapy is shown to be higher when provided directly by an oncologist at the site-of-care as opposed to by a separate pharmacy.[3] When community practices are forced to close or cease dispensing because of PBM low-ball reimbursement and steering practices to their own pharmacies, patients lose that integrated oversight. They experience delays,

---

[2] T. Lambourne *et al.,* Optimizing Patient Education of Oncology Medications: A Patient Perspective, *J Canc Educ* 34, 1024–1030 (2019), https://doi.org/10.1007/s13187-018-1406-9; *See also* Nancy J. Egerton, *In-Office Dispensing of Oral Oncolytics: A Continuity of Care and Cost Mitigation Model for Cancer Patients*, Am. J. Manag. Care Vol. 22, Supp. No. 4, S100 (2016), https://www.ajmc.com/view/in-office-dispensing-of-oral-oncolytics-a-continuity-of-care-and-cost-mitigation-model-for-cancer-patients (in-office dispensing model of chemotherapy drugs allows "the practitioner to optimize all aspect of cancer drug therapy management", including shorter wait times, cost savings, and a "nimble" approach to medication management).

[3] *See, e.g.*, American Society of Clinical Oncology, *In-House Specialty Pharmacy at Cancer Center Improves Quality of Care, Reduces Medical Errors* (Feb. 28, 2017), https://ascopost.com/News/48395 ("Along with a delay in access to medication, researchers found more errors when patients filled their prescriptions elsewhere.").

denials, and dosage errors when PBM mail-order or specialty pharmacies intervene, fragmenting care and delaying treatment.

COA has received numerous patient complaints describing delays, medication errors, and higher costs when insurance carriers, through their PBMs, require patients to obtain their oral cancer drugs from a PBM's pharmacy. The issues before the Court thus directly affect both patient outcomes and the ability of healthcare professionals to care for critically ill patients.

COA submits this brief not to duplicate the parties' legal arguments, but to provide factual context about PBM market structure, the limits of prior regulation, and the real-world consequences of vertical integration for patients and providers. COA respectfully submits that this information will assist the Court in evaluating the present matter on appeal.

No party's counsel authored this brief in whole or in part, and no person other than *amicus* or its members made a monetary contribution intended to fund its preparation or submission.

## II.    Introduction

This appeal challenges the district court's order enjoining enforcement of Act 624, which bars PBMs from owning or controlling pharmacies in Arkansas, after the court preliminarily found a likelihood of success on the merits based on its view that

the law is preempted by TRICARE, 10 U.S.C. § 1071 et seq., and violates the Commerce Clause, U.S. Const. art. I, § 8, cl. 3.

In reaching its conclusion, the district court relied on mistaken factual assumptions. It assumed that Arkansas' existing laws adequately regulated PBMs and that Act 624 was therefore unnecessary and protectionist, and that enforcing Act 624 would disrupt the uniform administration of TRICARE. Both premises are incorrect. As this brief demonstrates, those assumptions are not consistent with the actual experience of patients and providers in Arkansas nor with the legislative record.

COA submits this brief to provide the factual context necessary for evaluating those issues.

## III.  Factual Background

The factual record surrounding PBMs is critical to understanding why Arkansas enacted Act 624 and why the district court's premises were misguided. PBMs are not neutral claims administrators, but consolidated, vertically integrated entities whose market structure creates conflicts of interest that shape patient access, pharmacy reimbursement, and overall drug costs. This section outlines that structure nationally before turning to its operation in Arkansas and its relevance to Act 624.

## A. PBM Market Structure and Vertical Integration

### 1. <u>Role of PBMs in the health care system</u>

PBMs emerged in the 1960s and 1970s to help insurers and employers manage prescription drug benefits. Their core tasks are to process pharmacy claims, design and administer formularies, negotiate rebates from manufacturers, and manage pharmacy networks. In this role, PBMs act as intermediaries between manufacturers, payors, pharmacies, and patients.[4] *See Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 82–83 (2020) (describing PBMs as intermediaries).

Over time, those administrative functions have positioned PBMs as gatekeepers to the prescription-drug market. They decide which drugs are covered, what patients pay out of pocket, and through which pharmacies prescriptions may be filled. PBMs now act as powerful middlemen inflating drug costs and squeezing independent pharmacies.[5] Their control over reimbursement, formulary design, and network participation allows them to influence every stage of the prescription-drug

---

[4] Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* 4–6 (July 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

[5] *Id.* at 1.

supply chain—often in ways that raise costs for payors and patients alike.[6]

## 2. Industry consolidation

The PBM sector has consolidated dramatically over the past two decades. Independent firms that once numbered in the dozens have been absorbed through successive mergers and acquisitions. Today, three PBMs—CVS Caremark, Express Scripts, and OptumRx—process more than 80 percent of all prescription-drug claims.[7] The American Medical Association likewise reports that the PBM market is "highly concentrated," with barriers to entry entrenched and competition significantly weakened.[8]

This consolidation has left little room for new entrants or meaningful competition. By concentrating control of formulary management and rebate negotiations to just three firms, it has magnified the leverage PBMs exert over both

---

[6] H. Comm. on Oversight & Accountability, *Pharmacy Benefit Managers and Their Impact on Patients and Taxpayers* 2–3 (July 23, 2024), https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pdf.

iles/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf.

Fed. Trade Comm'n, *Prescription Drug Middlemen and the Impact of Pharmacy Benefit Managers* 3–4 (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf.

[8] FTC, Middlemen Inflating Drug Costs, at 6 (July 2024).

manufacturers and pharmacies.[9] The result is a market dominated by a handful of intermediaries whose decisions determine pricing, access, and reimbursement throughout the prescription-drug supply chain.[10]

### 3. Vertical integration with other health care sectors

Consolidation in the PBM industry has been accompanied by vertical integration within large health-care conglomerates that combine insurance, PBM, and pharmacy operations. CVS Caremark operates within CVS Health, which also owns the insurer Aetna and a nationwide chain of retail, mail-order, and specialty pharmacies. Express Scripts is part of Cigna, and OptumRx is part of UnitedHealth Group—both of which likewise combine insurance arms with PBM operations and specialty and mail-order pharmacies.[11]

As a result, most Americans with prescription-drug coverage now receive it through conglomerates that administer benefits while also competing in the pharmacy market.[12] This integration gives PBMs both the power to set

---

[9] *Id.* at 5.

[10] Fed. Trade Comm'n, *Prescription Drug Middlemen and the Impact of Pharmacy Benefit Managers* 3–4 (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf.

[11] FTC, Middlemen Inflating Drug Costs, at 8-9 (July 2024).

[12] AMA, Competition in PBM Markets at 5 (2025).

reimbursement rates and the incentive to favor their own pharmacies through network design, reimbursement terms, and patient steering. The FTC has documented how these arrangements disadvantage unaffiliated pharmacies and patients alike, including through spread pricing and restrictions that direct patients to PBM-owned outlets.[13]

### 4. Conflicts of interest inherent in vertical integration

Vertical integration does not merely restructure markets on paper; it creates tangible incentives for PBMs to favor themselves, disadvantage competitors and harm patients. Those incentives translate into specific practices that inflate costs and restrict access. Three patterns are especially well documented: spread pricing, rebate manipulation, and steering patients away from lower-cost options.

### a) Spread pricing

In their intermediary role, PBMs both bill insurers or employers for drugs and reimburse pharmacies for dispensing those same drugs. Spread pricing occurs when a PBM reimburses pharmacies at one rate but charges the plan sponsor a higher rate, keeping the "spread" as profit.

---

[13] FTC, PBM Impact Report at 3-4 (Jan. 2025).

This practice is problematic for three reasons. First, it is opaque: pharmacies see only the reimbursement they receive, and insurers and employers see only the invoices they are billed. Neither side sees the full transaction, which allows PBMs to pocket the difference without disclosure. Spread pricing typically comes to light only through regulator investigations or litigation discovery. Second, it inflates costs: PBMs have an incentive to maximize their own profits, raising expenditures for taxpayers and employers without adding value. Third, it distorts markets: independent pharmacies are reimbursed at unsustainable rates while PBM-owned pharmacies are protected, compounding the conflicts created when PBMs compete against the very providers they regulate.[14]

Regulators have begun to respond. An Ohio audit of Medicaid managed care found that in a single year PBMs extracted $224.8 million in spread, averaging $5.71 per claim, with the vast majority (about 93 percent) generated on generic drugs.[15] The Ohio Auditor emphasized the lack of transparency, recommended enhanced

---

[14] FTC, Middlemen Inflating Drug Costs, at 17 (July 2024).
[15] Ohio Auditor of State, *Pharmacy Benefit Manager Services in Ohio's Medicaid Managed Care Program* 4 (Aug. 2018), https://audits.ohioauditor.gov/Reports/AuditReports/2018/Medicaid_Pharmacy_Services_2018_Franklin.pdf.

auditing and reporting, and urged consideration of pass-through models where sponsors pay only the amount reimbursed to pharmacies plus an administrative fee.[16]

Nevertheless, spread pricing remains widespread. In 2025, the FTC found that the three dominant PBMs generated more than $1.4 billion in profits through spread pricing between 2017 and 2022, largely hidden from insurers and employers.[17]

Similar problems have surfaced in the Federal Employees Health Benefits Program. In 2024, the OPM Inspector General found that Express Scripts, Inc. overcharged the Compass Rose Health Plan by $5.8 million (plus $735,000 in lost investment income) under a pass-through pricing contract, and that the American Postal Workers Union Health Plan was overcharged approximately $14.4 million for the same reason.[18]

b) Rebate manipulation

PBMs also profit from rebates paid by drug manufacturers to secure favorable placement on formularies—that is, the lists of medicines that a health plan agrees to

---

[16] Id.

[17] Id.

[18] See U.S. Off. of Pers. Mgmt., Off. of Inspector Gen., Audit of the Compass Rose Health Plan (FEHBP) Administered by Express Scripts, Inc., Rep. No. 2023-SAG-019, at 5–6 (Nov. 2024). See also Audit of the American Postal Workers Union Health Plan (FEHBP) Administered by Express Scripts, Inc., Rep. No. 2022-SAG-029, at 4–5 (Mar. 2024).

cover and that determine patients' out-of-pocket costs. Manufacturers pay these rebates as a *quid pro quo*: in exchange for larger payments, PBMs give the manufacturers' drug preferred formulary status and greater access to patient volume.[19] In principle, rebates could lower costs if passed through to plan sponsors or patients. In practice, PBMs often retain a portion of these payments and structure formularies to favor high-list-price drugs that generate the largest rebates.

One of the ways PBMs generate additional revenue and fees from rebates is by creating vertically integrated "rebate aggregators" or "group purchasing organizations." Each of the three dominant PBMs (Caremark, Express Scripts, and OptumRx) has established such entities: Ascent Health Services (affiliated with Express Scripts and Prime, and also serving Humana Pharmacy Solutions), Zinc Health Services (affiliated with CVS), and Emisar Pharma Services (affiliated with OptumRx). These aggregators act as additional middlemen between drug manufacturers and PBMs, obscuring the flow of rebate dollars and enabling PBMs to take hidden, contingent fees from negotiated rebates.[20]

Like spread pricing, rebate manipulation creates problems along three dimensions. First, it is opaque: neither patients nor plan sponsors can easily

---

[19] House Oversight PBM Report at 4 (2024).
[20] See FTC, Middlemen Inflating Drug Costs, at 20–21 (2024).

determine the net cost of a drug after rebates, or how much of the rebate is retained by the PBM.[21] Second, it inflates costs: manufacturers are incentivized to raise list prices to fund larger rebates, which increases out-of-pocket spending for patients whose copays are tied to list price.[22] Third, it distorts access: PBMs can exclude or penalize lower-priced alternatives if they do not offer competitive rebates.[23]

c) Steering and suppression of lower-cost options

PBMs also use their control over networks, reimbursement, and formularies to steer patients toward PBM-owned pharmacies or higher-cost products, regardless of clinical appropriateness. They suppress lower-cost generics and biosimilars by denying their inclusion on formularies, placing them on unfavorable tiers, or imposing restrictive utilization rules that make them harder to access.

As with spread pricing and rebate manipulation, these practices create problems along three dimensions. First, they are opaque: patients and providers rarely know that coverage restrictions or network rules are driven by PBM ownership interests or rebate arrangements rather than clinical need.[24] Second, they

---

[21] *Id.*

[22] AMA, Competition in PBM Markets at 6 (2025).

[23] U.S. Gov't Accountability Off., *Prescription Drugs: Selected States' Regulation of Pharmacy Benefit Managers*, GAO-24-106898, at 16 (Mar. 2024), https://www.gao.gov/assets/gao-24-106898.pdf.

[24] *Id.* at 15–16.

inflate costs: steering patients to branded drugs or PBM-owned outlets drives up overall spending while lower-cost generics and independent providers are excluded.[25] Third, they harm patients by limiting meaningful choice—forcing them to abandon trusted local pharmacies, accept unwanted mail-order delivery, or pay more for treatment.[26]

Concrete examples underscore the harm. In the specialty generics market, PBMs have excluded lower-cost products from formularies or subjected them to burdensome prior authorization, while continuing to favor branded drugs with larger rebates.[27] Likewise, PBMs frequently mandate that high-cost or specialty drugs be dispensed only through their own mail-order or specialty pharmacies, or impose higher copays on patients who use independent providers.[28] These practices further channel revenue to PBM affiliates, restrict patient options, and undermine competition in precisely the ways that vertical integration makes possible.

Taken together, spread pricing, rebate manipulation, and patient steering illustrate how PBMs exploit their position as both payors' agents and market competitors. These practices are not isolated abuses but recurring patterns that flow

_____

[25] AMA, Competition in PBM Markets at 8 (2025).
[26] FTC, Middlemen Inflating Drug Costs, at 27 (2024).
[27] House Oversight PBM Report at 28–30 (2024).
[28] FTC, PBM Impact Report at 19–20 (2025).

directly from PBMs' ownership and control of affiliated pharmacies. That structural conflict enables PBMs to set reimbursement and access rules that advantage their own outlets, while disadvantaging rivals. The result is higher costs, reduced transparency, and diminished patient choice. These national patterns set the stage for the problems faced in Arkansas, where the same dynamics have undermined independent providers and motivated the legislature's efforts to curb PBM conflicts of interest.

### B. PBM-Affiliated Pharmacies Result in Lower Quality of Care and Increased Out-of-Pocket Costs.

The real-world impacts of PBM vertical integration are evident in the experiences of COA member practices, as detailed in the declaration of its Executive Director. These experiences demonstrate how PBMs' combined control over benefit management and pharmacy dispensing creates concrete barriers to timely care—manifesting in treatment delays, dispensing errors, and increased patient expenses.[29] Three specific examples illustrate these harms in practice.

One patient's experience demonstrates how PBM vertical integration turns ownership interests into barriers to timely treatment. This patient's oncologist

_____

[29] Declaration of Ted Okon, Executive Director, Community Oncology Alliance, (Appended hereto as Ex. A).

14

prescribed Temozolomide, a simple and inexpensive oral chemotherapy that the practice's own pharmacy could have dispensed immediately.[30] Yet the PBM administering the drug benefit required that it be obtained only through the PBM's own affiliated specialty pharmacy—a channel that served no medical purpose. Because the affiliated pharmacy operated remotely and demanded multiple patient interactions before shipping, delivery was delayed more than a week while the patient's radiation therapy was postponed. The practice ultimately supplied an emergency dose to keep treatment on track.

This kind of "specialty-pharmacy steering" exemplifies the structural conflict created when PBMs design drug-distribution rules and own the pharmacies they designate as exclusive providers. By classifying routine oral cancer drugs as "specialty" products, PBMs can capture dispensing revenue for their affiliates while denying patients the convenience and continuity of care available through their treating clinic. The result is higher cost, fragmented care, and, for patients like this one, needless suffering at a critical stage of treatment.

Oral oncology drugs (in essence, chemotherapy in a pill), which have become more available to treat cancer versus traditional infusible chemotherapy, are

---

[30] *Id.* at ¶ 4.

expensive and not stocked at retail pharmacies. These oral drugs are extremely lucrative to PBMs and their affiliated specialty and mail order pharmacies, which stock these drugs. PBMs reduce reimbursement to community oncology practice pharmacies and, in many cases, mandate that PBMs deliver the most lucrative drugs from their pharmacies. Patients then suffer from delays, denials, and higher costs, which is why Act 624 is so important in separating pharmacy control from PBMs.

An example of higher costs to cancer patients involves Capecitabine, an oral chemotherapy medication used widely in breast and colorectal cancer treatment.[31] Community oncology pharmacies can dispense the drug immediately for roughly twenty dollars, yet PBMs administering drug benefits frequently require that it be filled only through their affiliated specialty pharmacies for multiple times the price. Within those captive networks, co-payments commonly rise to two or three hundred dollars and refills are delayed by administrative hurdles. Patients who pay cash at their clinics to remain on their treatment schedule cannot apply their payments toward insurance deductibles, thus penalizing them for choosing timely care.

This pattern underscores the structural conflict at the heart of PBM vertical integration. By classifying inexpensive generic drugs as "specialty" products and

---

[31] *Id.* at ¶ 5.

channeling prescriptions through pharmacies they own or control, PBMs convert routine, low-cost prescriptions into high-margin transactions while depriving patients of affordable, local options. Act 624 seeks to eliminate this incentive by separating pharmacy ownership from pharmacy benefit management.

Finally, reports from COA practices also show how PBM control over distribution channels can directly interrupt patient care. One COA practice treated a patient with metastatic colon cancer whose prescribed therapy, Lonsurf, was available immediately through the practice's pharmacy.[32] The PBM administering the patient's drug benefit, however, required that it be obtained only through the PBM's mail-order specialty pharmacy. Because the patient lived in a rural area with poor mail and cell phone service, the first shipment arrived two weeks after approval. Subsequent refills were repeatedly delayed by dispensing errors—each time the PBM's pharmacy sent only part of the prescription, forcing additional travel and week-long interruptions in therapy. During one of those delays, the patient's disease progressed, requiring a switch to a harsher regimen.

This experience demonstrates how PBM vertical integration magnifies risk when the same entity both dictates distribution rules and profits from those rules. By

---

[32] *Id*. at ¶ 6-7.

requiring that oral chemotherapies be dispensed solely through their own mail-order affiliates, PBMs transform logistical complexity into a revenue stream, even when doing so jeopardizes timely treatment. Act 624 seeks to prevent that conflict of interest by ensuring that the entities managing drug benefits are not the same ones controlling the pharmacies.

### C. National Policy Context

The problems posed by PBM vertical integration are not unique to Arkansas. Federal agencies and Congress have recognized the same conflicts and their effects on patients and independent providers across the country.

### 1. Congressional Concern

Congress has scrutinized PBM conduct. In May 2025, the Senate Judiciary Committee denounced PBM practices as a national problem. Senator Cory Booker described PBM conduct as a "moral obscenity," while Senator Chuck Grassley emphasized that vertical integration was "hurting patients and driving independent pharmacies out of business." Providers testified that reimbursement practices forced pharmacy closures and limited access to drugs, particularly in rural areas.[33]

---

[33] Rebecca Pifer, 'Stopping a 'Moral Obscenity': Senate Judiciary Committee Expresses Support for PBM Reform,' Healthcare Dive (May 14, 2025), https://www.healthcaredive.com/news/senate-judiciary-backs-pbm-reform-hearing/747989

The FTC likewise reported "bipartisan interest in Congress and among the states in addressing PBM practices" and observed that legislative reforms "may be warranted."[34]

Relatedly, in 2023, the Senate introduced the *Pharmacy Benefit Manager Transparency Act*, which would enhance PBM reporting requirements and prohibit spread pricing in federal health programs.[35] The *Modernizing and Ensuring PBM Accountability Act*, addresses vertical integration more directly by restricting PBMs and their affiliates to bona fide, fair-market-value service fees and by barring incentive structures tied to drug prices or formulary placement—arrangements that vertically integrated PBMs have used to shift profits within their corporate networks.[36] Congress has not yet enacted either measure, but their bipartisan sponsorship underscores the growing consensus that PBM integration poses systemic risks to fair competition and patient access.

---

[34] FTC, PBM Impact Report 30 (2025).

[35] *Pharmacy Benefit Manager Transparency Act*, S. 127, 118th Cong. (2023), https://www.congress.gov/bill/118th-congress/senate-bill/127.

[36] *Modernizing and Ensuring PBM Accountability Act*, S. 2973, 118th Cong. (2023), https://www.congress.gov/bill/118th-congress/senate-bill/2973.

## 2. Structure Separation in Healthcare

Structural separation is not novel. Regulators have long required it when ownership creates conflicts of interest that distort competition or harm consumers.

Healthcare offers a clear and relevant example. Congress has long recognized that financial self-dealing can distort medical judgment. The Physician Self-Referral Law—commonly known as the Stark Law—prohibits physicians from referring patients to entities in which they hold a financial interest for designated health services reimbursable under Medicare, 42 U.S.C. § 1395nn. Its purpose is to prevent financial incentives from influencing treatment decisions and to preserve the integrity of patient care.

This federal precedent demonstrates the principle underlying Act 624: when vertical ownership creates conflicting incentives, structural limits are necessary to protect patients and ensure fair competition. By separating PBM ownership from pharmacy ownership and operations, Act 624 applies the same conflict-avoidance logic that Congress has long endorsed in healthcare regulation.

### D. Arkansas Context

PBM practices are not confined to national markets; they have had direct, well-documented effects in Arkansas. Independent pharmacies across the state have filed thousands of complaints over below-cost reimbursements, steering, and mail-

order mandates.[37] Legislators also heard testimony from patients and pharmacists describing delays in care and the erosion of community access as PBMs reimbursed their own affiliates more favorably than independents.[38] These problems persisted despite earlier state reforms, underscoring why the legislature concluded that additional measures were necessary.

1. Documented Harms in Arkansas and the Legislative Record for Act 624

The legislative record for Act 624 contained both data and testimony showing that the PBM practices documented nationally were also harming patients and providers within Arkansas. The Arkansas Insurance Department received nearly 3,000 complaints from independent pharmacies in 2024 regarding below-cost reimbursements, payment delays, and unfair contract terms.[39] Testimony before the House Insurance and Commerce Committee further described how PBMs

---

[37] Arkansas Senate News, Legislature Prohibits Pharmacy Benefit Managers from Operating Retail Drug Stores (Apr. 2025), https://senate.arkansas.gov/senate-news/posts/2025/april/pharmacy-benefit-managers

[38] Tess Vrbin, "Arkansas Lawmakers Seek to Ban Prescription Drug Middlemen from Owning Pharmacies in the State," Arkansas Advocate (Jan. 16, 2025), https://arkansasadvocate.com/2025/01/16/arkansas-lawmakers-seek-to-ban-prescription-drug-middlemen-from-owning-pharmacies-in-the-state.

[39] See Ark. H. Ins. & Com. Comm. Hr'g on H.B. 1150, 94th Gen. Assemb., Reg. Sess. (Apr. 2, 2025) (testimony of J. Vinson, Ark. Pharmacists Ass'n), https://arkleg.state.ar.us/Bills/Detail?ddBienniumSession=2025%2F2025R&id=hb 1150.

reimbursed their own affiliated outlets at higher rates than unaffiliated competitors for dispensing the same medications, creating a two-tiered system that undermined independent providers.[40]

Legislators also heard accounts of steering and mandatory mail-order delivery. Pharmacists and patients testified that consumers were directed away from their pharmacy of choice and compelled to use PBM-owned or -controlled outlets, often at greater inconvenience or cost. These practices, witnesses explained, reduced patient choice and exacerbated the financial pressures already forcing community pharmacies to close. Debate in the Senate referenced more than sixty pharmacy closures since 2016—a significant number in a state with roughly 750 community pharmacies overall, with severe effects in rural areas.[41]

Sponsors and witnesses framed these harms as the inevitable consequence of structural conflicts of interest when PBMs both set reimbursement rates and own retail pharmacies. Representative Jeremiah Moore, Act 624's House sponsor, told the committee that "you can be a PBM or you can be a pharmacy, but you cannot be both."[42] The Arkansas Pharmacists Association likewise warned that PBMs were

---

[40] FTC, Middlemen Inflating Drug Costs, at 17–20 (July 2024).
[41] GAO PBM Regulation Report at 15-16 (2024).
[42] *See* Ark. H. Ins. & Com. Comm. Hr'g on H.B. 1150, 94th Gen. Assemb., Reg. Sess. (Apr. 2, 2025) (statement of Rep. Moore),

"gaming the system to line their own pockets."[43]

The combination of complaint data, statistical evidence, and legislative testimony formed the factual foundation for Act 624, which the General Assembly enacted to address the structural conflict of interest undermining patient access and fair competition.

### 2. Prior Legislative Efforts and Their Limits

Act 624 did not emerge in a vacuum. For more than a decade, Arkansas has sought to regulate PBMs, but earlier reforms proved inadequate to address the structural conflicts that continued to harm patients and providers.

In 2015, the General Assembly enacted Act 900, which required PBMs to reimburse pharmacies no less than their acquisition cost for certain drugs and provided an appeals process for challenging below-cost payments. PBMs challenged that statute, but the Supreme Court upheld it in *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80 (2020), confirming that states may protect pharmacies from abusive reimbursement practices. Still, Arkansas pharmacists reported that PBMs

_____

https://arkleg.state.ar.us/Bills/Detail?ddBienniumSession=2025%2F2025R&id=hb 1150.

[43] See FTC, Middlemen Inflating Drug Costs, at 15–16 (July 2024).

quickly shifted tactics—continuing to impose below-cost reimbursements and opaque contract terms.[44]

In 2018, the legislature returned to the issue, enacting Acts 1 and 3, which prohibited PBMs from reimbursing their own affiliates at higher rates than independent competitors.[45] These reforms were designed to curb self-dealing, but pharmacies testified in subsequent hearings that the practice persisted in subtler forms, with PBMs continuing to advantage affiliated outlets through steering and differential contract terms.[46]

The Arkansas Insurance Department also sought to strengthen oversight by requiring PBMs to submit reimbursement data and by setting minimum dispensing fees. Yet complaints continued to mount—nearly 3,000 filed in 2024 alone.[47] According to the Arkansas Pharmacists Association, the persistence of these complaints showed that piecemeal regulation could not eliminate the fundamental conflict of interest created when PBMs act both as payors and competitors.[48]

---

[44] GAO PBM Regulation Report at 15-16 (2024).
[45] 2018 Ark. Laws Act 1 (H.B. 1010, 2d Ex. Sess.); 2018 Ark. Laws Act 3 (S.B. 2, 2d Ex. Sess.).
[46] FTC, PBM Impact Report at 19–20 (Jan. 2025).
[47] Vinson Testimony, Ark. H. Ins. & Com. Comm.
[48] FTC, Middlemen Inflating Drug Costs, at 15–16 (July 2024).

The legislature therefore concluded that more decisive action was necessary. Act 624 built on the lessons of these earlier measures by targeting the root cause— vertical integration—rather than its downstream symptoms.

### 3. Patient Harms in Arkansas

The legislative record also documented the direct impact of PBM practices on Arkansas patients. More than sixty pharmacy closures since 2016 were not merely business failures but events that left communities—especially rural ones—with limited or no local access to medications.[49] Witnesses explained that patients who lost their local pharmacy were forced to travel long distances or rely on PBM-owned mail-order delivery, which often led to delays and interruptions in therapy.[50]

Higher patient costs were another recurring theme in the legislative record. The Arkansas Insurance Department received complaints from patients steered into PBM-owned outlets or mail-order channels that charged more than community pharmacies.[51] Pharmacists testified that patients were sometimes denied coverage at independent pharmacies even when lower-cost generic alternatives were available, increasing out-of-pocket expenses.[52]

_____

[49] GAO, PBM Regulation Report at 15-16 (2024).
[50] FTC, PBM Impact Report 19–20 (Jan. 2025).
[51] *Id.*
[52] FTC, Middlemen Inflating Drug Costs, at 21–22 (July 2024).

Perhaps most troubling were treatment delays and interruptions in continuity of care. Patients described prescriptions for critical medications being held up or rejected because their chosen pharmacy was excluded from a PBM's preferred network.[53] *Cf. Express Scripts, Inc. v. Richmond*, No. 4:25-cv-00520-BSM, slip op. at 8–9 (E.D. Ark. July 28, 2025) (describing allegations that PBM network restrictions delayed patient access to medications). For oncology patients, whose treatment cycles depend on timely administration of oral and infused drugs, such delays can have profound and potentially deadly consequences.[54]

These accounts reinforced the legislature's conclusion that PBM ownership of retail pharmacies created structural conflicts of interest with serious downstream effects on patients. Act 624 was enacted not only to restore fair competition for providers but also to ensure that Arkansas patients retain meaningful access to affordable, timely, and local care. Those harms fall most heavily on rural residents and oncology patients—populations central to COA's mission to preserve access to community-based cancer treatment.

---

[53] FTC, PBM Impact Report 19–20 (Jan. 2025).
[54] FTC, Middlemen Inflating Drug Costs, at 26–27 (July 2024).

## IV. Argument

The aforementioned PBM practices and their consequences are intended to provide a foundation for this Court's *de novo* review. COA addresses four misplaced premises relied on by the lower court: (i) that prior Arkansas laws sufficiently addressed PBM conflicts, (ii) that Act 624 was enacted primarily for protectionist purposes, (iii) that the law threatens access to TRICARE benefits for military families, and (iv) that the evidence of patient harms resulting from PBM vertical integration were too uncertain or insubstantial to support the law.

### A. An Accurate Account of Arkansas's Legislative and Regulatory Context.

#### 1. Prior reforms did not resolve the PBM problem.

The district court reasoned that Arkansas's existing PBM laws "are sufficient for the state to achieve its stated purposes of curtailing plaintiffs' business tactics and minimizing the conflicts of interest inherent in PBM-affiliated pharmacies." *Richmond*, slip op. at 6. In reaching that conclusion, the court pointed to statutes requiring acquisition-cost reimbursement, prohibiting discriminatory payments to PBM affiliates, and barring network exclusion of willing pharmacies. *Id*.

That conclusion misinterprets the factual record in two respects. First, the state's prior reforms did not eliminate PBM practices that disadvantaged independent pharmacies and harmed patients. The statutes the district court cited

27

were already in force as the evidence of abuse continued to accumulate. After their enactment, the Arkansas Insurance Department still received complaints that PBMs reimbursed their affiliated outlets at higher rates while underpaying independents for the same prescriptions.[55] Legislative testimony confirmed that steering, treatment delays, and pharmacy closures persisted in the years that followed,[56] and nearly sixty non-PBM-affiliated pharmacies closed during that period despite the supposed safeguards.[57] These outcomes demonstrate that the earlier reforms were insufficient to counter the structural incentives that drove PBMs to favor their own affiliates.

Second, Act 624 was not redundant. Earlier laws focused on reimbursement parity and network access but Act 624 directly addresses the structural conflict created by PBM ownership of retail pharmacies. That ownership allowed PBMs to evade parity requirements by shifting volume to their own outlets and undermining willing-provider protections by making independent participation economically untenable. By prohibiting vertical integration outright, Act 624 closed the regulatory gap left open by prior statutes.[58] The legislature enacted it precisely because

---

[55] See *supra* Section III.D.2.
[56] *Id.*
[57] *Id.*
[58] See *supra* Section III.D.1.

testimony and evidence showed that previous reforms had failed to prevent PBMs from leveraging ownership interests to steer patients and distort competition.[59]

## 2. The law's purpose was patient-centered, not protectionist.

In finding Act 624 unconstitutional under the Commerce Clause, the district court relied on selected statements from the legislative record that it characterized as "protectionist rhetoric." *Richmond,* slip op. at 10-11. While the court properly warned that legislative history often contains "meaningless drivel," *quoting Conroy v. Aniskoff,* 507 U.S. 511, 518–19 (1993) (Scalia, J., concurring), it then did precisely what it cautioned against. By elevating a handful of rhetorical flourishes while disregarding the bulk of the testimony, the court overlooked extensive patient-centered evidence supporting the statute. That record demonstrates that Act 624 was enacted to remedy documented harms to patients, not to insulate Arkansas pharmacies from competition.[60]

The legislative hearings featured extensive testimony from patients, providers, and regulators describing how PBM ownership and control of pharmacies disrupted continuity of care. Oncology and chronic-disease patients testified that they were steered away from established providers and forced into PBM-owned

---

[59] *Id.*
[60] *Id.*

mail-order channels, leading to delayed treatments and increased risk of medication errors.[61] These were not abstract or hypothetical concerns but concrete real-world harms that disrupted treatment and eroded trust between patients and providers.

Lawmakers also heard evidence of reduced access in rural communities, where independent pharmacies often provide the only practical access to prescription drugs. Despite existing parity laws, PBM reimbursement practices had forced dozens of closures in Arkansas, creating pharmacy deserts.[62] Legislators emphasized that Act 624 was intended to address this widening gap in access to care, particularly for vulnerable populations in underserved areas.[63]

Finally, the record contained substantial evidence of administrative delays and higher costs caused by PBM conflicts of interest. Providers testified that PBM practices such as prior authorization and limited distribution channels created barriers to timely treatment.[64] Patients described increased out-of-pocket expenses when PBMs steered them to higher-cost branded drugs or PBM-affiliated pharmacies, even when lower-cost generics or local outlets were available.[65]

---

[61] *Id.*
[62] See *supra* Section III.D.3.
[63] See *supra* Section III.D.1.
[64] See *supra* Section III.D.1.
[65] *Id.*

Legislators focused on these patient harms—not abstract economic protectionism—when advancing Act 624 as a necessary structural reform.

In short, the legislative record was overwhelmingly patient-centered. Its consistent focus was on continuity of care, rural access, and the conflicts of interest driving higher costs and treatment delays. By giving undue weight to a few rhetorical flourishes and disregarding the extensive evidence of patient harm before the legislature, the district court misconstrued the record and the statute's central purpose.

## B. TRICARE and Preemption

The district court concluded that Act 624 is both "explicitly" and "implicitly" preempted by TRICARE. It reasoned that because Act 624 bars PBM-owned pharmacies from delivering care to Arkansas patients, the law conflicts with TRICARE's structure and undermines the program's stability and uniformity. *Richmond,* slip op. at 9-10. That reasoning rests on a misunderstanding of how TRICARE operates and what Act 624 actually does.

TRICARE contracts with PBMs to administer its retail pharmacy benefit—processing claims, setting reimbursement levels, and managing a pharmacy network. But TRICARE beneficiaries need not obtain their medications from a PBM-affiliated pharmacy. Rather, they can fill their prescriptions through military

treatment facility pharmacies, independent pharmacies, national chains, and mail-order services. Nothing in TRICARE's laws or in its PBM contracts requires that PBMs own or control any of these dispensing outlets. *See* 10 U.S.C. § 1074g.[66] Act 624 leaves PBM administrative functions entirely intact. It simply removes the structural conflict of interest that arises when the PBM also owns the retail outlet deciding whether and where a patient may obtain medication.

Far from reducing access for TRICARE families, Act 624 promotes it: by preventing PBMs from favoring their own outlets, the law expands opportunities for independent and community pharmacies—including those in rural and underserved areas on which TRICARE beneficiaries often rely. The statute thus strengthens, rather than weakens, beneficiaries' access to covered medications.

The district court also found that Act 624 frustrates TRICARE's "uniform" national character. But TRICARE's uniformity depends on consistent coverage and benefit design, not on ownership of retail pharmacies. Dispensing is carried out by the same mix of outlets nationwide—military, independent, chain, and mail-order—and Act 624 leaves all those channels fully available in Arkansas with the same

---

[66] See also TRICARE, Defense Health Agency, *TRICARE Pharmacy Program Overview Fact Sheet* (Feb. 2025), https://tricare.mil/Publications/Fact-Sheets/pharmacy_overview.

PBM-managed coverage as in every other state. The only difference is that none of those outlets may be PBM-owned. That condition does not alter the scope of TRICARE benefits or treat Arkansas families differently; it simply ensures that the benefits they receive are delivered without the conflict of interest that arises from PBM ownership of dispensing pharmacies.

In short, Act 624 neither bars TRICARE from contracting with PBMs nor restricts military families from access to medications. Rather, it targets structural conflicts of interest that have harmed TRICARE beneficiaries alongside other patients, and in doing so furthers TRICARE's objectives of affordability, stability, and reliable access to care.

### C. Patient Harms and the Public Interest

Under *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981) (*en banc*), a court weighing a preliminary injunction must consider not only the likelihood of success on the merits but also the balance of equities and the public interest. The district court acknowledged that standard but, in applying it, discounted the evidence of patient harm and public interest underlying Act 624. In concluding that "no harm is caused where defendants are enjoined from enforcing an unconstitutional law," the court effectively assumed that the law served no legitimate purpose. *Richmond,* slip op. at 13. That assumption overlooked the factual record

before the legislature and the extensive federal findings demonstrating that PBM ownership of pharmacies causes measurable harm to patients through higher costs, delayed treatment, and diminished access to care.[67]

The evidence before the legislature and in the broader regulatory record shows that these harms are neither speculative nor isolated. Reports from the FTC and the Government Accountability Office, along with data presented to Arkansas lawmakers, document that PBMs' vertically integrated structures distort reimbursement, restrict network participation, and steer patients away from their chosen providers.[68] Members of COA witness these effects daily: oncology and urology patients lose access to familiar dispensing channels, experience interruptions in chemotherapy cycles when prescriptions are redirected to PBM-owned outlets, and face unaffordable co-pays for brand drugs favored by PBM rebate structures. These consequences are precisely the patient-level harms the legislature sought to prevent through Act 624's ownership restrictions.

Recognizing these realities changes the *Dataphase* balance. The public interest factor does not turn on abstract constitutional formulations but on the tangible effects of the challenged law. The record shows that PBM ownership of

---

[67] See *supra* Section III.A.4.
[68] *Id.*

dispensing pharmacies distorts market incentives, raises costs, and disrupts continuity of care, while Act 624 addresses those conflicts without limiting access to any covered benefit. Enforcing Act 624 protects Arkansas patients, promotes fair competition, and advances the very stability in health-care delivery that Congress and the State seek to preserve.

## V.    Conclusion

The record before the Arkansas legislature and the extensive findings summarized above demonstrate that PBM ownership of pharmacies creates conflicts of interest that raise costs, restrict access, and harm patients—particularly those in rural and specialty-care settings. Act 624 was enacted to address those harms through a targeted structural reform consistent with well-established regulatory precedent.

For these reasons, *amicus* COA supports Defendants-Appellants' request to reverse the district court's order.

Dated: October 31, 2025                                    Respectfully submitted,

                                                                        **FRIER & LEVITT, LLC**

                                                                        /s/ *Todd Mizeski*
                                                                        Todd Mizeski, Esq.

Jonathan E. Levitt, Esq.
84 Bloomfield Avenue
Pine Brook, NJ 07058
(973) 618-1660
tmizeski@frierlevitt.com
jlevitt@frierlevitt.com
Counsel for *Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this brief:

1. Contains 6,482 words, excluding the parts of the brief exempted by Rule 32(f);

2. Has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font;

3. Complies with the type-volume limitation of Rule 29(a)(5);

4. This brief is being electronically filed as a single PDF file that has been scanned for viruses and is virus-free, consistent with 8th Cir. Rule 28A(h)(2).

Dated: October 31, 2025

/s/ Todd Mizeski
Todd Mizeski
Counsel for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system, which will serve all registered counsel of record.

Dated: October 31, 2025                    /s/ Todd Mizeski
                                           Todd Mizeski
                                           Counsel for *Amicus Curiae*