No. 25-2529

# In the United States Court of Appeals for the Eighth Circuit

EXPRESS SCRIPTS, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

RODNEY RICHMOND, IN HIS OFFICIAL CAPACITY AS BOARD MEMBER OF THE ARKANSAS STATE BOARD OF PHARMACY, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Arkansas
Nos. 4:25-cv-00524-BSM,
4:25-cv-00561-BSM, 4:25-cv-00598-BSM
The Honorable Brian S. Miller, District Judge

## BRIEF FOR PLAINTIFFS-APPELLEES

J. CARTER FAIRLEY
BEN C. HALL
BARBER LAW FIRM PLLC
1 Allied Drive, Suite 1600
Little Rock, AR 72202
(501) 372-6175
cfairley@barberlawfirm.com
bhall@barberlawfirm.com

JEFFREY B. WALL
JUDSON O. LITTLETON
RISHABH BHANDARI
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com
littletonj@sullcrom.com
bhandarir@sullcrom.com

*Counsel for Plaintiffs in No. 4:25-cv-00524-BSM*

*(Additional counsel on next page)*

DAVID S. MITCHELL, JR.
ROSE LAW FIRM
120 East Fourth Street
Little Rock, AR 72201
(501) 375-9131
dmitchell@roselawfirm.com

TYLER D. MLAKAR
ROSE LAW FIRM
809 South 52nd Street, Suite A
Rogers, AR 72758
(479) 301-2444
tmlakar@roselawfirm.com

MICHAEL B. KIMBERLY
LINDA M. BLAIR
WINSTON & STRAWN LLP
1901 L Street NW
Washington, DC 20036
(202) 282-5096
mkimberly@winston.com
lblair@winston.com

*Counsel for Plaintiffs in No. 4:25-cv-00561-BSM*

PETER SHULTS
AMANDA G. ORCUTT
SHULTS LAW FIRM LLP
200 West Capitol Avenue
Suite 1600
Little Rock, AR 72201
(501) 375-2301
pshults@shultslaw.com
aorcutt@shults.law.com

ALLYSON N. HO
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
aho@gibsondunn.com

GEOFFREY M. SIGLER
MATTHEW S. ROZEN
CLARE F. STEINBERG
M. CHRISTIAN TALLEY
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
(202) 955-8500
gsigler@gibsondunn.com
mrozen@gibsondunn.com
csteinberg@gibsondunn.com
ctalley@gibsondunn.com

*Counsel for Plaintiffs in No. 4:25-cv-00598-BSM*

## SUMMARY OF THE CASE

Plaintiffs—a group of out-of-state pharmacy benefit managers, affiliated pharmacies, and their trade association—challenge Arkansas Act 624, which prohibits any pharmacy affiliated with a pharmacy benefit manager from operating in Arkansas. Act 624 is the only law of its kind in the Nation. As the district court correctly recognized, the Act's text and its legislative history make clear that its purpose is to protect Arkansas pharmacies from competition with out-of-state pharmacies. Consistent with that purpose, the law will affect only out-of-state entities, and not a single local pharmacy. In purpose and effect, the law discriminates against interstate commerce.

The district court preliminarily enjoined Act 624, finding that it likely violates the Dormant Commerce Clause. Given the constitutional questions at issue and the importance of this matter both to out-of-state pharmacies and the millions of Arkansans who depend on them, appellees respectfully request twenty minutes of oral argument time.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, appellees provide the following disclosures:

CVS Pharmacy, Inc., is a direct, wholly owned subsidiary of CVS Health Corporation.  CVS Health Corporation is the only publicly traded corporation that owns 10% or more of CVS Pharmacy, Inc.'s stock.

Caremark Rx, L.L.C., Arkansas CVS Pharmacy, L.L.C., CP Acquisition, LLC, AMC-Tennessee, LLC, Caremark Arizona Mail Pharmacy, LLC, Caremark Arizona Specialty Pharmacy, L.L.C., Caremark Florida Mail Pharmacy, LLC, Caremark Florida Specialty Pharmacy, LLC, Caremark Illinois Specialty Pharmacy, LLC, Caremark Kansas Specialty Pharmacy, LLC, Caremark Massachusetts Specialty Pharmacy, LLC, Caremark Michigan Specialty Pharmacy, LLC, Caremark New Jersey Specialty Pharmacy, LLC, Caremark North Carolina Specialty Pharmacy, LLC, Caremark Tennessee Specialty Pharmacy, LLC, Caremark Texas Mail Pharmacy, LLC, Caremark, L.L.C., CaremarkPCS Pennsylvania Mail Pharmacy, LLC, Central Rx Services, LLC, CVS Caremark Advanced Technology Pharmacy, L.L.C., Express Pharmacy Services of PA, LLC, Holiday CVS, L.L.C., I.G.G. of America, LLC, JHC Acquisition LLC, NCS

Healthcare of Kentucky, LLC, Pharmacy Consultants, LLC, ProCare Pharmacy Direct, L.L.C., and ProCare Pharmacy, L.L.C. are limited liability companies that are indirect subsidiaries of CVS Health Corporation.

Advanced Care Scripts, Inc., Coram Alternate Site Services, Inc., CVS Rx Services, Inc., SilverScript Insurance Company, Coventry Health and Life Insurance Company, Coventry Health Care of Kansas, Inc., and Coventry Health Care of Missouri, Inc. are corporations that are indirect subsidiaries of CVS Health Corporation.

Pharmaceutical Care Management Association is a national trade association organized as a non-profit 501(c)(6) corporation. It does not have a parent corporation or subsidiaries, and it does not issue stock.

Navitus Health Solutions, LLC is a privately held company. Costco Wholesale Corp. owns greater than a 10 percent interest in the company. Costco Wholesale Corp. is publicly traded.

Optum, Inc. is a wholly owned indirect subsidiary of UnitedHealth Group Inc.

Optum Rx, Inc. is a wholly owned subsidiary of Optum Rx Holdings LLC, which is a wholly owned subsidiary of Optum, Inc.

divvyMED, LLC is a wholly owned subsidiary of Penzo Enterprises, LLC, which is a wholly owned subsidiary of Optum Rx Holdings, LLC, which is a wholly owned subsidiary of Optum, Inc.

Genoa Healthcare, LLC is a wholly owned subsidiary of Specialized Pharmaceuticals, Inc., which is a wholly owned subsidiary of Qol Acquisition Holdings Corp., which is a wholly owned subsidiary of Genoa Healthcare, Inc., which is a wholly owned subsidiary of Optum Rx Holdings, LLC, which is a wholly owned subsidiary of Optum, Inc.

Optum Frontier Therapies, LLC is a wholly owned subsidiary of Optum Frontier Therapies Holdings, LLC, which is a wholly owned subsidiary of Optum, Inc.

Optum Frontier Therapies II, LLC is a wholly owned subsidiary of Optum Frontier Therapies Holdings, LLC, which is a wholly owned subsidiary of Optum, Inc.

Optum Infusion Services 305, LLC is a wholly owned subsidiary of Optum Infusion Services 500, Inc., which is a wholly owned subsidiary of AxelaCare, LLC, which is a wholly owned subsidiary of AxelaCare Intermediate Holdings, LLC, which is a wholly owned subsidiary of Optum

Rx, Inc., which is a wholly owned subsidiary of Optum Rx Holdings, LLC, which is a wholly owned subsidiary of Optum, Inc.

Optum Infusion Services 550, LLC is a wholly owned subsidiary of Diplomat Blocker, LLC, which is a wholly owned subsidiary of Diplomat Pharmacy, Inc., which is a wholly owned subsidiary of Optum Rx Holdings, LLC, which is a wholly owned subsidiary of Optum, Inc.

Optum Infusion Services 553, LLC is a wholly owned subsidiary of Diplomat Pharmacy, Inc., which is a wholly owned subsidiary of Optum Rx Holdings, LLC, which is a wholly owned subsidiary of Optum, Inc.

Optum Pharmacy 700, LLC is a wholly owned subsidiary of Optum Rx Administrative Services, LLC, which is a wholly owned subsidiary of Optum Rx Holdings I, LLC, which is a wholly owned subsidiary of Optum Rx Group Holdings, Inc., which is a wholly owned subsidiary of Optum, Inc.

Optum Pharmacy 701, LLC is a wholly owned subsidiary of Optum Rx Administrative Services, LLC, which is a wholly owned subsidiary of Optum Rx Holdings I, LLC, which is a wholly owned subsidiary of Optum Rx Group Holdings, Inc., which is a wholly owned subsidiary of Optum, Inc.

Optum Pharmacy 702, LLC is a wholly owned subsidiary of Optum Rx PBM of Illinois, Inc., which is a wholly owned subsidiary of Optum Rx

Administrative Services, LLC, which is a wholly owned subsidiary of Optum Rx Holdings I, LLC, which is a wholly owned subsidiary of Optum Rx Group Holdings, Inc., which is a wholly owned subsidiary of Optum, Inc.

Optum Pharmacy 704, LLC is a wholly owned subsidiary of BriovaRx of Florida, Inc., which is a wholly owned subsidiary of Optum Rx PBM of Illinois, Inc., which is a wholly owned subsidiary of Optum Rx Holdings I, LLC, which is a wholly owned subsidiary of Optum Rx Group Holdings, Inc., which is a wholly owned subsidiary of Optum, Inc.

Optum Pharmacy 705, LLC is a wholly owned subsidiary of BriovaRx of Maine, Inc., which is a wholly owned subsidiary of Optum Rx PBM of Illinois, Inc., which is a wholly owned subsidiary of Optum Rx Administrative Services, LLC, which is a wholly owned subsidiary of Optum Rx Holdings I, LLC, which is a wholly owned subsidiary of Optum Rx Group Holdings, Inc., which is a wholly owned subsidiary of Optum, Inc.

Optum Pharmacy 801, LLC is a wholly owned subsidiary of Apothecary Holdings, Inc., which is a wholly owned subsidiary of Optum Rx Holdings, LLC, which is a wholly owned subsidiary of Optum, Inc.

UnitedHealth Group Inc. is a publicly traded corporation that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

No other publicly held corporation owns 10% or more of the stock of any of the parties discussed above.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ..................................................................i

CORPORATE DISCLOSURE STATEMENT ...................................ii

TABLE OF AUTHORITIES .............................................................x

INTRODUCTION ............................................................................1

STATEMENT OF THE ISSUES .......................................................5

STATEMENT OF THE CASE ...........................................................6

    A.    Factual Background ........................................................6

        1.    PBM-affiliated pharmacies .....................................6

        2.    H.B. 1150 ................................................................9

        3.    Act 624 .................................................................14

    B.    Procedural Background ................................................16

SUMMARY OF THE ARGUMENT ..................................................18

ARGUMENT ..................................................................................20

I.    THE DISTRICT COURT CORRECTLY CONCLUDED
THAT PLAINTIFFS WILL LIKELY SUCCEED ON
THE MERITS ........................................................................21

    A.    The State's Geographic Argument Is Both Forfeited
And Wrong ................................................................23

    B.    Act 624 Unlawfully Discriminates Against Interstate
Commerce ..................................................................31

        1.    Act 624 has a discriminatory purpose .................31

2.	Act 624 has an entirely discriminatory effect......................44

3.	Act 624 is not saved by *Exxon*................................................48

C.	Act 624 Fails *Pike* Balancing.........................................................54

II.	THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE NON-MERITS FACTORS FAVOR PRELIMINARY RELIEF ......................................................................58

CONCLUSION....................................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co.* v. *Abbott*,
495 F.3d 151 (5th Cir. 2007)..................................................................54

*Bacchus Imps., Ltd.* v. *Dias*,
468 U.S. 263 (1984) ...............................................................................35

*Ben Oehrleins & Sons & Daughter, Inc.* v. *Hennepin Cnty.*,
115 F.3d 1372 (8th Cir. 1997).................................................26, 27, 28, 29

*Brandt ex rel. Brandt* v. *Griffin*,
147 F.4th 867 (8th Cir. 2025) (en banc) .................................................34

*Burwell* v. *Hobby Lobby Stores, Inc.*
573 U.S. 682 (2014) ...............................................................................54

*Cachia* v. *Islamorada*,
542 F.3d 839 (11th Cir. 2008)...........................................................46, 52

*Cole* v. *UAW*,
533 F.3d 932 (8th Cir. 2008)..................................................................23

*Comptroller of Treasury of Md.* v. *Wynne*,
575 U.S. 542 (2015) ...............................................................................21

*Continental Ins. Cos.* v. *Ne. Pharm. & Chem. Co.*,
842 F.2d 977 (8th Cir. 1988)..................................................................59

*Cotto Waxo Co.* v. *Williams*,
46 F.3d 790 (8th Cir. 1995)....................................................................57

*Cronquist* v. *City of Minneapolis*,
237 F.3d 920 (8th Cir. 2001)..................................................................24

*Dean Milk Co.* v. *City of Madison*,
340 U.S. 349 (1951) ...........................................................................25, 33

*Dep't of Revenue of Ky.* v. *Davis,*
553 U.S. 328 (2008) ..............................................22, 58

*Eggers* v. *Evnen,*
48 F.4th 561 (8th Cir. 2022) ...................................59

*Exxon Corp.* v. *Governor of Md.,*
437 U.S. 117 (1978) .......................................*passim*

*Family Winemakers of Cal.* v. *Jenkins,*
592 F.3d 1 (1st Cir. 2010) ....................................46, 52

*Fla. Transp. Servs., Inc.* v. *Miami-Dade Cnty.,*
703 F.3d 1230 (11th Cir. 2012)................................30

*Flynt* v. *Bonta,*
131 F.4th 918 (9th Cir. 2025) ................................54

*Ford Motor Co.* v. *Tex. Dep't of Transp.,*
264 F.3d 493 (5th Cir. 2001)..................................54

*Fresenius Med. Care Holdings, Inc.* v. *Tucker,*
704 F.3d 935 (11th Cir. 2013)................................54

*Granholm* v. *Heald,*
544 U.S. 460 (2005) ...........................................55

*Healy* v. *Beer Inst.,*
491 U.S. 324 (1989) ...........................................55

*Hemphill* v. *Orloff,*
277 U.S. 537 (1928) ...........................................54

*Hunt* v. *Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ......................................25, 40, 45

*IESI AR Corp.* v. *Nw. Ark. Reg'l Solid Waste Mgmt. Dist.,*
433 F.3d 600 (8th Cir. 2006)............................26, 28, 36

*Kassel* v. *Consol. Freightways Corp.,*
450 U.S. 662 (1981) ...........................................55

*LensCrafters, Inc.* v. *Robinson,*
403 F.3d 798 (6th Cir. 2005)...................................................................54

*LSP Transmission Holdings, LLC* v. *Sieben,*
954 F.3d 1018 (8th Cir. 2020)...........................................................29, 30

*McBurney* v. *Young,*
569 U.S. 221 (2013) ...................................................................................54

*Minnesota* v. *Clover Leaf Creamery Co.,*
449 U.S. 456 (1981) ...................................................................................34

*Missouri* v. *Trump,*
128 F.4th 979 (8th Cir. 2025) ...........................................................5, 20, 59

*Morrison* v. *Olson,*
487 U.S. 654 (1988) .....................................................................................1

*Nat'l Pork Producers Council* v. *Ross,*
598 U.S. 356 (2023) ..........................................................................*passim*

*Nat'l Basketball Ass'n* v. *Minn. Pro. Basketball, Ltd. P'ship,*
56 F.3d 866 (8th Cir. 1995).....................................................................5, 59

*NextEra Energy Cap. Holdings, Inc.* v. *Lake,*
48 F.4th 306 (5th Cir. 2022) ....................................................................30

*Or. Waste Sys., Inc.* v. *Dep't of Env't Quality of Or.,*
511 U.S. 93 (1994) .....................................................................................22

*Orion Fin. Corp.* v. *American Foods Grp.,*
281 F.3d 733 (8th Cir. 2002)....................................................................23

*PCMA* v. *District of Columbia,*
613 F.3d 179 (D.C. Cir. 2010) ....................................................................6

*Pike* v. *Bruce Church, Inc.,*
397 U.S. 137 (1970) ..........................................................................*passim*

*R & M Oil & Supply, Inc.* v. *Saunders,*
307 F.3d 731 (8th Cir. 2002)....................................................................57

*Raymond Motor Transp., Inc.* v. *Rice,*
        434 U.S. 429 (1978) ...................................................................35

*Rodgers* v. *Bryant,*
        942 F.3d 451 (8th Cir. 2019)........................................................59

*Rutledge* v. *PCMA,*
        592 U.S. 80 (2020) .......................................................................6

*S.D. Farm Bureau, Inc.* v. *Hazeltine,*
        340 F.3d 583 (8th Cir. 2003)..............................................*passim*

*Schmitt* v. *Rebertus,*
        148 F.4th 958 (8th Cir. 2025) ................................................5, 59

*SDDS, Inc.* v. *South Dakota,*
        47 F.3d 263 (8th Cir. 1995)................................................*passim*

*Spirtas Co.* v. *Nautilus Ins. Co.,*
        715 F.3d 667 (8th Cir. 2013).......................................................45

*Tenn. Wine & Spirits Retailers Ass'n* v. *Thomas,*
        588 U.S. 504 (2019) ....................................................................22

*U & I Sanitation* v. *City of Columbus,*
        205 F.3d 1063 (8th Cir. 2000).........................................41, 55, 58

*United Waste Sys. of Iowa, Inc.* v. *Wilson,*
        189 F.3d 762 (8th Cir. 1999)........................................................58

*Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.,*
        429 U.S. 252 (1977) ....................................................................34

*Waste Sys. Corp.* v. *Cnty. of Martin,*
        985 F.2d 1381 (8th Cir. 1993)......................................................25

*W. Lynn Creamery, Inc.* v. *Healy,*
        512 U.S. 186 (1994) ...............................................................52, 53

*Wiser* v. *Wayne Farms,*
        411 F.3d 923 (8th Cir. 2005)........................................................23

**Constitution**

U.S. Const. Article I, § 8, cl. 3 ...............................................................21

**Statutes and Bills**

Ark. Code Ann. § 17-92-407 ...........................................................14, 15

Ark. Code Ann. § 17-92-507 .............................................................9, 41

Ark. Code Ann. § 23-99-203 .................................................................10

Ark. Code Ann. § 23-99-204 .................................................................10

Ark. Code Ann. § 23-92-503 .................................................................12

Ark. Code Ann. § 23-92-506 .........................................................9, 10, 41

Ark. Code Ann. § 23-92-508 .................................................................42

Ark. Code Ann. § 23-92-514 .............................................................10, 41

H.B. 1150 amend. H1, 95th Gen. Assemb., Reg. Sess. (Ark. 2025).................12

H.B. 1150 amend. H2, 95th Gen. Assemb., Reg. Sess. (Ark. 2025).................13

**Other Authorities**

America's Health Rankings, *Rural Population in Arkansas*,
    https://tinyurl.com/yu3fjrzn .........................................................7

Concurring Statement of Comm'r Andrew N. Ferguson,
    *Pharmacy Benefits Mangers Interim Staff Report*, FTC
    File No. P221200 (July 9, 2024),
    https://tinyurl.com/yeyn8dr5.......................................................43

Dan Sullivan, *HB1150 Puts Pharmacy Patients, Quality Care
    First*, Jonesboro Sun (Mar. 17, 2025),
    https://tinyurl.com/y8njmynd.......................................................38

Dissenting Statement of Comm'r Melissa Holyoak, *Pharmacy
    Benefits Mangers Interim Staff Report*, FTC File No.
    P221200 (July 9, 2024), https://tinyurl.com/mr3s3y5z...........................43

Greg Geary, *Small pharmacies in danger of closing if PBM bill doesn't pass, state representative says*, White County Citizen (Mar. 27, 2025), https://tinyurl.com/bdennnse .......................13, 35

Maggie Ryan, *Lawmakers Introduce Bill to Ban PBM-Owned Pharmacies*, Little Rock Pub. Radio (Jan. 17, 2025), https://tinyurl.com/5b7y2b3x.......................................................37

Mark Friedman, *Arkansas Bill Would Bar PBMs from Selling Drugs*, Ark. Bus. (Feb. 24, 2025), https://tinyurl.com/atttr4zz ......................................................36

Mark Johnson, *Set the record straight on HB1150*, Ark. Democrat-Gazette (Mar. 2, 2025), https://tinyurl.com/5fnshhe6 ....................................................38

Neal Earley, *Sanders Signs Bill Opposed by CVS; Measure Prohibits Prescription Drug Middlemen from Owning Pharmacies*, Ark. Democrat-Gazette (Apr. 16, 2025), https://tinyurl.com/b7vsf6nt ....................................................37

Pharmacists United for Truth & Transparency, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation*, YouTube (Feb. 5, 2025), https://tinyurl.com/37pbd3c4.................................10, 11, 36, 37

U.S. Gov't Accountability Off., *Prescription Drugs: Selected States' Regulation of Pharmacy Benefit Managers*, GAO-24-106898 (Mar. 2024), https://tinyurl.com/vhtfrrcx...............................61

16A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3956.4 (5th ed. 2019 & Supp. 2023) ......................................61

## INTRODUCTION

In recent years, Arkansas lawmakers and local pharmacies have objected to competition from large out-of-state pharmacies. In April 2025, Arkansas decided to eliminate most of that competition. It enacted Act 624, which prohibits pharmacies that are affiliated with pharmacy benefit managers (or PBMs) from continuing to operate in the State. PBMs sit between pharmacies and drug manufacturers, and among other things they negotiate lower prices from manufacturers, leading to savings for businesses, their employees, and other customers. Many of the Nation's largest retail, home-delivery, and specialty pharmacies—including appellees CVS, Optum, and Express Scripts—either affiliate with or are PBMs, meaning that Act 624 would exclude from Arkansas most of the major national pharmacy providers.

Often a protectionist law of this kind will come "clad, so to speak, in sheep's clothing" because the State will not make clear its reasons. *Morrison* v. *Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). "But this wolf comes as a wolf." *Id*. The Arkansas General Assembly declared on the face of the law that it is intended to favor local pharmacies. The Assembly achieved that protectionist aim with complete precision: only out-of-state pharmacies like appellees are affected by Act 624; not a single local pharmacy is. In fact, when

lawmakers realized that an earlier version of the bill would cover Walmart—Arkansas's largest employer and pharmacy chain—they amended the law to carve out Walmart's pharmacies. And if that all were not enough, as the district court recognized, Act 624's legislative history is "brimming with protectionist rhetoric"—indeed, "too many examples . . . to list in [its] order." Ark. Add. 6; App. 780; R. Doc. 73, at 6.[1]

The Dormant Commerce Clause prevents exactly this kind of "economic protectionism." *Nat'l Pork Producers Council* v. *Ross*, 598 U.S. 356, 369 (2023). After examining the text and legislative history of Act 624, the district court correctly concluded that the law likely discriminates against interstate commerce and is thus subject to strict scrutiny, which it cannot survive. The district court also correctly concluded that Act 624 fails for the independent reason that, under *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970), its substantial burdens on interstate commerce far exceed the minimal local benefits the State could identify. Indeed, the only interests Arkansas asserts are already fully served by other state laws. The district court further found that appellees will be irreparably harmed if Act 624 expels them from the

---

[1] Unless noted, record citations refer to the docket in case No. 4:25-cv-520-BSM (E.D. Ark.).

Arkansas pharmacy market and that the balance of equities and public interest favor preliminary relief. The court therefore entered a preliminary injunction against Act 624.

On appeal, Arkansas does not contest any of the three non-merits factors for preliminary relief. It argues only that Act 624 does not violate the Dormant Commerce Clause. Tellingly, the State starts its defense (at 25) with a brand-new argument that, even though appellees are all headquartered outside Arkansas and have the vast bulk of their employees and operations outside Arkansas, they "cannot claim to be discriminated against as out-of-state firms" because they have some in-state operations. That argument is both forfeited and wrong. Many of the Dormant Commerce Clause cases from this Court and the Supreme Court involve discrimination against out-of-state entities that nevertheless have some in-state presence. Economic protectionism is rarely inspired by entities that lack such a presence.

As for the arguments it raised below, the State begins by attempting to rewrite the text and history of Act 624. In its telling, Act 624 is simply about preventing "vertical integration" between pharmacies and PBMs. But that is not what the State said or did. The statute itself says that its target is business

practices that have driven *"locally-operated pharmacies* out of business." Pl. Add. 1 (§ 1(a)(2)) (emphasis added). And notwithstanding its supposed concerns over vertical integration, the State carved out an exception for Walmart that the State does not even address in its opening brief. Moreover, the statute's supporters repeatedly contrasted "local independent pharmacies" that are "investing in their communities" with out-of-state national chains like CVS that are "sucking the economy out" of Arkansas and "sending it somewhere else." *See infra*, pp. 11-12. Just as tellingly, the State already has laws on the books that prohibit the alleged anticompetitive practices by PBMs that Act 624 purports to prevent. The State has never explained why Act 624 is necessary in light of these laws—which, as the district court held, is strong evidence that Act 624 was "motivated by a discriminatory purpose." *S.D. Farm Bureau, Inc.* v. *Hazeltine*, 340 F.3d 583, 596 (8th Cir. 2003); *see* Ark. Add. 6; App. 780; R. Doc. 73, at 6.

Faced with the weight of that evidence, the State rests almost entirely on the Supreme Court's decision in *Exxon Corp.* v. *Governor of Maryland*, 437 U.S. 117 (1978). That decision does not establish a categorical "vertical integration" exception to the Dormant Commerce Clause, and no court has ever read it that way. *Exxon* stands for the far narrower, common-sense

4

proposition that a State may regulate vertical integration when it does not discriminate in either purpose or effect. That rule is no help to Arkansas, which—unlike Maryland in *Exxon*—has discriminated in both purpose *and* effect. This Court therefore should affirm the district court's order preliminarily enjoining Act 624.

## STATEMENT OF THE ISSUES

1.    The State's brief presents a single question: whether the district court correctly held that Arkansas Act 624 likely violates the Dormant Commerce Clause. *See Exxon Corp.* v. *Governor of Maryland*, 437 U.S. 117 (1978); *S.D. Farm Bureau, Inc.* v. *Hazeltine*, 340 F.3d 583 (8th Cir. 2003); *SDDS, Inc.* v. *South Dakota*, 47 F.3d 263 (8th Cir. 1995).

2.    The COA amici seek to raise an additional question that the Court should not consider: whether the district court correctly held that the non-merits factors also favor preliminary relief. *See National Basketball Association* v. *Minnesota Professional Basketball, Ltd. Partnership*, 56 F.3d 866 (8th Cir. 1995); *Missouri* v. *Trump*, 128 F.4th 979 (8th Cir. 2025); *Schmitt* v. *Rebertus*, 148 F.4th 958 (8th Cir. 2025).

**STATEMENT OF THE CASE**

### A. Factual Background

### 1. PBM-affiliated pharmacies

Many Americans obtain prescription drugs with the help of health insurance that includes a prescription-drug benefit. The sponsors of these plans are employers, labor unions, and federal, state, and municipal governments. Designing and administering prescription-drug benefit plans is an extraordinarily complex and time-consuming undertaking that plan sponsors cannot realistically undertake on their own. *See PCMA* v. *District of Columbia*, 613 F.3d 179, 183 (D.C. Cir. 2010). Virtually all drug plan sponsors therefore turn to PBMs to help design their benefits, negotiate prices with drug manufacturers and distributors to secure volume discounts for prescription drugs, construct the network of pharmacies to be used under the plan, process claims, and perform other critical benefit-administration functions. *See Rutledge* v. *PCMA*, 592 U.S. 80, 83-84 (2020); *see also* App. 252; R. Doc. 19, at 2; App. 276; R. Doc. 45, at 3.

To enhance these efficiencies, some PBMs are affiliated with or manage their own pharmacies. Appellees CVS Caremark and Optum Rx, Inc. are PBMs that are headquartered outside of Arkansas but that have affiliated

pharmacies throughout the country. App. 1019 n.150; R. Doc. 13-10 (4:25-cv-561), at 71 n.150. PBM-affiliated pharmacies offer simplified payment procedures, streamlined claims processing, superior information regarding drug safety and efficacy, and other efficiencies—all of which make access to prescription drugs more convenient and affordable. App. 253; R. Doc. 19, at 3; *see* R. Doc. 44, at 7-8.

PBM-affiliated pharmacies dispense millions of prescriptions to hundreds of thousands of Arkansans every year. CVS, for example, operates 23 retail pharmacies in Arkansas, which collectively employ more than 500 Arkansans, and filled more than 2.4 million prescriptions for more than 340,000 patients in 2024. App. 816; R. Doc. 1 (4:25-cv-524), at 23. Optum operates 11 retail pharmacies in Arkansas and was projected to dispense more than 317,000 prescriptions in 2025. App. 1160; R. Doc. 1 (4:25-cv-598), at 15. Appellees' home-delivery services are especially critical for the more than 40% of Arkansans living in rural areas, who often lack convenient access to a brick-and-mortar pharmacy. *See* America's Health Rankings, *Rural Population in Arkansas*, https://tinyurl.com/yu3fjrzn.

Many of the Arkansans whom appellees serve have complex and chronic conditions that require "specialty" drugs. App. 835; R. Doc. 1 (4:25-cv-524), at

7

42; App. 255-257; R. Doc. 19, at 5-7; App. 280; R. Doc. 45, at 7. Specialty drugs have greater expense, potency, or sensitivity to environmental conditions than others; require substantial levels of patient management, education, and monitoring; often demand special handling or packaging; and play a significant and expanding role in treating complex diseases like cancer. *See, e.g.*, App. 256; R. Doc. 19, at 6; App. 280; R. Doc. 45, at 7. In 2024 alone, CVS Specialty served more than 10,000 Arkansans. R. Doc. 14 (4:25-cv-524), at 19. Optum Rx Specialty Pharmacy and Optum Rx Frontier Therapies were projected to deliver more than 27,000 prescriptions in Arkansas throughout 2025. App. 291; R. Doc. 45, at 18. And Accredo Health Group, which is a specialty pharmacy associated with appellee Express Scripts, Inc. (ESI), dispensed almost 70,000 medications to over 5,700 patients in Arkansas in 2024. App. 255; R. Doc. 19, at 5.

Specialty pharmacies have important benefits for cost, access, and quality of care. First, they buy specialty drugs in bulk, with better rates for health plans and their beneficiaries. Second, because specialty pharmacies can effectively handle, store, and advise patients on specialty medications, they generally produce better patient outcomes. *See, e.g.*, App. 1136; R. Doc. 13-15 (4:25-cv-561), at 3. Accredo, for example, provides specialty in-home nursing

services and 24-hour nurse availability for certain drugs.  App. 257; R. Doc. 19, at 7.  And Optum Rx Specialty Pharmacy makes its pharmacists available 24/7 to help manage medications, including side effects.  App. 280; R. Doc. 45, at 7.

To ensure patient safety, some specialty medications appellees dispense are part of exclusive- or limited-distribution channels, meaning the medication's manufacturer has made it available only through a single specialty pharmacy or small number of specialty pharmacies.  App. 256; R. Doc. 19, at 6; App. 281; R. Doc. 45, at 8.  The process for selecting a limited- or exclusive-distribution pharmacy is lengthy, typically beginning 18 to 24 months before the drug manufacturer launches the medication.  App. 256; R. Doc. 19, at 6.

### 2.    H.B. 1150

The law at issue in this case is not the first Arkansas law to regulate PBMs.  Since 2015, Arkansas law has required PBMs to reimburse Arkansas pharmacies at a price equal to or greater than what the pharmacy paid to buy the drug.  Ark. Code Ann. § 17-92-507(c).  In addition, since 2018, the Arkansas Pharmacy Benefits Manager Licensure Act has prohibited PBMs from favoring affiliated pharmacies over nonaffiliated pharmacies with respect to reimbursement.  *Id.* § 23-92-506(b)(4)(A).  That statute also subjects PBMs to

supervision by the Arkansas Insurance Commissioner on a range of matters, including claim adjudications, accreditation requirements, and reimbursement rates. *See generally id.* § 23-92-506. Likewise, existing Arkansas law prohibits PBMs from steering patients toward an affiliated pharmacy. *See id.* § 23-92-514(a)(2)(C). And in April 2025, Arkansas amended its "Any Willing Provider" law to prohibit PBMs from discriminating against pharmacies or excluding them from a health-benefit plan if the pharmacy is willing to meet the network's terms and conditions. *Id.* §§ 23-99-203(d), 23-99-204(a)(3).

Notwithstanding these regulations, Arkansas lawmakers proposed H.B. 1150, the bill that would later become Act 624. The need to protect local pharmacies from out-of-state competition quickly emerged as the law's central selling point. As the lead House sponsor explained, "supporting these independent neighborhood pharmacies is a really big part of why we're running [H.B. 1150]." Pharmacists United for Truth & Transparency, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation* at 2:27, YouTube (Feb. 5, 2025) (statement of Rep. Moore), https://tinyurl.com/37pbd3c4 (PUTTcast). The bill's Senate sponsor similarly explained that too many patients were using "out-of-state mail-order pharmacies" affiliated with PBMs, and the bill would shift patients back to

"their local community pharmacy."  App. 430:22-431:20; R. Doc. 46-2, at 3:22-4:20.  He contrasted "local independent pharmacies" that were "investing in their communities" with out-of-state national chains like CVS that were "sucking the economy out" of Arkansas and "sending it somewhere else." PUTTCast at 34:29-35:07.

This protectionist rhetoric was not limited to H.B. 1150's sponsors.  At the House committee debate, one representative expressed concern for local pharmacies, asserting that competition from PBMs would "take them out of business."  App. 326:11-18; R. Doc. 46-1, at 28:11-18.  Another likewise warned that without H.B. 1150, "small-town pharmacist[s] … can't survive," and Arkansas may have to "close all our brick and mortars" due to competition from PBM-affiliated "mail-in" pharmacies.  App. 341:7-20; R. Doc. 46-1, at 43:7-20.  At a Senate committee hearing, senators cast the legislation as an effort to protect "local pharmacies," App. 440:20; R. Doc. 46-2, at 13:20, based in Arkansans' "home communities," App. 443:5-6; R. Doc. 46-2, at 16:5-6, from "out of state" competition, App. 436:22-437:1; R. Doc. 46-2, at 9:22-10:1.  One senator, for instance, touted H.B. 1150 as a means to prevent PBMs from "steering patients to *out-of-state* mail order pharmacies that they own or [are] affiliated with."  App. 430:19-431:1; R. Doc. 46-2, at 3:19-4:1 (emphasis added).

11

This rhetoric extended beyond the legislature too. John Vinson, the CEO of the Arkansas Pharmacists Association, testified that Act 624 would "grow the economy locally" by eliminating competition from "out-of-state mail-order pharmacies." App. 317:13-318:1; R. Doc. 46-1, at 19:13-20:1. And Governor Sanders issued a press release upon signing Act 624 that touted the law as "a win for local businesses" and criticized PBMs for "attacking our state." App. 937; R. Doc. 13-9 (4:25-cv-00561), at 1.

Consistent with the Assembly's aims, H.B. 1150 was affirmatively tailored to affect only out-of-state pharmacies. As originally drafted, the bill would have prohibited not only pharmacies affiliated with a PBM, but also those affiliated with a "healthcare payor," which is "[a]n entity that provides or administers a self-funded health benefit plan." Ark. Code Ann. § 23-92-503(9)(D). Because it sponsors a self-funded plan, Walmart is a "healthcare payor" and thus would have lost its pharmacy permit.

The bill was amended, however, to remove the prohibition on pharmacies affiliated with a "healthcare payor." H.B. 1150 amend. H1, 95th Gen. Assemb., Reg. Sess. (Ark. 2025). It was then amended again to specify that the permit ban "does not apply to a pharmacy employer" that administers its own pharmacy benefits when "[t]he pharmacy employer is the sole

12

Arkansas client of the [PBM]" and "[e]xclusively services the employees and dependents of the pharmacy employer while utilizing the affiliated [PBM] in this state." H.B. 1150 amend. H2, 95th Gen. Assemb., Reg. Sess. (Ark. 2025). The State has never disputed that Walmart is the only in-state employer captured by that exemption, or that many legislators required the Walmart exemption as a condition of their support. *See* Greg Geary, *Small pharmacies in danger of closing if PBM bill doesn't pass, state representative says*, White County Citizen (Mar. 27, 2025), https://tinyurl.com/bdennnse. As a result of these amendments, the impact of Act 624 falls exclusively on out-of-state PBMs and their affiliated pharmacies.

Three specific out-of-state PBMs were mentioned often during the legislative process that produced Act 624. The law's preamble mentions a Federal Trade Commission report heavily targeting the "three largest PBMs" (CVS Caremark, Optum Rx, and ESI). App. 639; R. Doc. 54-2, at 1; *see* Pl. Add. 1 (§ 1(a)(2)). And during the Senate hearing, the bill's lead Senate sponsor named "CVS[,] Optum[,] and Express Scripts," App. 430:12-18; R. Doc. 46-2, at 3:12-18, while a supporter testified that legislators should not be worried about Act 624's anticompetitive effects because "we're talking

about three of the biggest companies on earth," App. 475:20-22; R. Doc. 46-2, at 8:20-22.

### 3. Act 624

In April 2025, Governor Sanders signed H.B. 1150 into law as Act 624. Consistent with the legislative history just discussed, the preamble to Act 624 states that "[i]t is the intent of the General Assembly . . . [to] eliminat[e] certain anticompetitive business tactics"—namely, "anticompetitive business tactics that have driven *locally-operated pharmacies out of business*, limiting patient choices and inflating drug prices at pharmacies owned by [PBMs]." Pl. Add. 1 (§§ 1(a)(2), 1(b)) (emphasis added).

In its operative provisions, the Act prohibits PBM-affiliated pharmacies from operating in Arkansas. It defines "[p]harmacy benefits manager" to include PBM-affiliated pharmacies, sweeping in any entity that is "managed by a [PBM] or is a subsidiary of a [PBM]" or "[h]as a direct or indirect ownership interest in a [PBM]." Pl. Add. 2 (§ 2(a)(2)(B)). The statute then declares that PBMs "shall not acquire direct or indirect interest in, or otherwise hold, directly or indirectly a permit … for the retail sale of drugs or medicines in this state," *id.* (§ 2(b)), including a "permit for a mail-order pharmacy," *id.* (§ 2(a)(1)(B)).

14

To enforce this prohibition, Act 624 requires the State Board of Pharmacy to "either revoke or not renew a permit of" any PBM-affiliated pharmacy beginning on January 1, 2026. Pl. Add. 2 (§ 2(c)). Unlike current Arkansas law, which permits the Board to revoke pharmacy licenses only for misconduct like unauthorized practice, false representations, knowing violation of pharmacy laws, or public endangerment, *see* Ark. Code Ann. § 17-92-407, Act 624 requires the Board to revoke qualified pharmacies' licenses based solely on their affiliation with a PBM.

Act 624 details a series of steps leading up to license revocation on January 1, 2026. Before its enforcement was enjoined, the statute would have required the State Board of Pharmacy, no later than October 3, 2025, to "send written notice to each pharmacy permit holder that the board reasonably believes will" trigger the statute's license-revocation requirement. Pl. Add. 3-4 (§ 2(a)(1)). And by November 2, 2025, the statute would have required PBM-affiliated pharmacies to provide "written notice … to each patient and each patient's prescribing healthcare provider that has used the pharmacy within the previous twelve … months that the pharmacy can no longer dispense retail drugs to the patient on or after January 1, 2026." *Id.* at 4 (§ 2(c)(1)(A)).

The statute affords the Pharmacy Board discretion to issue temporary "limited use permit[s]" for certain rare drugs that may otherwise be unavailable. Pl. Add. 2 (§ 2(d)(1)). The statute, however, does not specify criteria for identifying drugs that qualify, and the provisions for limited-use permits expire on September 1, 2027. *Id.* at 3 (§ 2(d)(2)(B)).

## B.    Procedural Background

Plaintiffs in the consolidated actions below moved to preliminarily enjoin Act 624 on the ground that, among other things, the law violates the Dormant Commerce Clause. After a hearing, the district court issued a preliminary injunction, Ark. Add. 1; App. 775; R. Doc. 73, at 1, finding that plaintiffs were likely to succeed on this claim, Ark. Add. 4; App. 778; R. Doc. 73, at 4.[2]

First, the district court held that Act 624 "overtly discriminate[s] against plaintiffs as out of state companies," and "the state has failed to show that it has no other means to advance its interests." Ark. Add. 5; App. 779; R. Doc. 73, at 5. The court explained that Act 624 "specifically states that its purpose is to eliminate plaintiffs' business tactics" and "to protect 'locally-operated pharmacies.'" *Id.* The court further observed that Act 624's legislative history

---

[2]    The ESI appellees also claimed that the law is preempted by TRICARE, a federal statute. The district court agreed with this claim and the State does not challenge that ruling on appeal.

is "brimming with protectionist rhetoric," Ark. Add. 6; App. 780; R. Doc. 73, at 6, confirming its discriminatory purpose. Indeed, the court remarked there are "too many examples of this rhetoric to list." *Id.*

The court also concluded that Act 624 independently violates the Dormant Commerce Clause because "the burden Act 624 imposes on interstate 'commerce is clearly excessive in relation to the putative local benefits.'" Ark. Add. 6; App. 780; R. Doc. 73, at 6 (quoting *Pike*, 397 U.S. at 142). The court rejected Arkansas's argument that Act 624 furthers the nondiscriminatory goal of "minimiz[ing] [PBM] conflicts of interest" since "Arkansas already has laws in place that" are "sufficient for the state to achieve [that] stated purpose." *Id.*

The court next held that the remaining injunctive factors favor preliminary relief. It concluded that "[p]laintiffs will suffer irreparable harm if a preliminary injunction is not issued" because if Act 624 took effect, "plaintiffs would suffer great economic loss in the state" and could not "recoup any potential financial loss through a damages award because of defendants' immunity." Ark. Add. 16; App. 790; R. Doc. 73, at 16. The court concluded that "[t]he balance of equities and public interest also favor plaintiffs" because "[n]o harm is caused when defendants are enjoined from enforcing an

unconstitutional law," and "it is always in the public interest to prevent the violation of a party's constitutional rights." Ark. Add. 16-17; App. 790-791; R. Doc. 73, at 16-17 (quotation marks omitted).

## SUMMARY OF THE ARGUMENT

I. A. The State's argument that an out-of-state party cannot raise a Dormant Commerce Clause challenge if it has a substantial in-state presence is both forfeited and wrong. It is forfeited because it was neither pressed nor passed upon below; this Court generally does not consider arguments raised for the first time on appeal; and the State does not even try to explain why this Court should excuse the forfeiture. The argument is wrong because the Dormant Commerce Clause prevents Arkansas from discriminating against out-of-state companies both when they enter the State *and* once they are there. No court has ever held otherwise. Indeed, many (if not most) of this Court's and the Supreme Court's Dormant Commerce Clause cases involve out-of-state companies with some presence in the State discriminating against them.

B. As to the issues litigated below, the Dormant Commerce Clause does not allow States to discriminate against "out-of-state economic interests." *Nat'l Pork Producers*, 598 U.S. at 364. Even "a facially neutral measure" may

18

discriminate if it has a "discriminatory purpose" or a "discriminatory effect." *SDDS*, 47 F.3d at 267. Act 624 has both. It was motivated by a discriminatory purpose—to protect local pharmacies by expelling out-of-state pharmacies from the State. And it has a purely discriminatory effect—it bans *only* out-of-state firms from doing business in Arkansas. For either reason, strict scrutiny applies, and Arkansas does not even try to argue that it can satisfy that demanding standard.

Arkansas rests almost entirely on the Supreme Court's decision in *Exxon*, 437 U.S. 117. But *Exxon* does not allow States to discriminate against out-of-state commerce simply by labeling their protectionism as a remedy for "vertical integration" (here, the integration between pharmacies and PBMs). Arkansas does not point to any court that has read *Exxon* that way. In *Exxon*, the Supreme Court did not consider any argument about discriminatory purpose, and it rejected the challengers' argument that the Maryland law had discriminatory effects. *Exxon* thus stands for the limited principle that States may regulate vertical integration when they do not discriminate in purpose or effect. Here, Arkansas has discriminated in both.

C.    Act 624 independently violates the Dormant Commerce Clause under the *Pike* balancing test. The statute imposes extraordinary "burden[s]

. . . on [interstate] commerce" that "clearly exce[ed] the putative local benefits." *Pike*, 397 U.S. at 142. On one side of the ledger, appellees and many other pharmacies will have to abruptly exit the market and leave hundreds of thousands of Arkansans who have relied on their services without convenient access to much-needed medicine. On the other side, the State cannot identify any legitimate interest that is not already served by the laws on Arkansas's books.

II. The State does not dispute that the other preliminary-injunction factors favor relief. The public-interest and balance-of-equities prongs are satisfied because the State has no legitimate interest in enforcing an unconstitutional law. *See Trump*, 128 F.4th at 997. And appellees established irreparable harm several times over. Most obviously, if Act 624 is allowed to go into effect, then appellees will have to leave the State abruptly and at great expense that they cannot recover from the State due to sovereign immunity. Under this Court's case law, that is more than enough to establish irreparable harm.

## ARGUMENT

The district court correctly entered a preliminary injunction against Act 624 because the Act likely violates the Dormant Commerce Clause;

20

appellees would be irreparably harmed if Act 624 took effect and expelled them from Arkansas, forcing them to shutter pharmacies and fire employees while millions of Arkansans would need to fill their prescriptions elsewhere; and the balance of equities and public interest favor preventing Act 624 from taking effect pending the conclusion of this litigation.

On appeal, the State does not challenge that the remaining injunctive factors warrant relief. The Court can affirm those portions of the decision below for that reason alone, and in any event the district court's conclusions are correct. The State challenges only the district court's determination that Act 624 likely violates the Dormant Commerce Clause, but none of the State's arguments has merit. Act 624 runs afoul of the Dormant Commerce Clause from every angle: it discriminates against out-of-state commerce in both its purpose and effects, and it imposes burdens on out-of-state commerce that far outweigh its putative benefits.

## I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS WILL LIKELY SUCCEED ON THE MERITS.

The Commerce Clause provides Congress with a "positive grant" of authority "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3; *Comptroller of Treasury of Md.* v. *Wynne*, 575 U.S. 542, 548 (2015). It also includes a "further, negative command," *Nat'l Pork Producers*,

598 U.S. at 368, that "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services," *Tenn. Wine & Spirits Retailers Ass'n* v. *Thomas*, 588 U.S. 504, 514 (2019). In particular, the Dormant Commerce Clause "prohibits the enforcement of state laws 'driven by … economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Nat'l Pork Producers*, 598 U.S. at 369 (quoting *Dep't of Revenue of Ky.* v. *Davis*, 553 U.S. 328, 337-338 (2008) (citation and quotation marks omitted)).

Under the Dormant Commerce Clause, a law that discriminates against out-of-state interests is "virtually *per se* invalid," and "will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Davis*, 553 U.S. at 338 (quotation marks omitted). Because this "strictest scrutiny" is difficult to surmount, this Court has struck down laws that discriminate against out-of-state commerce. *See, e.g.*, *Hazeltine*, 340 F.3d at 597-598 (quoting *Or. Waste Sys., Inc.* v. *Dep't of Env't Quality of Or.*, 511 U.S. 93, 101 (1994)); *SDDS*, 47 F.3d at 267. The district court correctly concluded that Act 624 is likely to meet the same fate.

**A.    The State's Geographic Argument Is Both Forfeited And Wrong.**

The State begins its defense of Act 624 by trying to insulate it from scrutiny altogether.  For the first time in this litigation, the State now argues (at 19) that plaintiffs—all of whom are or represent PBMs or PBM-affiliated pharmacies domiciled outside of Arkansas—"are not out-of-state firms for dormant Commerce Clause purposes."  As the argument goes, it does not matter that national corporations like CVS, Express Scripts, and Optum are headquartered outside Arkansas and have the vast bulk of their employees and operations outside Arkansas.  Because they have some operations in the State, they "cannot claim to be discriminated against as out-of-state firms." Br. 25.  That argument fails for two reasons.

1.    First, it is obviously forfeited.  The State never even hinted at this argument in its brief or at oral argument below, which explains why the district court did not pass on it.  In general, "this [C]ourt will not consider arguments raised for the first time on appeal."  *Wiser* v. *Wayne Farms*, 411 F.3d 923, 926 (8th Cir. 2005).  This Court has repeatedly applied that rule in a variety of contexts.  *See, e.g.*, *Cole* v. *UAW*, 533 F.3d 932, 936 (8th Cir. 2008) (appellant forfeited argument disputing ERISA's applicability to retirement plan); *Orion Fin. Corp.* v. *American Foods Grp.*, 281 F.3d 733, 740

(8th Cir. 2002) (appellant forfeited argument that it reasonably relied on appellee's promise not to ask for success fee); *Cronquist* v. *City of Minneapolis*, 237 F.3d 920, 925 (8th Cir. 2001) (appellant forfeited mixed-motive theory of discrimination). There is no reason for a different result here. Arkansas does not even acknowledge its forfeiture, let alone attempt to explain why excusing the forfeiture is warranted.

2. Second, the argument is wrong. Indeed, it would eviscerate the Dormant Commerce Clause. That Clause prohibits local "economic protectionism," including laws "designed to benefit in-state economic interests by burdening out-of-state competitors," or that "seek[] to advantage in-state firms or disadvantage out-of-state rivals." *Nat'l Pork Producers*, 598 U.S. at 369-370 (citations omitted). On Arkansas's view, the State may not keep out-of-state firms from entering—but as soon as those firms establish a "substantial presence" (whatever that means), Br. 24, they lose their out-of-state character and the State is free to disadvantage them or even kick them out. That does not make any sense. A State is most likely to target an out-of-state entity when its success threatens local industry; that is when the Dormant Commerce Clause's protections typically will matter the most. Unsurprisingly then, the State does not point to any court to hold that once an

out-of-state firm has some in-state operations, the Dormant Commerce Clause no longer applies.

To the contrary, time and again, the Supreme Court and this Court have sustained Dormant Commerce Clause challenges asserted by out-of-state companies that were already doing business in the State. *See, e.g.*, *Dean Milk Co.* v. *City of Madison*, 340 U.S. 349, 351 (1951) (out-of-state milk distributor that distributed dairy products in state); *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977) (out-of-state apple farmers who already were selling to in-state consumers); *Waste Sys. Corp.* v. *Cnty. of Martin*, 985 F.2d 1381, 1383 (8th Cir. 1993) (out-of-state landfill that processed in-state waste). Under the State's theory, these cases all should have come out the other way because the companies had some "local presence" or operations in the state when the discriminatory law was enacted.

Even the State's banner case, *Exxon Corp.* v. *Governor of Maryland*, 437 U.S. 117 (1978)—which Arkansas cites more than 90 times in its brief— undercuts its argument. The *Exxon* plaintiffs were out-of-state producers or refineries that owned retail gas stations in Maryland when the State passed a law prohibiting such vertical integration. *Id.* at 121. Exxon, for instance, had 36 gas stations in Maryland that it would have been required to divest or close.

*Id.* If Arkansas were right that those companies' presence in Maryland meant they were in-state firms for Commerce Clause purposes, the Supreme Court should not even have addressed their claims. *But see id.* at 126-127. To be sure, Maryland did not make Arkansas's argument—but that is because no one, including the Supreme Court, thought to view international oil companies like Exxon, Phillips, and Shell as local Maryland actors.

The State also relies (at 20-23) on language from *Ben Oehrleins & Sons & Daughter, Inc.* v. *Hennepin County*, 115 F.3d 1372, 1386 (8th Cir. 1997), which was subsequently quoted in *IESI AR Corp.* v. *Northwest Arkansas Regional Solid Waste Management District*, 433 F.3d 600, 605 (8th Cir. 2006). But the State is taking that language out of context. In *Oehrleins*, a Minnesota county passed an ordinance that required any local waste disposal to occur at certain county-designated facilities, although residents could still dispose of their waste at out-of-state facilities. 115 F.3d at 1377-1378. As relevant here, this Court rejected the argument that the intra-county restriction discriminated against interstate commerce. *Id.* at 1385-1387.

The Court began by noting that the "only preference granted to the designated facilities is with respect to other *local* operators." *Oehrleins*, 115 F.3d at 1385 (emphasis in original). Out-of-state landfills could still receive

county waste, but unauthorized local entities could not. *Id.* The Court observed that this preference created "an economic benefit, not burden, to out-of-state interests," which were able to charge "fees substantially less than those charged by the County." *Id.* "This may be economically distorting," the Court explained, but local "market controls that inure to the benefit of out-of-state concerns simply do not constitute 'discrimination' under the Commerce Clause." *Id.*

The Court then turned to the argument that out-of-state companies were being shut out of the local market because they could not build facilities in the county and process waste there. *Oehrleins*, 115 F.3d at 1386. In responding to "[t]his 'market access' theory," the Court rejected the notion that "an out-of-state concern that permanently locates an operation within the state is still an 'out-of-state' entity that can complain that a law that even-handedly restricts a local market is 'discriminatory.'" *Id.* But the Court's point had nothing to do with determining domicile for Commerce Clause purposes. The Court's point was instead that an out-of-state company that set up a local facility and could not obtain county authorization would be no different than an existing local facility that similarly missed out on a permit—they would all be similarly disadvantaged.

*IESI*, in its own words, "is almost identical to *Oehrleins*," and follows the same logic. 433 F.3d at 605. There, a state agency promulgated a regulation requiring that waste produced in northwest Arkansas had to be disposed of at an out-of-state landfill or a designated in-state facility absent express approval. *Id.* at 603. IESI was an Arkansas subsidiary of an out-of-state company, and it sued under the Dormant Commerce Clause because the regulation prevented it from transferring "additional waste to its in-state landfill without the [agency's] approval." *Id.* at 605-606. This Court rejected IESI's argument because the regulation precluded waste disposal at *any* non-designated in-state landfill.

Both *Oehrleins* and *IESI* thus involved situations where, unlike here, the law "*even-handedly* restrict[ed] a local market." *Oehrleins*, 115 F.3d at 1386 (emphasis added); *accord IESI*, 433 F.3d at 606 (law "applies equally to all businesses regardless of location"). Neither rested at all on determining where an out-of-state company with an in-state presence is domiciled for Commerce Clause purposes. And *Oehrleins* specifically pointed out—in a footnote the State ignores—that "[i]t would be a different matter, of course, if the state were to treat a company incorporated or principally located in

28

another state differently from Minnesota companies." 115 F.3d at 1387 n.13. That is precisely this case. *See infra*, pp. 45-48.

In fact, this Court has already declined an earlier invitation to accept the State's geographic argument. In *LSP Transmission Holdings, LLC* v. *Sieben*, 954 F.3d 1018, 1024 (8th Cir. 2020), the Court considered a Minnesota law that gave incumbent electricity providers a right of first refusal on building new lines. An out-of-state electric company, LSP, challenged the law on Dormant Commerce Clause grounds. A number of the benefited incumbents were also headquartered out-of-state. *Id.* at 1028. Just as the State does here, LSP relied on *Oehrleins* to argue that those companies should be treated as local Minnesota entities based on their "meaningful in-state presence." *Id.* at 1027 (quoting LSP's brief). The Court did not do that. It held that the Minnesota law applied "evenhandedly to all entities, regardless of whether they are Minnesota-based entities or based elsewhere." *Id.* at 1028. And as in *Oehrleins*, the Court noted that the case would have been different if the law had disfavored companies incorporated or principally located outside Minnesota. *Id.* (citing *Oehrleins*, 115 F.3d at 1387 n.13).

What is more, the Court even considered Arkansas's argument that *Oehrleins* already decided that a substantial in-state presence renders a firm

local for Commerce Clause purposes.  Here is what the Court said in *LSP*: "Although briefly discussed in *Oehrleins*, we have not squarely addressed the issue of whether an entity that has an in-state presence but is headquartered elsewhere is considered an in-state entity for the purpose of dormant Commerce Clause review.  We need not do so now."  954 F.3d at 1029 n.7. Arkansas says in a footnote (at 23 n.4) that *LSP* was "mistaken[]," but it was entirely correct.  As already explained, nothing in *Oehrleins* (or *IESI*) turned on whether companies headquartered or domiciled out of state should be treated as local entities merely because they had some in-state operations.

The State's out-of-circuit cases are no better.  Br. 23-24 (citing *NextEra Energy Cap. Holdings, Inc.* v. *Lake*, 48 F.4th 306 (5th Cir. 2022); *Fla. Transp. Servs., Inc.* v. *Miami-Dade Cnty.*, 703 F.3d 1230 (11th Cir. 2012)).  In those cases, Texas and Florida had provided a benefit for market incumbents, and they defended those policies on the ground that some of the benefited incumbents were headquartered or domiciled out of state.  The Fifth and Eleventh Circuits both held that a discriminatory law is not insulated from constitutional scrutiny because it incidentally benefits some out-of-state interests.  *See* 48 F.4th at 322-325; 703 F.3d at 1259.  That point cuts against the State.  And in any event, neither case supports Arkansas's distinct

contention that an out-of-state entity loses protection under the Dormant Commerce Clause as soon as it establishes an in-state presence.

**B. Act 624 Unlawfully Discriminates Against Interstate Commerce.**

At "the 'very core'" of the Dormant Commerce Clause lies its "antidiscrimination principle": no State may discriminate against "out-of-state economic interests." *Nat'l Pork Producers*, 598 U.S. at 364, 369. Even "a facially neutral measure" may discriminate if it has a "discriminatory purpose" or a "discriminatory effect." *SDDS*, 47 F.3d at 267. Act 624 has both. It was motivated by discriminatory purpose—to protect local pharmacies by expelling out-of-state pharmacies from the market. And it has a purely discriminatory effect—it bans *only* out-of-state firms from doing business in Arkansas. For either reason, strict scrutiny applies, and Arkansas correctly does not argue that it can satisfy that demanding standard.

**1. Act 624 has a discriminatory purpose.**

Discriminatory-purpose claims are not always easy to prove because lawmakers typically conceal their protectionist motives. Not here. Act 624's advocates repeatedly said the quiet part out loud, starting with the statute's text and continuing through the legislative history. The State tries to whitewash each piece of that record, but the collective import is overwhelming.

The State also lacks any persuasive explanation for why Act 624 was necessary in light of existing laws that regulate PBMs.

a.  **Text**.  Act 624 has two sections, and both evince a discriminatory purpose.  In Section 1, the Assembly made three findings:  first, that the State should support "patient access to prescription drugs and pharmacy services at fair prices," Pl. Add. 1 (§ 1(a)(1)); second, that the Federal Trade Commission and a U.S. House Committee had found "evidence of anticompetitive business tactics that have driven *locally-operated pharmacies* out of business, limiting patient choices and inflating drug prices at pharmacies owned by pharmacy benefits managers," Pl. Add. 1 (§ 1(a)(2)) (emphasis added); and third, that the State wanted to "minimize conflicts of interest by stopping the pharmacy benefits managers acting . . . [as] both a price setter and price taker," Pl. Add. 1 (§ 1(a)(3)).

The Assembly then turned to its "intent":  "[to] improve healthcare delivery in the pharmacy market for patients by eliminating certain anticompetitive business tactics."  Pl. Add. 1 (§ 1(b)).  The Assembly had just made clear what "anticompetitive business tactics" it was talking about—the ones that had supposedly "driven *locally-operated pharmacies* out of business."  As the district court put it, that statement "artlessly discloses [the

32

State's] avowed purpose to discriminate." Ark. Add. 5; App. 779; R. Doc. 73, at 5 (quoting *Dean Milk Co.*, 340 U.S. at 354). The Assembly's goal was to protect "locally-operated pharmacies" from what it viewed as anticompetitive practices by national pharmacy chains. Of course labeling practices as "anticompetitive" does not make them so, and the Assembly did not point to any state-specific evidence to back up its view. But in any event, protecting local businesses against competition with out-of-state businesses is exactly what the Dormant Commerce Clause prohibits.

The State offers two responses. First, it says (at 42) that Act 624 is not about "reduc[ing] out-of-state competition or increas[ing] local pharmacies' market share." In the State's telling (at 41-44), Act 624 is only about preventing vertical integration between PBMs and pharmacies. That is simply not a plausible reading of what the Assembly said. The Assembly said that PBMs were engaging in "anticompetitive business tactics that have driven locally-operated pharmacies out of business," which in turn was "limiting patient choice and inflating drug prices at pharmacies owned by [PBMs]." Pl. Add. 1 (§ 1(a)(2)). In other words, the Assembly sought to

improve patient choice and lower drug prices *by protecting locally operated pharmacies* from what the Assembly viewed as unfair competition.[3]

Second, the State says (at 44) that, even if Act 624 is about "protecting local pharmacies from anticompetitive practices purely for its own sake," that is not a discriminatory purpose. The State cites nothing in support, nor could it. Arkansas may generally foster business or regulate using States' traditional powers, *see* Br. 44-45—but when the sources of the supposed "anticompetitive practices" or "unfair competition" are out-of-state companies, Arkansas may not "protect[] local pharmacies . . . for its own sake." That is precisely what the Dormant Commerce Clause exists to prevent.

In addition to the Assembly's findings and stated intent in Section 1, there is its prohibition on PBM-affiliated pharmacies in Section 2. As initially

---

[3] The State argues that this Court has to accept the Assembly's stated intent. Br. 40-41 & n.5, 45 (citing *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981)). The problem for the State is that the Assembly proclaimed its desire to protect locally operated pharmacies on the face of the statute. That alone means Act 624 is invalid. *See Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-266 (1977) (plaintiffs need not show that government action "rested solely on … discriminatory purposes"); *Brandt ex rel. Brandt* v. *Griffin*, 147 F.4th 867, 880 (8th Cir. 2025) (en banc) (legislature impermissibly discriminates if it passes a law "*in part* 'because of' . . . its adverse effects upon an identifiable group") (emphasis added). In any event, as explained below, the Court still has to examine the broader "circumstances," *Clover Leaf Creamery*, 449 U.S. at 463 n.7, which here show that Act 624 is discriminatory both in its purpose and effects.

proposed, that prohibition would have been a blanket one. But that would have swept in Walmart, the only in-state PBM-affiliated pharmacy chain (and the State's largest private employer). As enacted, Act 624 carves out an exemption when "[t]he pharmacy employer is the sole Arkansas client of the pharmacy benefits manager." Pl. Add. 3 (§ 2(f)(2)). The State has never denied that in practice the exemption captures only Walmart. Nor does it deny that exempting Walmart was, for at least some legislators, a condition of their support. *See* Geary, *supra*, p. 13. There is no need to "guess at the legislature's motivation" when the law contains an exception plainly designed to "aid [local] industry." *Bacchus Imps., Ltd.* v. *Dias*, 468 U.S. 263, 271 (1984).

The State says not a word about the Walmart exemption. That exemption is strong evidence that the State's asserted purposes are pretextual. *See Raymond Motor Transp., Inc.* v. *Rice*, 434 U.S. 429, 445 (1978) (purported benefits of law undercut by "exemptions"). If Act 624's only concern were "vertically integrated firms," Br. 42, that concern would apply equally to Walmart's more than 60,000 employees in the State. Below, the State's explanation was that Walmart's "PBM is only serving the pharmacy's employees and those employees are likely filling prescriptions at their employer's pharmacy." R. Doc. 54, at 24. But one of the State's principal

35

justifications for Act 624 is that otherwise PBMs could steer customers to their own affiliated pharmacies with inflated prices. App. 430:22-431:20; R. Doc. 46-2, at 3:22-4:20. Obviously that concern applies equally to Walmart's PBM if Walmart's employees are directed to use Walmart's pharmacies.

b.    **Legislative History**. In determining whether Act 624 has a discriminatory purpose, this Court also looks to "statements by lawmakers." *IESI*, 433 F.3d at 604; *see Hazeltine*, 340 F.3d at 594. Here, as the district court found, "the legislative history of [Act 624] is brimming with protectionist rhetoric." Ark. Add. 6; App. 780; R. Doc. 73, at 6 (quoting *SDDS*, 47 F.3d at 268). Indeed, the court noted that there were "too many examples of this rhetoric to list in [its] order." *Id.* Appellees highlight only a few below.

Representative Moore was the bill's House co-sponsor. He warned that neighborhood pharmacies are "closing at a rapid pace" and that the need to "support[] these independent pharmacies is a really big part of why we're running [Act 624]." Mark Friedman, *Arkansas Bill Would Bar PBMs from Selling Drugs*, Ark. Bus. (Feb. 24, 2025), https://tinyurl.com/atttr4zz; PUTTCast at 2:27. Representative Moore described the bill as sending a message to out-of-state PBM-affiliated pharmacies that they should "[l]eave the medication dispensing to the small businesses that actually care," and said

36

that without the law "Arkansas patients would be forced to get their medications from either a mail-order pharmacy or a big box store such as CVS." Maggie Ryan, *Lawmakers Introduce Bill to Ban PBM-Owned Pharmacies* at 9:22 CST, Little Rock Pub. Radio (Jan. 17, 2025), https://tinyurl.com/5b7y2b3x. Simply put, the bill would provide "justice" for "local pharmacies." Neal Earley, *Sanders Signs Bill Opposed by CVS; Measure Prohibits Prescription Drug Middlemen from Owning Pharmacies*, Ark. Democrat-Gazette (Apr. 16, 2025), https://tinyurl.com/b7vsf6nt.

Things were no less protectionist on the other side of the Assembly. There, Senator Hammer was the bill's Senate sponsor. He said that patients were voting with their feet for "out-of-state mail order pharmacies" affiliated with PBMs, and the bill would shift patients back to "their local community pharmacy." App. 430:21-431:20; R. Doc. 46-2, at 3:21-4:20. He contrasted "local independent pharmacies" that are "investing in their communities" with out-of-state national chains like CVS that were "sucking the economy out" of Arkansas and "sending it somewhere else." PUTTCast at 34:29-35:07.

Those statements by Representative Moore and Senator Hammer are alone enough to establish discriminatory intent because they show the "intent of the individuals who drafted the [legislation]." *Hazeltine*, 340 F.3d at 596.

But there is much more. Senator Johnson called the bill an "essential step" to "protecting local pharmacies" and criticized a witness who testified against the bill for not supporting "our local businesses." Mark Johnson, *Set the record straight on HB1150*, Ark. Democrat-Gazette (Mar. 2, 2025), https://tinyurl.com/5fnshhe6; App. 502:8-15; R. Doc. 46-2, at 75:8-15. Senator Sullivan described the bill as "protect[ing] competition so local pharmacies can keep serving their communities." Dan Sullivan, *HB1150 Puts Pharmacy Patients, Quality Care First*, Jonesboro Sun (Mar. 17, 2025), https://tinyurl.com/y8njmynd. At a hearing in the House, Representatives Lundstrum and McGrew echoed that the bill would protect "small-town pharmacist[s]" from large pharmacy chains. App. 326-327, 341; R. Doc. 46-1, at 28-29, 43. As the plaintiffs detailed below, *see* R. Doc. 14 (4:25-cv-524), at 28-29, the record is chock-full of protectionist language.

These statements (and others like them) are far worse than the kinds of legislative statements that have previously led this Court to invalidate state laws as unconstitutionally discriminatory. In *Hazeltine*, for instance, this Court described the legislative record as "brimming with protectionist rhetoric" based on a single statement that the challenged law would keep profits in "local economies" and agriculture "in the hands of family farmers,"

rather than "a few, large corporations."  340 F.3d at 594.  And in *SDDS*, this Court found "ample evidence of a discriminatory purpose" based on exhortations to voters to reject an "out-of-state dump" in order to keep "imported garbage … out of South Dakota."  47 F.3d at 268.  Here, appellees pointed to a slew of discriminatory statements by Act 624's sponsors and supporters (as well as Governor Sanders and outside groups).

The State does not address any of these specific statements.  It starts by trying to paint other statements as innocent:  they were merely about "protect[ing] independent pharmacies—and thereby patient access and price competition—from anticompetitive PBM practices."  Br. 45.  There is a reason the State did not make this argument below or otherwise attempt to defend the legislators' statements.   When the State speaks about protecting "independent pharmacies," what it really means is that Arkansas must protect locally owned and operated pharmacies from the purportedly "anticompetitive PBM practices" of out-of-state companies such as CVS, Express Scripts, and Optum.  The State's euphemisms thus cannot obscure what the district court grasped:  Act 624 "attempt[s] to protect 'locally-operated pharmacies' as opposed to just consumers."  Ark. Add. 5; App. 779; R. Doc. 73, at 5.

The State then points (at 46-47) to supposedly "benign" statements from the Act's legislative history. But even those statements are just more protectionism. All of the statements complain in some way that out-of-state PBMs are steering customers to their own affiliated pharmacies, and removing those pharmacies from the picture will allow more Arkansans to fill their prescriptions at local pharmacies. *See, e.g.*, Br. 46 ("[P]rescriptions were 'being forced through out-of-state mail order pharmacies at higher prices . . . that should be able to be filled locally.'") (quoting App. 317:15-17; R. Doc. 46-1, at 19:15-17). And in any event, even if some legislative statements suggest a nondiscriminatory purpose by a handful of legislators, that cannot cleanse a record "brimming with protectionist rhetoric." Ark. Add. 6; App. 779; R. Doc. 73, at 6 (quoting *SDDS*, 47 F.3d at 268); *see supra,* pp. 33-34 n.3.

c. **Existing Laws**. In determining whether a law has a discriminatory purpose, this Court also considers whether the "means used to achieve the [S]tate's 'ostensible . . . purpose' were relatively ineffective," *SDDS*, 47 F.3d at 268-269 (quoting *Hunt*, 432 U.S. at 352), or whether "there is scant evidence in the record to suggest that drafters made an effort" to determine whether the law would "effectively" achieve its goals, *Hazeltine*, 340 F.3d at 594. Those red flags are present here because the State never

developed a record—either during this litigation or in the process of enacting the law—to show why Act 624 was needed given that "other less burdensome means" were available for "the [State] . . . to achieve its stated purposes." *U & I Sanitation* v. *City of Columbus*, 205 F.3d 1063, 1071 (8th Cir. 2000).

Below and again here, the State has justified Act 624 on two grounds: PBMs disadvantage nonaffiliated pharmacies by paying affiliated pharmacies a higher reimbursement rate, and PBMs steer patients towards affiliated pharmacies. *See, e.g.,* R. Doc. 54, at 10-11; Br. 55. But the State already has laws on the books to address those two concerns. Arkansas already prohibits PBMs from reimbursing any in-state pharmacy "less than the amount that the [PBM] reimburses a [PBM] affiliate for providing the same pharmacist services." Ark. Code Ann. § 23-92-506(b)(4)(A). It also requires PBMs to reimburse Arkansas pharmacies at a price equal to or greater than what the pharmacy paid for the drug. *See id.* § 17-92-507(c). And it prohibits PBMs from steering patients toward an affiliated pharmacy. *See id.* § 23-92-514(a)(2)(C). With respect to all of these laws, PBMs are subject to extensive supervision by the Arkansas Insurance Commissioner, who has the authority to revoke a PBM's license to operate in the State if violations are identified. *See id.* § 23-92-508.

Below, Arkansas never attempted to explain why Act 624 is necessary in light of these provisions. For example, the State did not point to a single violation of any of the provisions that prevent PBMs from favoring affiliated pharmacies over nonaffiliated ones. For that reason, "[b]ased on the evidence in the record," the district court concluded that Arkansas's existing laws appear "sufficient for the [S]tate to achieve its stated purposes of curtailing plaintiffs' business tactics and minimizing the conflicts of interest inherent in PBM-affiliated pharmacies." Ark. Add. 6; App. 780; R. Doc. 73, at 6. Even before this Court, Arkansas does not explain what Act 624 supposedly adds to the existing legal regime other than propping up local businesses at the expense of out-of-staters. The State does not even mention these various Arkansas provisions in its opening brief.

The State does point (at 4-5, 43-44) to two interim national studies by Federal Trade Commission staff that are referred to in Act's 624 findings. Pl. Add. 1 (§ 1(a)(2)). Those studies purport to show that PBMs reimburse their affiliated pharmacies at higher rates, but in fact, as plaintiffs explained below, the studies are deeply flawed and have been heavily criticized.[4]

---

[4] Then-Commissioner Holyoak described the report as "plagued by process irregularities" and "fail[ing] to meet the standards of economic rigor

Regardless, the studies do not provide any specific data on Arkansas—nor is it apparent how they could, given the PBM laws already on the State's books. If PBMs were harming nonaffiliated pharmacies in Arkansas, the State (including its Insurance Commissioner) has had every incentive in this litigation to provide examples. It has offered nothing. On this record, the lack of a practical need for Act 624 strongly suggests that concerns about anticompetitive conduct are pretextual. And that inference becomes undeniable when added to the Assembly's stated purpose to protect locally operated pharmacies, its carveout for Walmart, and its protectionist rhetoric throughout the legislative process.

At bottom, this case is not meaningfully different from *Hazeltine*—and indeed the evidence of discrimination is starker here. There, this Court struck down a South Dakota law that prohibited corporations and syndicates from owning farmland, notwithstanding the State's claim that regulating those

expected of Commission reports." Dissenting Statement of Comm'r Melissa Holyoak at 2-4, *Pharmacy Benefits Mangers Interim Staff Report*, FTC File No. P221200 (July 9, 2024), https://tinyurl.com/mr3s3y5z. Now-Chair Andrew Ferguson likewise criticized the report for "rel[ying] heavily on public comments," including "anonymous" ones and comments from entities with an "incentive to instigate regulatory action against PBMs." Concurring Statement of Comm'r Andrew N. Ferguson at 2-3, *Pharmacy Benefits Mangers Interim Staff Report*, FTC File No. P221200 (July 9, 2024), https://tinyurl.com/yeyn8dr5.

corporate structures was necessary to promote family farming and protect the environment. 340 F.3d at 595-596. The Court found that explanation pretextual because "the drafters and supporters of [the law] had no evidence that a ban on corporate farming would effectively" achieve those goals, and they had made "little effort to measure the probable effects of [the law] and of less drastic alternatives." *Id.* at 594, 595. The same is true here. Arkansas has presented no evidence that Act 624 would effectively achieve its supposed goals, nor made any effort to measure the effects of Act 624 or less drastic alternatives. Like this Court in *Hazeltine*, the district court here correctly concluded that Act 624 was likely "motivated by a discriminatory purpose." *Id.* at 596.

### 2.     Act 624 has an entirely discriminatory effect.

Because the district court correctly concluded that Act 624 had an overtly discriminatory purpose, it did not need to address whether Act 624 also has an unlawful discriminatory effect. But Act 624 has a *purely* discriminatory effect—Arkansas crafted it to apply *exclusively* to out-of-state firms. Act 624's discriminatory effect provides an independently sufficient ground on which to affirm the district court's conclusion that the law likely violates the Dormant Commerce Clause. *See Spirtas Co.* v. *Nautilus Ins. Co.*, 715 F.3d

44

667, 670-671 (8th Cir. 2013) (This Court "can affirm on any basis supported in the record.").

a. Even a facially neutral law that has "the practical effect" of disfavoring interstate commerce triggers strict scrutiny under the Dormant Commerce Clause. *Hunt*, 432 U.S. at 350; *see SDDS*, 47 F.3d at 267. Here, the practical effect of Act 624 will fall fully on non-Arkansas companies. As appellees argued below and the State has never contested, Act 624's ban on PBM-affiliated pharmacies, in its final enacted form, will affect *only* pharmacies owned by out-of-state entities. Conversely, *no* in-state pharmacy will have its license revoked. As explained earlier, lawmakers ensured that would be the case when they amended the statute to carve out Walmart. Arkansas thus intentionally shaped the ban to affect only out-of-state firms, and no in-state ones (especially its largest employer).

The fact that Act 624's burdens fall exclusively on out-of-state interests makes this case like *Hunt* and *SDDS*. In *Hunt*, a North Carolina statute affected only out-of-state apple growers, *see* 432 U.S. at 352-353; and in *SDDS*, a South Dakota referendum intended to hinder the importation of out-of-state waste, *see* 47 F.3d at 268. Here, as in those cases, "out-of-staters [are] singled out to bear 100% of the cost" of the challenged law. *Id.* at 270-271 (discussing

*Hunt* as "analogous" in finding a South Dakota referendum subject to strict scrutiny because it "so predominantly affects only out-of-staters"). Act 624 should therefore be subject to strict scrutiny, which even Arkansas does not argue the statute could satisfy.

Other courts of appeals have applied the same analysis to purportedly neutral state laws that do not ban out-of-state companies altogether but do disproportionately affect them. For instance, in *Family Winemakers of California* v. *Jenkins*, 592 F.3d 1, 4-5 (2010), the First Circuit enjoined a Massachusetts law that allowed "small" wineries to sell directly to consumers but prohibited "large" wineries—which were defined in a way that covered only out-of-state entities—from doing so. The First Circuit reasoned that the statute was "impermissibly discriminatory in effect" because it advantaged Massachusetts wineries at the expense of out-of-state producers. *Id.* at 12-13. Similarly, in *Cachia* v. *Islamorada*, 542 F.3d 839, 843 (2008), the Eleventh Circuit held that an ordinance prohibiting chain restaurants from operating in a town was subject to strict scrutiny. Even though the ordinance allowed some out-of-state restaurants to enter the local market, the court found that the ordinance's prohibition was "not evenhanded in effect[] and disproportionately targets restaurants operating in interstate commerce." *Id.*

b.    More than in those cases, Act 624 does not simply confer an advantage on local pharmacies or shift costs to out-of-state companies. It *bans* out-of-state competitors like plaintiffs—some of the largest pharmacy chains in Arkansas—from the Arkansas pharmacy market entirely.  As a result, the discriminatory impact of Act 624 will be enormous.  As the record shows, CVS alone filled more than 2.7 million prescriptions for more than 340,000 Arkansans across 23 retail pharmacies in 2024.  R. Doc. 14 (4:25-cv-524), at 25-26.    Optum-affiliated pharmacies were projected to dispense nearly 1 million prescriptions in Arkansas in 2025.  R. Doc. 44, at 12-13.  Express Scripts-affiliated pharmacies delivered more than 700,000 prescriptions to over 50,000 Arkansans in 2024.  R. Doc. 17, at 5.  All told, more than 50 out-of-state pharmacies, filling between $2 billion and $5 billion in prescriptions annually, would be forced to leave the State if Act 624 goes into effect.  App. 317:13-18, 385:4-14; R. Doc. 46-1, at 19:13-18, 87:4-14.

That departure would create a huge opportunity for in-state pharmacies to capture this market share.  Walmart in particular has already begun reaping the rewards of Act 624's passage.  Since mid-March 2025, even though the law remains enjoined, many customers in the State are leaving CVS on the understanding that CVS's pharmacies will shutter soon, and CVS's internal

47

data shows that Walmart has received nearly twice as many prescriptions transferred from CVS retail pharmacies as from CVS's next closest competitor. App. 864; R. Doc. 12-1 (4:25-cv-524), at 9. Of course, redirecting that commerce to locally owned and operated pharmacies is exactly what the State wants—and exactly what the Dormant Commerce Clause does not allow.

### 3. Act 624 is not saved by *Exxon*.

Against this overwhelming evidence of Act 624's discriminatory purpose and effect, Arkansas rests its defense of the law almost entirely on the Supreme Court's decision in *Exxon*. The State tries to reframe that decision as standing for the proposition that "laws that ban vertical integration" are categorically "non-discriminatory." Br. 28. But *Exxon* does not establish a vertical-integration exception to the Dormant Commerce Clause, and no court has ever treated it that way. *Exxon* stands for the far narrower, common-sense proposition that a State may regulate vertical integration when it does not discriminate in purpose or effect. That rule is no help to Arkansas, which—unlike Maryland in *Exxon*—has discriminated in both.

a. In response to the gasoline shortage in the 1970s, Maryland enacted a law that prohibited oil producers and refiners from operating retail gas stations in the State. *Exxon*, 437 U.S. at 119-121. Exxon and other oil

companies owned relatively few gas stations in the State—only "about 5% of the total number of Maryland retailers"—but they challenged the law on Dormant Commerce Clause grounds. *Id.* at 123-124. They argued that the Maryland law was discriminatory because its burden fell "solely on interstate companies." *Id.* at 125. The Court held that such a minimal burden alone did not establish discrimination against interstate commerce, particularly because there were "several major interstate marketers of petroleum" that operated in Maryland and were "not affected by the Act." *Id.* at 125-126. Far from supporting Arkansas, the Court's decision underscores why Act 624 is unlawful.

First, *Exxon* was about discriminatory "effect," not purpose. 437 U.S. at 125. The Court in *Exxon* specifically noted the lack of any evidence that Maryland lawmakers were trying to favor local dealers over interstate dealers. *See id.* at 126 (distinguishing *Hunt* on the ground that the North Carolina law there "favored the in-state dealer in the local market"). There is ample such evidence here, as the district court found. Ark. Add. 5-6; App. 779-780; R. Doc. 73, at 5-6. Simply put, *Exxon* has nothing to say about intentional discrimination. Under the Dormant Commerce Clause, Arkansas may not

purposely discriminate in favor of local interests—full stop. It does not matter if Arkansas incants the words "vertical integration."

The State observes (at 28, 35-36) that Justice Blackmun's partial dissent in *Exxon* argued that the Maryland law was motivated by a discriminatory purpose to protect in-state dealers. The State suggests (at 37) that, because the Court "did not even respond to that theory," the Court must not have thought such a purpose was "impermissible." That suggestion is meritless. The *Exxon* majority was not silently overruling the line of Dormant Commerce Clause cases that condemn state laws motivated by a discriminatory purpose. The far more sensible inference is that the *Exxon* majority did not believe Justice Blackmun's slim evidence, *see* 437 U.S. at 140, merited a response. Here, by contrast, "[t]here [were] too many examples of [protectionist] rhetoric" for the district court to recount. Ark. Add. 6; App. 780; R. Doc. 73, at 6.

Second, even as a case about discriminatory effect, *Exxon* is not helpful to Arkansas. The Court in *Exxon* noted that, because of the particular market structure, there might be no discriminatory effect at all. The retail market was composed of three groups: interstate refiners (like Exxon), interstate dealers that were not also refiners, and local dealers. 437 U.S. at 125-126. The

Court explained that although refiners would no longer be able to operate their own stations, their 5% of the market could be absorbed *either* by the interstate dealers *or* the local ones: "in-state independent dealers will have no competitive advantage over out-of-state dealers." *Id.* at 126. As the Court put it, "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Id.* at 127. Here, by contrast, the record shows that the law will shift business from out-of-state pharmacies to local competitors, and that it exempts the only in-state entity that is vertically integrated.

b. All of that analysis is enough to distinguish this case from *Exxon*. But the *Exxon* Court went further and added a footnote to remove all doubt. The Court observed that "[i]f the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market[,] . . . the regulation may have a discriminatory effect on interstate commerce." *Exxon*, 437 U.S. at 126 n.16. The Court noted that was not true in *Exxon*: "the Maryland statute has no impact on the relative proportions of local and out-of-state goods sold in Maryland and, indeed, no demonstrable effect whatsoever on the

51

interstate flow of goods." *Id.* By contrast here, Act 624 would have a massive effect on market share: billions of dollars in prescriptions would shift to local pharmacies. *See supra*, pp. 7-8, 47.

*Exxon*'s footnote also disposes of the State's argument that there is some categorical exception to the Dormant Commerce Clause for laws that aim at vertical integration. The Supreme Court was explicit that *Exxon* might have been different if the Maryland law (like Act 624) had shifted market share from out-of-state to in-state firms. Other courts of appeals have emphasized this proviso in *Exxon* when continuing to find state laws discriminatory for just that reason. *See Family Winemakers*, 592 F.3d at 13 ("*Exxon* is not apposite where, as here, there is an in-state market and the law operates to its comparative benefit."); *Cachia*, 542 F.3d at 842-843.

More generally, the Supreme Court has shunned categorical rules in the Dormant Commerce Clause context, instructing courts to engage in a "case-by-case analysis." *W. Lynn Creamery, Inc.* v. *Healy*, 512 U.S. 186, 201 (1994). Because the Clause is concerned with whether state decisionmakers acted with animus toward out-of-state actors, or how a state law affects the flow of interstate commerce within a particular market, it would not make any sense to say that certain classes of laws are categorically non-discriminatory.

As an example, in *Hazeltine*, South Dakota's law was facially neutral and regulated only a particular corporate structure (*i.e.*, corporations and syndicates). But this Court still invalidated the law because it "was motivated by a discriminatory purpose." 340 F.3d at 596-597. "Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce." *W. Lynn Creamery*, 512 U.S. at 201.

The State cites (at 30-31) a number of cases upholding various regulations aimed at vertical integration. Not a single one of those decisions declares that States may discriminate against out-of-state firms to the benefit of local players so long as their laws target "vertical integration." Rather, those courts, like the district court here, examined the particular records before them. Some of the State's cases did not even involve any claim of discriminatory purpose; in others the evidence of discriminatory purpose was

quite weak; and in the remainder the evidence of discriminatory effect was

weak.[5]  None of the State's cases is remotely comparable to this one.[6]

### C.    Act 624 Fails *Pike* Balancing.

The district court also correctly held that, in addition to being

discriminatory, Act 624 violates the Dormant Commerce Clause under the

*Pike* balancing test.    In *Pike*, the Supreme Court held that even a

nondiscriminatory law violates the Dormant Commerce Clause if it imposes a

---

[5]    *See, e.g.*, *Ford Motor Co.* v. *Tex. Dep't of Transp.*, 264 F.3d 493, 502 (5th Cir. 2001) (plaintiff relied solely on "fact that Texas has no motor vehicle manufacturers as evidence of the law's discriminatory purpose and effect"); *Allstate Ins. Co.* v. *Abbott*, 495 F.3d 151, 160 (5th Cir. 2007) (finding "stray protectionist remarks … insufficient to condemn the statute"); *LensCrafters, Inc.* v. *Robinson*, 403 F.3d 798, 803 (6th Cir. 2005) (plaintiff "point[ed] to no substantive evidence suggesting that this legislation had a discriminatory purpose"); *Flynt* v. *Bonta*, 131 F.4th 918, 926 (9th Cir. 2025) (plaintiffs' "primary evidence of discriminatory purpose" was language of predecessor statute); *Fresenius Med. Care Holdings, Inc.* v. *Tucker*, 704 F.3d 935, 942 (11th Cir. 2013) (plaintiffs argued only that challenged law "has the practical effect of discriminating against out-of-state commerce").

[6]    Act 624 is unconstitutional under the Privileges and Immunities Clause for the same reasons that the law violates the Dormant Commerce Clause. *See, e.g.*, *McBurney* v. *Young*, 569 U.S. 221, 227 (2013).  To be sure, current doctrine holds that the Privileges and Immunities Clause does not apply to corporations, *see Hemphill* v. *Orloff*, 277 U.S. 537, 548 (1928), but recent decisions have called that doctrine into question, *see Burwell* v. *Hobby Lobby Stores, Inc.* 573 U.S. 682, 706-707 (2014).  Appellees thus preserve this point for future consideration.

"burden … on [interstate] commerce" that "clearly exce[eds] the putative local benefits." 397 U.S. at 142. A state law is thus invalid if it only "marginally" furthers its purposes while "substantially" interfering with interstate commerce. *Kassel* v. *Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981) (plurality opinion); *see U & I*, 205 F.3d at 1069-1072 (law fails *Pike* balancing where the "local benefits" are "illusory"). For many of the same reasons discussed above, Act 624 flunks *Pike* balancing.

1. Begin with the burdens. Act 624 forces PBM-affiliated pharmacies to cease all operations in the State. It shuts them out of the Arkansas pharmacy market entirely, requiring them to close brick-and-mortar pharmacies, cease mail services, terminate the employment of pharmacists and other employees, and inform customers that they must find new pharmacies to fill their prescriptions. Those burdens are severe. And if each State "adopted similar legislation," *Healy* v. *Beer Inst.*, 491 U.S. 324, 336 (1989), the result would be the "economic Balkanization" the Dormant Commerce Clause is intended to prevent, *Granholm* v. *Heald*, 544 U.S. 460, 472 (2005). The State offers some arguments for why this Court should disregard these substantial burdens, but none is persuasive.

First, the State argues that "[p]laintiffs do not claim that any drug manufacturer will stop selling any drug to Arkansas pharmacies." Br. 54. That is not correct. As plaintiffs explained below, they own the only pharmacies in Arkansas authorized to distribute certain "exclusive distribution drugs," or EDDs. R. Doc. 14 (4:25-cv-524), at 20; R. Doc. 17, at 5-6, 34. At least until manufacturers enter into new distribution agreements with other pharmacies, Act 624 may make it impossible for certain drugs to be sold in the State altogether. The State's argument also wrongly focuses on the market for drugs rather than the market for pharmacy services—the latter is Act 624's target and it would be heavily disrupted if Act 624 were to take effect.

Second, Arkansas argues that Act 624 has a "smaller footprint" than the law in *Exxon*, which the State says "shutter[ed] over eighty percent of the local gas stations' competition." Br. 54. That argument is wrong on its face. As the Court made clear when describing the Maryland law's impact, the "number of stations actually operated by a refiner or an affiliate [was] relatively small, representing about 5% of the total number of Maryland retailers." 437 U.S. at 123. Act 624, by contrast, affects a vastly greater percentage of the Arkansas pharmacy market. More than 50 affiliated pharmacies, which provide between $2 billion and $5 billion in prescriptions per year, would be forced to leave the

56

State.  CVS alone operates 23 retail pharmacies that serve more than 340,000 Arkansans each year.  As the legislative record makes clear, both lawmakers and independent-pharmacy lobbyists expected that local pharmacies would be able to fill this significant void.  *See supra*, pp. 10-11, 36-38.

Third, the State notes (at 54-55) that Act 624 allows certain out-of-state pharmacies to continue to operate.  But that does not undermine the substantial nature of Act 624's burden, which operates *exclusively* on out-of-state firms and would expel them from the market.  And the evidence in the record shows that in-state pharmacies—led by Walmart—will take the lion's share of the market share that would be up for grabs if Act 624 went into effect.  R. Doc. 76, at 21:9-16.

2.  Turning to benefits, Act 624 does not advance legitimate local interests in a way that would justify the "excessive" burdens it creates.  *Pike*, 397 U.S. at 142.  The State makes much (at 55-56) of the fact that *Pike* asks courts to consider only "putative" rather than "actual" benefits.  But this Court does not take the State's word for it—the State still has to substantiate that the benefits may be real.  *See R & M Oil & Supply*, *Inc.* v. *Saunders*, 307 F.3d 731, 735 (8th Cir. 2002) ("question[ing]" law's purported local benefits due to lack of "evidence"); *Cotto Waxo Co.* v. *Williams*, 46 F.3d 790, 795 (8th Cir.

1995) (same).  As the district court found, existing Arkansas laws already provide tools to regulate anticompetitive conduct by PBMs.  "Based on the evidence in the record," the court explained, "it appears that these laws are sufficient for the state to achieve its stated purposes."  Ark. Add. 6; App. 780; R. Doc. 73, at 6.

The State also asserts that its existing laws should not be considered because less restrictive alternatives are not relevant to the *Pike* balancing analysis.  Br. 56-57 (citing *United Waste Sys. of Iowa, Inc.* v. *Wilson*, 189 F.3d 762, 768 (8th Cir. 1999); *Davis*, 553 U.S. at 338-339).  But *Pike* instructs that courts must consider whether the local interest "could be promoted as well with a lesser impact on interstate activities," 397 U.S. at 142, and *Davis* says nothing to the contrary.  To the extent *United Waste Systems* left the issue open, 189 F.3d at 768, this Court has since closed it.  *See U & I*, 205 F.3d at 1070 ("[T]he availability of a less burdensome alternative is relevant to the inquiry that *Pike* requires.").

## II.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE NON-MERITS FACTORS FAVOR PRELIMINARY RELIEF.

Neither Arkansas nor amici dispute that plaintiffs face irreparable harm absent a preliminary injunction.  Nor does the State dispute that preliminary relief is supported by the balance-of-equities and public-interest factors, which

merge here because plaintiffs seek to enjoin state action. *See Eggers* v. *Evnen*, 48 F.4th 561, 564-565 (8th Cir. 2022). Only the COA amici (at 33-35) dispute where the balance of equities and public interest lie. But this Court's practice is to "consider only issues argued in the briefs filed by the parties and not those argued in the briefs filed by interested non-parties." *Continental Ins. Cos.* v. *Ne. Pharm. & Chem. Co.*, 842 F.2d 977, 984 (8th Cir. 1988). Because Arkansas "does not challenge the district court's finding that the public interest," the balance of equities, and the threat of irreparable harm "weigh[] in favor of … preliminary relief," this Court "need not consider" those factors. *Nat'l Basketball Ass'n*, 56 F.3d at 871.

To the extent this Court considers COA's arguments on the merged balance-of-equities and public-interest factor, it should reject them. To start, as the district court recognized, *see* Ark. Add. 16-17; App. 790-791; R. Doc. 73, at 16-17, the State suffers no harm when enjoined from enforcing an unconstitutional law, *see Trump*, 128 F.4th at 997, and "it is always in the public interest to protect constitutional rights," *Schmitt*, 148 F.4th at 970 (quoting *Rodgers* v. *Bryant*, 942 F.3d 451, 458 (8th Cir. 2019)). Because Act 624 is unconstitutional, the balance-of-equities and public-interest analysis can end here.

As to harms, the record contains extensive evidence about how Arkansans would be affected if Act 624 were enforced. Plaintiffs submitted declarations below explaining that Act 624 would imperil access to care for hundreds of thousands of Arkansans who rely on PBM-affiliated pharmacies. *See, e.g.*, App. 277-283; R. Doc. 45, at 4-10; App. 862-864; R. Doc. 12-1 (4:25-cv-524), at 7-9; App. 906-908; R. Doc. 13-1 (4:25-cv-561), at 4-6. This includes patients whose lives depend on access to specialty medications and in-home nursing care provided *only* by PBM-affiliated pharmacies, such as immunocompromised 83-year-old retired nurse Irma Harper. App. 262-266; R. Doc. 20, at 1-5; *see* App. 279-280; R. Doc. 45, at 6-7. Under Act 624, these individuals—and hundreds of thousands like them—would lose access to all sorts of critical care. COA entirely ignores these undisputed harms.

On the other side of the ledger, COA cites no record evidence that Act 624 would help Arkansans. COA points first (at 34) to "[r]eports from the [Federal Trade Commission] and the Government Accountability Office." But the FTC reports contain *no evidence* from Arkansas. *See* App. 637-709; R. Doc. 54-2 (July 2024); App. 710-769; R. Doc. 54-3 (January 2025). And far from identifying any PBM conduct in Arkansas that Act 624 is needed to address, the GAO report simply documents that, *before* Act 624, Arkansas already had

PBM regulations that are among the most comprehensive—if not *the* most comprehensive—in the country. *See* U.S. Gov't Accountability Off., *Prescription Drugs: Selected States' Regulation of Pharmacy Benefit Managers*, GAO-24-106898, at 11, 16 (Mar. 2024), https://tinyurl.com/vhtfrrcx.

COA next points (at 34) to "data presented to Arkansas lawmakers," specifically noting (at 22) that "[d]ebate in the Senate referenced more than sixty pharmacy closures since 2016." But there is no evidence that any closure resulted from anticompetitive conduct by PBMs rather than from fair competition and consumer choice. Moreover, legislators were informed that Act 624 itself would cause dozens of pharmacies to shutter, App. 500:6-13; R. Doc. 46-2, at 73:6-13, causing even the law's supporters to concede that it would result in pharmacy "deserts," App. 485:1-15; R. Doc. 46-2, at 58:1-15.

Finally, COA alludes (at 1-3) to its members' alleged experiences, as described in a declaration that COA attaches to its brief in this Court. But that declaration was not submitted below, and COA has not moved to supplement the record, let alone made the demanding showing of exceptional circumstances that would allow this Court to look outside the existing record. *See*, *e.g.*, 16A Charles Alan Wright & Arthur R. Miller, Federal Practice &

Procedure § 3956.4 (5th ed. 2019 & Supp. 2023).  On the existing record, the question of harms is not a close one.

## CONCLUSION

The district court's order should be affirmed.

January 28, 2026                              Respectfully submitted,

                                              /s/ Jeffrey B. Wall
J. Carter Fairley                             Jeffrey B. Wall
Ben C. Hall                                   Judson O. Littleton
Barber Law Firm PLLC                          Rishabh Bhandari
1 Allied Drive, Suite 1600                    Sullivan & Cromwell LLP
Little Rock, AR 72202                         1700 New York Avenue NW
(501) 372-6175                                Washington, DC 20006
cfairley@barberlawfirm.com                    (202) 956-7500
bhall@barberlawfirm.com                       wallj@sullcrom.com
                                              littletonj@sullcrom.com

*Counsel for Plaintiffs in E.D. Ark. case no. 4:25-cv-00524-BSM*

David S. Mitchell, Jr.                        Michael B. Kimberly
Rose Law Firm                                 Linda M. Blair
120 East Fourth Street                        Winston & Strawn LLP
Little Rock, AR 72201                         1901 L Street NW
(501) 375-9131                                Washington, DC 20036
dmitchell@roselawfirm.com                     (202) 282-5096
                                              mkimberly@winston.com
                                              lblair@winston.com
Tyler D. Mlakar
Rose Law Firm
809 South 52nd Street, Suite A
Rogers, AR 72758
(479) 301-2444
tmlakar@roselawfirm.com

*Counsel for Plaintiffs in E.D. Ark. case no. 4:25-cv-00561-BSM*

PETER SHULTS
AMANDA G. ORCUTT
SHULTS LAW FIRM LLP
200 West Capitol Avenue
Suite 1600
Little Rock, AR 72201
(501) 375-2301
pshults@shultslaw.com
aorcutt@shults.law.com

ALLYSON N. HO
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
aho@gibsondunn.com

GEOFFREY M. SIGLER
MATTHEW S. ROZEN
CLARE F. STEINBERG
M. CHRISTIAN TALLEY
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
(202) 955-8500
gsigler@gibsondunn.com
mrozen@gibsondunn.com
csteinberg@gibsondunn.com
ctalley@gibsondunn.com

*Counsel for Plaintiffs in E.D. Ark. case no. 4:25-cv-00598-BSM*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,980 words, excluding the portions exempted by Rule 32(f).

This brief also complies with the electronic-filing requirement of Circuit Rule 28A(h)(2) because it was scanned for viruses and no virus was detected.

/s/ Jeffrey B. Wall
JEFFREY B. WALL

# CERTIFICATE OF SERVICE

On January 30, 2026, I electronically filed the foregoing with the Court using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by that system.

/s/ Jeffrey B. Wall
JEFFREY B. WALL
