No. 25-2529

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

EXPRESS SCRIPTS, INC., et al.,

*Plaintiffs-Appellees,*

*v.*

RODNEY RICHMOND, IN HIS OFFICIAL CAPACITY AS BOARD
MEMBER OF THE ARKANSAS STATE BOARD OF PHARMACY, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Arkansas
Nos. 4:25-cv-00520, 4:25-cv-00524, 4:25-cv-0561 &
4:25-cv-00598
(Hon. Brian S. Miller)

BRIEF OF AMERICA'S HEALTH INSURANCE PLANS
AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE

Pratik A. Shah
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER
 & FELD LLP
2001 K Street NW
Washington, D.C. 20006
(202) 887-4000
pshah@akingump.com

*Counsel for* Amicus Curiae *America's Health Insurance Plans*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus curiae* states that America's Health Insurance Plans is a trade association whose members have no ownership interests. America's Health Insurance Plans is incorporated in Delaware as America's Health Insurance Plans, Inc. It has no parent corporation. And because it has no stock, there is no publicly held corporation that owns 10% or more of its stock.

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF *AMICUS CURIAE* ......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT............................3

ARGUMENT ........................................................................................5

I.   HEALTH PLANS NEED MORE PHARMACIES, NOT FEWER, TO HELP PATIENTS OBTAIN NEEDED MEDICATIONS AT AFFORDABLE PRICES.....................5

    A.   Pharmacy Deserts And Rising Prescription Drug Costs Are Threatening Patients' Ability To Access And Afford Needed Medications.................................5

    B.   Robust Pharmacy Markets Are Critical To Health Plans' Efforts To Address Patients' Ability To Access And Afford Needed Medications ...............10

II.  BANNING PBM-AFFILIATED PHARMACIES IN ARKANSAS WILL THREATEN ACCESS TO AFFORDABLE PHARMACEUTICAL CARE IN ARKANSAS AND BEYOND................................17

CONCLUSION ....................................................................................25

CERTIFICATE OF COMPLIANCE .................................................26

CERTIFICATE OF SERVICE ...........................................................27

Appellate Case: 25-2529     Page: 3     Date Filed: 02/09/2026 Entry ID: 5606148

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
　640 F.2d 109 (8th Cir. 1981) (en banc) ........................................... 3, 24

*Entergy Arkansas, LLC v. Webb*,
　122 F.4th 705 (8th Cir. 2024) ....................................................... 3, 24

*Pike v. Bruce Church, Inc.*,
　397 U.S. 137 (1970) ........................................................................ 3

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
　397 F.3d 56 (1st Cir. 2005) ............................................................ 25

**Statutes**

Ark. Admin. Code 003.22.118-7 ........................................................ 20

Ark. Code Ann. § 23-92-503(8)(C) .................................................... 15

Ark. Code Ann. 23-92-505(a)(1)(B) .................................................. 15

Ark. Code Ann. § 23-92-509(b)(2)(B) ................................................ 15

Ark. Code Ann. § 23-92-510(d) ........................................................ 15

**Rules and Regulations**

42 C.F.R. § 423.120 ........................................................................ 15

Fed. R. App. P. 29(a)(4)(E) ............................................................... 1

**Other Authorities**

Adepoju, Omolola E. et al., *Rethinking access to care: A
　spatial-economic analysis of the potential impact of
　pharmacy closures in the United States*, PLoS ONE (July
　27, 2023) ............................................................................... 19, 20

Appellate Case: 25-2529　　Page: 4　　Date Filed: 02/09/2026 Entry ID: 5606148

Agency for Healthcare Research & Quality, *2021 National Healthcare Quality and Disparities Report* (Dec. 2021) ......................6

Chen, Jihui, *The Effects of Competition on Prescription Payments in Retail Pharmacy Markets*, 85(3) S. Economic J. 865 (Jan. 2, 2019)............................................................14

Ctrs. for Medicare & Medicaid Servs., *National Health Expenditure Projections 2024-2033: Forecast Summary* (June 25, 2025)...........................................................8, 9

Cutler, Rachelle Louise et al.*, Economic impact of medication nonadherence by disease groups: a systematic review*, 8 BMJ Open 1 (Nov. 2017) .....................................22

Di Novi, Cinzia et al., *Older Patients and geographic barriers to pharmacy access: When nonadherence translates to an increased use of other components of health care*, 29 Health Economics 97 (Oct. 2020) .......................................22

Do, Khuong BT, *Pharmacy Networks, Prescription Drug Access, and Patient Outcomes* (Mar. 2025) (Ph.D. dissertation, Harvard University)................................21, 22

Esposito, Lisa, *Rural Pharmacies Are Closing: Where Does That Leave Patients?*, U.S. News & World Report (Oct. 17, 2018)..................................................................6

Fernandez, Elena V. et al., *Examination of the Link Between Medication Adherence and Use of Mail-Order Pharmacies in Chronic Disease States*, 22 J. Managed Care & Specialty Pharmacy 1247 (2016) ...................................11, 12

Fiscal Impact Statement, H.B. 1150, 2025 Reg. Sess. (Ark. Mar. 17, 2025) ........................................................21

Inst. for Clinical & Econ. Rev., *Launch Price & Access Report* ES1 (Oct. 23, 2025) ...............................................9

Appellate Case: 25-2529     Page: 5     Date Filed: 02/09/2026 Entry ID: 5606148

Johnson, Syundai R. et al., *Patients' Experiences with Refilling their HIV Medicines: Facilitators and Barriers to On-Time Refills*, 24(5) Permanente J. (Dec. 2, 2020)..........................11

Mattingly, T. Joseph II et al., *Community Pharmacy Turnover and Context of Openings and Closings by Ownership Type*, 6(8) JAMA Health Forum (Aug. 1, 2025).................7

Murphy, Michael & Jennifer Rodis, *The growing crisis of pharmacy deserts*, Ohio State Univ. Coll. of Pharmacy (Apr. 28, 2025)..........................................................................6

Murphy, Tom & Kasturi Pananjady, *As pharmacies shutter, some Western states, Black and Latino communities are left behind*, Associated Press (June 3, 2024) ......................19

Neal, ThienLy, *What Are Specialty Pharmacies?*, GoodRx (Oct. 26, 2021) ......................................................................12

PwC, *Medical cost trend: Behind the numbers 2026* (2025) ..................10

Qato, Dima M. et al., *Association Between Pharmacy Closures and Adherence to Cardiovascular Medications Among Older U.S. Adults*, 2(4) JAMA Network Open (Apr. 2019)..................................................................................21

Sparks, Grace et al., *Public Opinion on Prescription Drugs and Their Prices*, KFF (Oct. 4, 2024)....................................10

Swanson, Ashley, *Preferred Pharmacy Networks: Health Care Savings on the Margins*, 7(3) Wharton Pub. Pol'y Initiative 4 (May 2019) ................................................16, 17

Swenson, Ali & Linley Sanders, *Most Americans are concerned about rising health care costs, AP-NORC poll finds*, PBS News (Oct. 21, 2025)..........................................9

*TRICARE by the Numbers*, Defense Health Agency ..............................23

United Health Foundation, *America's Health Rankings: Rural Population in Arkansas* (2023) ................................18

Appellate Case: 25-2529     Page: 6     Date Filed: 02/09/2026 Entry ID: 5606148

U.S. Dep't of Labor, *OWCP Did Not Ensure Best Prices and Allowed Inappropriate, Potentially Lethal Prescriptions in the FECA Program*, Rep. No. 03-23-001-04-431 (Mar. 31, 2023) ................................................................................. 13

Visante, *Pharmacy Benefit Managers (PBMs): Generating Savings for Plan Sponsors and Consumers* (Feb. 2020) ................... 13

Visante, *The Return on Investment (ROI) on PBM Services* (Nov. 2016) ............................................................................. 13

Wittenauer, Rachel et al., *Locations and characteristics of pharmacy deserts in the United States: a geospatial study*, 2 Health Affs. Scholar (Apr. 2024) ....................................................... 8

Xu, Jianhui et al., *Pharmacy switching in response to preferred pharmacy networks in Medicare Part D*, 57(5) Health Serv. Res. 1112 (Oct. 2022) ................................................... 16

Appellate Case: 25-2529     Page: 7     Date Filed: 02/09/2026 Entry ID: 5606148

## INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans, Inc. (AHIP) is the national trade association representing the health insurance plan industry. AHIP is committed to market-based solutions and public-private partnerships that make high-quality coverage and care more affordable, accessible, and equitable for everyone. Along with its predecessors, AHIP has over 50 years of experience in the industry.

AHIP's members offer health and supplemental benefits through the individual insurance market, employer-provided coverage, and public programs (such as Medicare and Medicaid). Combined, AHIP's members provide health care coverage, services, and solutions to more than 200 million Americans. That experience gives AHIP extensive first-hand knowledge about the Nation's health care and health insurance systems, and a unique understanding of how those systems work.

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than *amicus*, its members, and its counsel) have contributed money to fund the preparation or submission of this brief.

1

AHIP has particular experience with pharmacy benefits managers (PBMs), which administer health plans' prescription drug benefits. AHIP has previously participated as *amicus curiae* in other cases to explain how state PBM regulations interfere with the design, structure, and administration of health plans. *See, e.g.*, *Rutledge v. Pharmaceutical Care Mgmt Ass'n*, No. 18-540 (U.S.); *Pharmaceutical Care Mgmt Ass'n v. Tufte*, No. 18-2926 (8th Cir.).

Likewise here, AHIP seeks to provide the Court with its expertise and experience with PBM-affiliated pharmacies as well as pharmacies more broadly. Specifically, AHIP seeks to explain why Act 624, an Arkansas law that bans PBM-affiliated pharmacies, will cause serious harm to health plans and health plan members—including the millions of Arkansans who rely on health plan coverage to obtain affordable and easily accessible prescription drugs.

## INTRODUCTION AND SUMMARY OF ARGUMENT

AHIP agrees with Plaintiffs that Act 624, which bans PBMs from owning or operating pharmacies in Arkansas, is unconstitutional and should remain enjoined. Most notably, the Act overtly discriminates against out-of-state pharmacies for the benefit of local ones, in violation of the dormant Commerce Clause. AHIP submits this brief to explain why, even if Act 624 were not blatantly protectionist, it would still violate the dormant Commerce Clause because it "impos[es] a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *Entergy Arkansas, LLC v. Webb*, 122 F.4th 705, 711 (8th Cir. 2024); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Because that burden ultimately falls on patients, the "public interest" also favors affirmance of the preliminary injunction. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

To understand how Act 624 will affect interstate commerce—specifically, the national health care market—one must first understand how pharmacies impact health plans' efforts to manage the cost and accessibility of pharmacy services. Health plans are continuously working to provide their members with access to affordable medications.

Appellate Case: 25-2529     Page: 10     Date Filed: 02/09/2026 Entry ID: 5606148

But rising drug prices and growing pharmacy deserts have impeded those efforts. Prescription drug costs are currently rising at a rate that outpaces inflation. Meanwhile, nearly 5% of Americans live in areas with little or no access to any pharmacies, and more pharmacies (independent and chain) are closing every year.

Plans have responded by contracting with more pharmacies (both independent and chain) and increasing patients' ability to access specialty and mail-order pharmacy services. Leveraging competition among pharmacies has also been one of health plans' most critical tools, as the more pharmacies there are to choose from, the better positioned plans are to negotiate discounts.

Act 624's ban on PBM-pharmacy integration will, however, undo much of the progress that health plans have made for Arkansans in need of pharmacy care by forcing many national pharmacies to exit the state. Indeed, that departure will disrupt patients' care and increase patients' costs—particularly in rural communities. As a result, many Arkansans will be left without any easy access to pharmaceutical care. Some may lose access entirely to certain specialty drugs that are distributed only through designated exclusive channels due to complex handling

4

requirements. And costs for employer-plan sponsors and health plans with national pharmacy contracts will rise, likely increasing premiums nationwide.

At bottom, Act 624 will cause numerous harms to the health care market and health plan members—both within Arkansas and beyond.

## ARGUMENT

## I. HEALTH PLANS NEED MORE PHARMACIES, NOT FEWER, TO HELP PATIENTS OBTAIN NEEDED MEDICATIONS AT AFFORDABLE PRICES

### A. Pharmacy Deserts And Rising Prescription Drug Costs Are Threatening Patients' Ability To Access And Afford Needed Medications

Health plans strive to ensure that all patients get the health care they need at a cost they can afford. Today, health plans provide access to quality medical and pharmaceutical care to millions of Americans, including over two million Arkansans. Such access—including for preventative care—helps consumers avoid preventable illnesses and better manage chronic diseases. Indeed, increased health plan coverage of Americans "is associated with statistically significant and clinically relevant improvements for low-income adults," as well as "improved medication adherence, more regular communication with physicians, and

5

improved perceived health status" for "those with chronic conditions." Agency for Healthcare Research & Quality, *2021 National Healthcare Quality and Disparities Report* (Dec. 2021).[2]

Unfortunately, many Americans face barriers to accessing health care, including needed medications. In particular, many communities in the United States have limited or no access to a pharmacy. Between 2010 and 2020, nearly 30% of pharmacies across the country closed. Michael Murphy & Jennifer Rodis, *The growing crisis of pharmacy deserts*, Ohio State Univ. Coll. of Pharmacy (Apr. 28, 2025).[3] By March 2018, over 600 rural communities that previously "had at least one independent, chain or franchise retail pharmacy" had *none*. Lisa Esposito, *Rural Pharmacies Are Closing: Where Does That Leave Patients?*, U.S. News & World Report (Oct. 17, 2018).[4]

Notably, that decline is not attributable solely to the closure of independent pharmacies. *Contra* Defs.' Br. 9. To the contrary, one recent study found (as depicted below) that "independent pharmacies *** have

---

[2] https://www.ncbi.nlm.nih.gov/books/NBK578537/.

[3] https://pharmacy.osu.edu/news/growing-crisis-pharmacy-deserts.

[4] https://health.usnews.com/health-care/patient-advice/articles/2018-10-17/rural-pharmacies-are-closing-where-does-that-leave-patients.

6

had more net openings than closings since 2010," while "chain pharmacies *** have had more net closures than openings during this time."  T. Joseph Mattingly II et al., *Community Pharmacy Turnover and Context of Openings and Closings by Ownership Type*, 6(8) JAMA Health Forum, at 5-6 (Aug. 1, 2025);[5] *see also id.* at 7 (rebutting "conclusions" that "'independent pharmacies are at greater risk for closure' compared with chain pharmacies").

*Figure 1. Openings & Closures of Chain Pharmacies & Independent/ Franchise Pharmacies From 2010-2023*



5  https://jamanetwork.com/journals/jama-health-forum/fullarticle /2836775.

Appellate Case: 25-2529    Page: 14    Date Filed: 02/09/2026 Entry ID: 5606148

Put simply, there have been closures of both types of pharmacies—independent and chain. And now nearly 16 million Americans live in a "pharmacy desert"—many with access to "zero pharmacies" at all. Rachel Wittenauer et al., *Locations and characteristics of pharmacy deserts in the United States: a geospatial study*, 2 Health Affs. Scholar, at 3 (Apr. 2024).[6]

Access to a pharmacy is not the only barrier to care, though. So too is affordability. Health care spending has been increasing on a yearly basis and is expected to continue increasing by 5.8% per year through 2033—outpacing average annual growth in the economy. Ctrs. for Medicare & Medicaid Servs., *National Health Expenditure Projections 2024-2033: Forecast Summary*, at 1 (June 25, 2025) ("CMS Forecast Summary").[7] Already, most U.S. adults are worried about health care costs going up—a worry that polling shows "extends across age groups and includes people with and without health insurance." Ali Swenson &

---

[6] https://doi.org/10.1093/haschl/qxae035.

[7] https://www.cms.gov/files/document/nhe-projections-forecast-summary.pdf.

Linley Sanders, *Most Americans are concerned about rising health care costs, AP-NORC poll finds*, PBS News (Oct. 21, 2025).[8]

Medication costs, specifically, are a top concern. Prescription drug spending has risen much faster than other health care expenses, increasing by over 10% annually in recent years. *See* CMS Forecast Summary 4. That increase is not surprising given that drug manufacturers—who alone set and control drug prices—have been launching new drugs at ever-growing prices. *See* Inst. for Clinical & Econ. Rev., *Launch Price & Access Report* ES1 (Oct. 23, 2025) (finding "51% increase in the median annual net launch price (i.e., the actual amount the manufacturer receives after rebates, discounts, and other reductions) after adjusting for inflation" in an analysis of launch price trends from 2022-2024).[9]

Costs are not likely to decrease meaningfully any time soon. Growing demand for GLP-1 weight-loss drugs and the launch of new expensive gene, cell, and biologic therapies are driving higher projected

---

[8] https://www.pbs.org/newshour/health/most-americans-are-concerned-about-rising-health-care-costs-ap-norc-poll-finds.

[9] https://icer.org/wp-content/uploads/2025/10/ICER_2025_Launch-Price-and-Access-Final-Report_For-Publication.pdf.

Appellate Case: 25-2529    Page: 16    Date Filed: 02/09/2026 Entry ID: 5606148

drug spending for plan year 2026.  *See generally* PwC, *Medical cost trend: Behind the numbers 2026* (2025).[10]  And consumers are feeling the effects: About eight in ten adults "say the cost of prescription drugs is unreasonable," and nearly three in ten "report not taking their medicines as prescribed *** because of the cost."  Grace Sparks et al., *Public Opinion on Prescription Drugs and Their Prices*, KFF (Oct. 4, 2024).[11]

### B.    Robust Pharmacy Markets Are Critical To Health Plans' Efforts To Address Patients' Ability To Access And Afford Needed Medications

Given these challenges, health plans are continuously working to increase patients' access to pharmacy services and decrease patients' pharmacy-related costs—efforts that are aided by there being *more* pharmacies (including PBM-affiliated pharmacies), not fewer.

**1.**    To start, some health plans are expanding their networks and contracting with more pharmacies, including brick-and-mortar pharmacies (both independent and chain, and those the plans are affiliated with and those they are not), as well as specialty pharmacies.

---

[10]              https://www.pwc.com/us/en/industries/health-industries/library/assets/pwc-behind-the-numbers-2026.pdf.

[11]     https://www.kff.org/health-costs/public-opinion-on-prescription-drugs-and-their-prices/.

10

Appellate Case: 25-2529     Page: 17     Date Filed: 02/09/2026 Entry ID: 5606148

Plans are also expanding alternative access channels by contracting with more mail-order pharmacies. Some plans also partner with mobile pharmacy units, the convenience of which remove cost, time, and other barriers to the ability of patients to acquire necessary medications.

These efforts not only facilitate patient access but increase patient choice as well. Many patients can choose between different pharmacies based on considerations like price, convenience, and medication selection. For example, mail-order pharmacies may be preferable to patients who are uncomfortable accessing certain medications—such as for HIV, mental health, or weight loss—in person at their community pharmacy. Mail-order pharmacies also help patients fill prescriptions in a timely manner when brick-and-mortar pharmacies are either too far away or have limited operating hours. *See* Syundai R. Johnson et al., *Patients' Experiences with Refilling their HIV Medicines: Facilitators and Barriers to On-Time Refills*, 24(5) Permanente J. 1 (Dec. 2, 2020).[12] That fact explains why mail-order pharmacies "substantial[ly]" enhance patients' medication adherence. Elena V. Fernandez et al., *Examination of the Link Between Medication Adherence and Use of Mail-Order Pharmacies*

---

[12] https://doi.org/10.7812/TPP/19.207.

Appellate Case: 25-2529     Page: 18     Date Filed: 02/09/2026 Entry ID: 5606148

*in Chronic Disease States*, 22 J. Managed Care & Specialty Pharmacy 1247, 1258 (2016) ("The existing research provides strong evidence that patients who use mail-order pharmacies are more adherent than those who use retail pharmacies.").[13]

In addition, specialty pharmacies ensure patients have access to the medications (and support) the patients need to treat complicated or rare health conditions like cancer or multiple sclerosis. *See* ThienLy Neal, *What Are Specialty Pharmacies?*, GoodRx (Oct. 26, 2021).[14]

**2.** As for reducing pharmacy-related costs, some plans use PBMs to help them offer the most cost-effective way to structure benefits and assume claim-processing responsibilities. Plans also use PBMs to (i) negotiate prices with pharmacies and drugmakers; (ii) implement drug-management strategies (like drug-quantity and refill limits) to ensure pharmacies follow clinically appropriate guidelines; and (iii) provide clinical and educational programs to pharmacies on dispensing practices, health and safety guidelines, and cost-control measures.

---

[13] https://pmc.ncbi.nlm.nih.gov/articles/PMC10397763/pdf/jmcp-022-011-1247.pdf.

[14] https://www.goodrx.com/drugs/medication-basics/specialty-pharmacies.

Appellate Case: 25-2529     Page: 19     Date Filed: 02/09/2026 Entry ID: 5606148

All in, partnerships between plans and PBMs should save consumers more than $1 trillion between 2020 and 2029—nearly $1,000 per enrollee per year, and $6 for every $1 spent. Visante, *Pharmacy Benefit Managers (PBMs): Generating Savings for Plan Sponsors and Consumers*, at 3 (Feb. 2020);[15] Visante, *The Return on Investment (ROI) on PBM Services*, at 2 (Nov. 2016);[16] *see also, e.g.*, U.S. Dep't of Labor, *OWCP Did Not Ensure Best Prices and Allowed Inappropriate, Potentially Lethal Prescriptions in the FECA Program*, Rep. No. 03-23-001-04-431 (Mar. 31, 2023) (workers' compensation program's lack of a "[PBM] to help contain costs" between 2015 and 2020 may have led to more than $300 million "in excess spending").[17]

**3.** One of the most important means of promoting affordability is ensuring competition among pharmacies. Studies have shown that, all things being equal, "the farther away a competitor is located, the higher the price a pharmacy *** charge[s] for the[] most-prescribed

---

[15] https://www.pcmanet.org/wp-content/uploads/2020/02/Pharmacy-Benefit-Managers-Generating-Savings-for-Plan-Sponsors-and-Consumers-2020-1.pdf.

[16] https://www.pcmanet.org/wp-content/uploads/2016/11/ROI-on-PBM-Services-FINAL.pdf.

[17] https://oig.dol.gov/public/reports/oa/2023/03-23-001-04-431b.pdf.

Appellate Case: 25-2529      Page: 20      Date Filed: 02/09/2026 Entry ID: 5606148

medications." Jihui Chen, *The Effects of Competition on Prescription Payments in Retail Pharmacy Markets*, 85(3) S. Economic J. 865, 874 (Jan. 2, 2019).[18] Meanwhile, the more pharmacies there are, the more competition there is. And the more competition there is, the more bargaining power buyers like health plans have to negotiate better prices and options for employers, families, individuals, and other consumers of pharmacy care. Indeed, one study found that "if a new pharmacy enters a market, it would intensify the competition, at least locally, and lead to lower prices. \*\*\* For example, \*\*\* pharmacies with high market power (concentration in the 90th percentile) would charge 2.78% more than those with low market power (concentration in the 10th percentile)[.]" *Id.* at 880, 882.

That plans must meet state and federal "network adequacy requirements"—*i.e.*, have enough in-network pharmacies within a certain distance of most beneficiaries in a particular area—increases the importance of market competition. These requirements limit plans' ability to exclude pharmacies—such as for quality- or affordability-related reasons—and thus limit plans' ability to negotiate. For example,

---

[18] https://doi.org/10.1002/soej.12325.

Appellate Case: 25-2529    Page: 21    Date Filed: 02/09/2026 Entry ID: 5606148

Arkansas law requires that:

(i)    At least ninety percent (90%) of individuals covered by a health benefit plan in an urban area served by the health benefit plan to live within two (2) miles of a network pharmacy that is a retail community pharmacy;

(ii)   At least ninety percent (90%) of individuals covered by a health benefit plan in suburban areas served by the health benefit plan to live within five (5) miles of a network pharmacy that is a retail community pharmacy; and

(iii)  At least seventy percent (70%) of individuals covered by a health benefit plan in a rural area served by the health benefit plan to live within fifteen (15) miles of a network pharmacy that is a retail community pharmacy.

Ark. Code Ann. § 23-92-509(b)(2)(B). Access to a mail-order pharmacy does not factor into those calculations. *See id.* § 23-92-505(a)(1)(B). Thus, if only a few pharmacies operate in Arkansas, health plans may be unable to walk away from any one of them—even those offering unfavorable terms or expensive rates—due to the risk of noncompliance. That, in turn, would give the existing pharmacies substantial market power. [19]

---

[19] The requirements just discussed apply not only to fully-insured health plans located in Arkansas, but also to plans issued outside of Arkansas so long as they provide benefits to Arkansas residents and to self-insured ERISA plans. *See* Ark. Code Ann. §§ 23-92-510(d), 23-92-503(8)(C). And the same distance standards apply to Medicare Part D plans. *See* 42 C.F.R. § 423.120.

15

On the other hand, if there are many pharmacies to choose from, plans can negotiate "preferred pharmacy networks"—a subset of in-network pharmacies that offer lower drug prices. Studies show that "preferred network status has a large positive effect on pharmacy demand," with the "status alone" increasing a pharmacy's "market share." Ashley Swanson, *Preferred Pharmacy Networks: Health Care Savings on the Margins*, 7(3) Wharton Pub. Pol'y Initiative 4 (May 2019).[20] So when there is sufficient competition among pharmacies, plans can offer that beneficial status in exchange for discounts. Plans can also use "the threat of exclusion from a preferred network *** to negotiate larger discounts." *Id.* at 5.

Those savings are meaningful for consumers and purchasers of pharmacy services. One study showed that "[u]nsubsidized Part D beneficiaries faced an average difference of $129 per year in out-of-pocket spending between using nonpreferred and preferred pharmacies." Jianhui Xu et al., *Pharmacy switching in response to preferred pharmacy networks in Medicare Part D*, 57(5) Health Serv. Res. 1112, 1112 (Oct.

---

[20] https://repository.upenn.edu/server/api/core/bitstreams/ea47a4f2-7a0a-409d-a156-a4c9e3e3ba8c/content.

Appellate Case: 25-2529     Page: 23     Date Filed: 02/09/2026 Entry ID: 5606148

2022).[21]  Another found that "preferred pharmacy contracting results in a roughly 1 percent decrease in Medicare Part D drug costs among plans utilizing this tool"—a small but important decrease.  Swanson, *Preferred Pharmacy Networks*, at 1.

## II.  BANNING PBM-AFFILIATED PHARMACIES IN ARKANSAS WILL THREATEN ACCESS TO AFFORDABLE PHARMACEUTICAL CARE IN ARKANSAS AND BEYOND

Arkansas's new law banning PBM-affiliated pharmacies will undermine all of health plans' efforts to increase access and reduce costs of pharmacy services—thereby undercutting the only nondiscriminatory rationale the State has offered.  *See* Defs.' Br. 9-10, 42 (claiming ban's purpose is "to reduce market consolidation, improve consumer access, and reduce prices").

1.  For starters, banning PBM-affiliated pharmacies will significantly reduce the availability of brick-and-mortar, mail-order, and specialty pharmacy services in Arkansas.  As Plaintiffs explain, for national pharmacies that are affiliated with PBMs, restructuring their ownership structure to avoid the ban is effectively impossible.  Those

---

[21]    https://pmc.ncbi.nlm.nih.gov/articles/PMC9441277/pdf/HESR-57-1112.pdf.

Appellate Case: 25-2529     Page: 24     Date Filed: 02/09/2026 Entry ID: 5606148

pharmacies would thus have no choice but to stop providing pharmacy care to the state entirely—meaning they would have to close their brick-and-mortar locations and cease any services within the state, including mail-order and specialty-pharmacy services. *See* CVS, Optum, & PCMA's Br. 1, 55-57.

That loss of pharmacy services will undoubtedly jeopardize health plans' ability to ensure Arkansans have access to affordable medications. Fewer pharmacy services means many Arkansans will likely struggle to access the medications their doctors prescribe. Indeed, many who prefer (or need) to receive medications by mail will have to find a new mail-order pharmacy that is still in network—a step some may not be willing to take. Moreover, others will lose all access to certain specialty drugs, *i.e.*, drugs that treat some of the most rare and complicated conditions, because those pharmacies are unable to distribute specialty drugs in the state. *See supra*, p. 12; CVS, Optum, & PCMA's Br. 56.

The effects of the closures will be particularly severe for the more than 40% of Arkansans who live in rural areas and so may already lack ready access to brick-and-mortar pharmacies. *See* United Health Foundation, *America's Health Rankings: Rural Population in Arkansas*

18

(2023);[22] *see also* Tom Murphy & Kasturi Pananjady, *As pharmacies shutter, some Western states, Black and Latino communities are left behind*, Associated Press (June 3, 2024) (showing that, in Arkansas, many zip codes have no pharmacy at all).[23] Those living in medically underserved areas already have to travel, on average, almost twice as far as those who are not, and studies show that "this disparity is exaggerated with pharmacy closures." Omolola E. Adepoju et al., *Rethinking access to care: A spatial-economic analysis of the potential impact of pharmacy closures in the United States*, PLoS ONE (July 27, 2023).[24]

Costs will assuredly increase as well, jeopardizing affordability for consumers. As explained, fewer pharmacies means less competition, and less competition generally means an increase in prices. *See supra*, pp. 13-17. And an increase in prices is even more likely if the closures jeopardize health plans' ability to meet Arkansas's network adequacy requirements, *see supra*, pp. 14-15—the violation of which could result in

---

[22] https://www.americashealthrankings.org/explore/measures/pct_rural_b/AR.

[23] https://apnews.com/article/pharmacy-closure-drugstore-cvs-walgreens-rite-aid-91967f18c0c059415b98fcf67ad0f84e.

[24] https://doi.org/10.1371/journal.pone.0289284.

19

the imposition of a monetary penalty or the suspension or revocation of a plan's license, *see* Ark. Admin. Code 003.22.118-7 (explaining that the "pharmacy network adequacy" rules "shall apply to healthcare insurers and healthcare payors, and PBMs administering for such health benefit plans") (capitalization altered).

At a minimum, the loss of pharmacies in the state would require plans to find currently non-contracting pharmacies that are willing to join their networks—an expensive and time-consuming process. And the many Arkansans already living in medically underserved areas will likely face thousands of dollars of additional costs per person, per year, due to the corresponding increase in travel costs and decrease in productivity (*i.e.*, hours worked). *See* Adepoju, *Rethinking access to care* 12 ("Individuals residing in [medically underserved areas] will experience significantly greater annual economic costs [due to pharmacy closures] than non-[medically underserved areas], estimated at $12,000 excess of costs in non-[medically underserved areas].").

Notably, Arkansas's own fiscal-impact analysis of the ban predicts these very effects. Specifically, the analysis notes that the ban will likely force Arkansas's state health plan "to reevaluate and restructure their

20

pharmacy networks," which "may reduce pharmacy network access." Fiscal Impact Statement, H.B. 1150, 2025 Reg. Sess. (Ark. Mar. 17, 2025).[25] The analysis even flags that "less competition w[ill] likely drive less favorable rates." *Id.*

The impact on the health of Arkansans will be tangible. Studies show that increasing pharmacy costs while decreasing pharmacy access reduces patients' adherence to medication regimens. *See, e.g.*, Dima M. Qato et al., *Association Between Pharmacy Closures and Adherence to Cardiovascular Medications Among Older U.S. Adults*, 2(4) JAMA Network Open (Apr. 2019) (finding that "[p]harmacy closures are associated with persistent, clinically significant declines in adherence to cardiovascular medications among older adults in the United States");[26] *see also* Khuong BT Do, *Pharmacy Networks, Prescription Drug Access, and Patient Outcomes* 23 (Mar. 2025) (Ph.D. dissertation, Harvard University) (concluding that that Medicare Part D patients affected by pharmacy network changes, including pharmacy closures, "experience an

---

[25]

https://arkleg.state.ar.us/Home/FTPDocument?path=/Assembly/2025/2025R/Fiscal%20Impacts/HB1150-Other1.pdf.

[26]

https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2730785.

21

immediate and statistically significant drop in [medication] adherence").[27]  And though patients should "partially recover and regain over half of the initial decline in adherence," studies show that "long-term effects"—like a significant increase in mortality rates—will most likely "persist."  Do, *Pharmacy Networks,* at 3.

   **2.**    The negative effects will not be confined to Arkansas's borders, either.   The ban will also affect interstate commerce—specifically, the national health care market.

   For starters, "[m]edication non-adherence places a significant cost burden" on the health care system more broadly due to (among other things) a corresponding increase of disease prevalence, hospitalizations, and emergency department visits.   Rachelle Louise Cutler et al*., Economic impact of medication nonadherence by disease groups: a systematic review*, 8 BMJ Open 1, 1 (Nov. 2017);[28]  *see also* Cinzia Di Novi et al., *Older Patients and geographic barriers to pharmacy access: When nonadherence translates to an increased use of other components of health*

---

[27]    https://dash.harvard.edu/server/api/core/bitstreams/450084d9-88d3-4adc-8b28-0313363a63c9/content.

[28] https://bmjopen.bmj.com/content/bmjopen/8/1/e016982.full.pdf.

Appellate Case: 25-2529    Page: 29    Date Filed: 02/09/2026 Entry ID: 5606148

*care*, 29 Health Economics 97 (Oct. 2020).[29] And that increase in costs would be especially problematic for health plans sponsored by multi-state employers—*i.e.*, plans governed by the Employee Retirement Income Security Act (ERISA)—as well as other national plans such as Medicare Part D, Medicare Advantage, and the Department of Defense's TRICARE plan for military servicemembers and their families. When calculating premiums, those plans often "pool" together the health risks—and thus anticipated costs—of employees nationwide. Thus, for the plans with members in Arkansas—which Medicare Part D, Medicare Advantage, and TRICARE all have—an increase in costs in Arkansas could lead to higher premiums for *all* members, including those in other states.[30]

What's more, the ban will likely unravel nationally negotiated pharmacy networks—including reimbursement structures, utilization-management tools, and operational standards—substantially burdening the health plans and members that use them. Indeed, plans that contract with pharmacies on a national basis will likely have to rework existing

---

[29] https://doi.org/10.1002/hec.4031.

[30] For example, there are nearly 85,000 TRICARE members in Arkansas. *TRICARE by the Numbers*, Defense Health Agency, https://dha.mil/About-DHA/TRICARE-Numbers (last visited Jan. 30, 2026); *see also* ESI's Br. 5-6.

Appellate Case: 25-2529   Page: 30   Date Filed: 02/09/2026 Entry ID: 5606148

contracts, if not rebuild pharmacy networks from the ground up. Meanwhile, the plans and their members will be deprived of the nationwide arrangements that plans have developed to address affordability by reducing costs and controlling quality. In fact, the ban will likely invalidate existing national mail-order pharmacy contracts between certain health plans and PBM-affiliated mail-order and specialty pharmacies—creating uncertainty for all those plans' members.

At a minimum, patients who visit Arkansas will be unable to use the same pharmacy chains they can use anywhere else in the country, potentially compromising medicine access. And those who live or work on the state's borders—such as near West Memphis or Texarkana—may have very different pharmacy access depending on which side of the line they live.

\*     \*     \*

In short, if allowed to take effect, Act 624 will significantly disrupt pharmaceutical care—increasing costs for health plans and consumers alike—inside Arkansas and beyond. Act 624 thus "impos[es]" a "clearly excessive" burden on "interstate commerce," *Entergy Arkansas*, 122 F.4th at 711, and the "public interest" favors leaving it enjoined, *Dataphase*,

640 F.2d at 114; *see also Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 77 (1st Cir. 2005) (affirming preliminary injunction in part because, without it, "hundreds of Medicaid patients" would be "adversely affect[ed]").

## CONCLUSION

The Court should affirm the district court's order preliminarily enjoining the enforcement of Act 624.

Respectfully submitted,

*/s/ Pratik A. Shah*
Pratik A. Shah
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street NW
Washington, D.C. 20006
(202) 887-4000
pshah@akingump.com

*Counsel for* Amicus Curiae *America's Health Insurance Plans*

February 4, 2026

Appellate Case: 25-2529     Page: 32     Date Filed: 02/09/2026 Entry ID: 5606148

# CERTIFICATE OF COMPLIANCE

**1.** This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because: this brief contains 4,085 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

**2.** This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, 14 point Century Schoolbook.

**3.** This brief complies with the electronic-filing requirement of Circuit Rule 28A(h)(2) because this PDF file was scanned for viruses and no viruses were detected.

*/s/ Pratik A. Shah*
Pratik A. Shah

*Counsel for* Amicus Curiae

Dated: February 4, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Pratik A. Shah*
Pratik A. Shah

Appellate Case: 25-2529    Page: 34    Date Filed: 02/09/2026 Entry ID: 5606148